# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PUEBLO OF POJOAQUE and BUFFALO
THUNDER, INC.,

        Plaintiffs,

vs.                                                         No. CIV 20-0166 JB/DLM

THE HONORABLE BRYAN BIEDSCHEID,
individually and in his official capacity as
District Judge, New Mexico First Judicial
District Division VI, and RUDY PENA,

        Defendants.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Summary

Judgment, filed June 25, 2021 (Doc. 36)("SJ Motion"); and (ii) the Plaintiffs' Motion to

Reconsider Order Denying Summary Judgment, filed April 4, 2022 (Doc. 64)("Reconsider

Motion"). The Court held a hearing on the SJ Motion on February 4, 2022. See Clerk's Minutes

at 1, filed February 4, 2022 (Doc. 58)("February 4 Clerk's Minutes"). The Court held a hearing

on the Reconsider Motion on July 25, 2022. See Clerk's Minutes at 1, filed July 25, 2022 (Doc.

79)("July 25 Clerk's Minutes"). The primary issue is whether Defendant the Honorable Bryan

---

[1]On March 17, 2022, the Court entered an Order disposing of the Plaintiffs' Motion for
Summary Judgment, filed June 25, 2021 (Doc. 36). See Order, filed March 17, 2022 (Doc. 61)("SJ
Motion Order"). In the SJ Motion Order, the Court states that it will "issue, a Memorandum
Opinion at a later date fully detailing its rationale for its decision." SJ Motion Order at 1 n.1.
Similarly, on March 6, 2023, the Court entered an Order disposing of the Plaintiffs' Motion to
Reconsider Order Denying Summary Judgment, filed April 4, 2022 (Doc. 64). See Order, filed
March 6, 2023 (Doc. 87)("Reconsider Motion Order"). In the Reconsider Motion Order, the Court
states that it will "issue at a later date . . . a Memorandum Opinion more fully detailing its rationale
for th[e] decision." Reconsider Motion Order at 1 n.1. This Memorandum Opinion constitutes
the promised opinions.

Biedscheid, District Judge, Division VI, County of Santa Fe, First Judicial District Court, State of New Mexico, has jurisdiction over Defendant Rudy Pena's State tort case, because the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-21 ("IGRA"), permits States and Tribes to shift jurisdiction from Tribal court to State court in tort suits stemming from falls near slot machines at casinos on Tribal land.  The Court concludes that, while the State court lacks jurisdiction over Pena's case as pled, Plaintiffs Pueblo of Pojoaque and Buffalo Thunder, Inc. are not entitled to summary judgment for two reasons.  First, the Court must abstain from issuing the requested relief under Younger v. Harris, 401 U.S. 37 (1971)("Younger").  Second, the Anti-Injunction Act, 28 U.S.C. § 2283, bars the Court from issuing the requested injunctive relief.  The Court further concludes, however, that it does not need to abstain from issuing the requested relief under Brillhart v. Excess Insurance Co. of America, 316 U.S. 491 (1972)("Brillhart"), or Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976)("Colorado River").  Finally, the Court concludes that the Rooker-Feldman doctrine does not bar the Plaintiffs' suit.  Accordingly, the Court denies the SJ Motion and the Reconsider Motion.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' assertions of undisputed material fact in their SJ Motion briefs.  See Plaintiffs' Memorandum in Support of Motion for Summary Judgment at ¶¶ 1-9, at 1-2, filed June 25, 2021 (Doc. 36-1)("SJ Motion Opening Brief"); the Defendant Rudy Pena's Memorandum in Support of Response to Plaintiffs' Motion for Summary Judgment ¶¶ 1-10, at 2-3, filed July 23, 2021 (Doc. 41)("Pena SJ Motion Response"); the Honorable Bryan Biedscheid's Response to Plaintiffs' Motion for Summary Judgment ¶¶ 1-9, at 2-3, filed July 23, 2021 (Doc. 43)("Biedscheid SJ Motion Response").  Many of this case's facts are undisputed.  The Court states the undisputed material facts in the text.  The Court specifically

discusses facts that are purportedly disputed or actually disputed in the footnotes.

Pojoaque Pueblo is a federally recognized Tribe located in Santa Fe County, New Mexico. See SJ Motion Opening Brief ¶ 1, at 1 (asserting this fact); Pena SJ Motion Response ¶ 1, at 2 (admitting this fact); Biedscheid SJ Motion Response ¶ 1, at 2 (admitting this fact). Buffalo Thunder is a tribally chartered resort and casino located on the Pojoaque Pueblo. See SJ Motion Opening Brief ¶ 2, at 1 (asserting this fact); Pena SJ Motion Response ¶ 2, at 2 (admitting this fact); Biedscheid SJ Motion Response ¶ 2, at 2 (admitting this fact). In other words, Buffalo Thunder is within Indian country. See SJ Motion Opening Brief ¶ 3, at 1 (asserting this fact); Pena SJ Motion Response ¶ 3, at 2 (admitting this fact); Biedscheid SJ Motion Response ¶ 3, at 2 (admitting this fact). Pojoaque Pueblo wholly owns Buffalo Thunder. See SJ Motion Opening Brief ¶ 2, at 1 (asserting this fact); Pena SJ Motion Response ¶ 2, at 2 (admitting this fact); Biedscheid SJ Motion Response ¶ 2, at 2 (admitting this fact).

On February 1, 2015, Pena went to Buffalo Thunder. See SJ Motion Opening Brief ¶ 4, at 1 (admitting this fact by reference to Complaint for Personal Injuries and Damages ¶ 24, at 6, filed June 25, 2021 (Doc. 36-2)("State Complaint")); Pena SJ Motion Response ¶ 4, at 3; Biedscheid SJ Motion Response ¶ 4, at 2 (admitting all facts alleged in Pena's State Complaint, including this fact). Pena sat at a slot machine. See SJ Motion Opening Brief ¶ 4, at 1 (admitting this fact by reference to State Complaint ¶ 24, at 6); Pena SJ Motion Response ¶ 4, at 3 (admitting this fact); Biedscheid SJ Motion Response ¶ 4, at 2 (admitting all facts alleged in Pena's State Complaint, including this fact). Pena played on the slot machine. See Pena SJ Motion Response ¶ 4, at 3 (asserting this fact).[2] Buffalo Thunder employees asked Pena to move. See SJ Motion Opening

_____

[2]The Plaintiffs neither admit nor dispute this fact. See Plaintiffs' Reply Memorandum in Support of Motion for Summary Judgment (Doc. 36-1), filed August 3, 2021 (Doc. 44)("SJ Motion

Brief ¶ 4, at 1 (admitting this fact by reference to State Complaint ¶ 24, at 6); Pena SJ Motion

Response ¶ 4, at 3 (admitting this fact); Biedscheid SJ Motion Response ¶ 4, at 2 (admitting all

facts alleged in Pena's State Complaint, including this fact).  Pena stopped playing on the slot

machine and swiveled his chair clockwise such that the slot machine was to his left side.  See

---

Reply").  Instead, in the SJ Motion Reply, the Plaintiffs assert that this fact is "newly interjected." SJ Motion Reply at 3.  The Plaintiffs assume "*arguendo* that admissible evidence support[s] the contention."  SJ Motion Reply at 3 (emphasis in original).  The Plaintiffs assert that "the facts taken most favorably to Mr. Pena would establish that he was playing a slot machine when employees/contractors asked him to move."  SJ Motion Reply at 3.

Although the Plaintiffs do not admit that Pena was using the slot machine before his fall, the Court concludes that uncontroverted record evidence supports a finding that Pena was playing on the slot machine before his fall.  See Scott v. Harris, 550 U.S. 372, 378-81 (2007)("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  The Plaintiffs submitted security footage, from multiple angles, of Pena's fall.  See Security Camera Footage of Incident at 00:12-00:15, filed March 9, 2022 (Doc. 60)("Accident Video").  The Accident Video shows that Pena was playing on the slot machine before he fell.

Specifically, the Accident Video shows Pena seated at a slot machine moments before his fall.  See Accident Video at 00:10-00:14.  In those same moments, the slot machine that Pena is seated at is illuminated, and lights on the console are flashing.  See Accident Video at 00:10-00:14.  That the lights on the slot machine are blinking supports a finding that Pena was playing the slot machine immediately before he fell.  The Court considered the possibility that Pena was merely sitting at the slot machine, but not playing on it, and that the machine was blinking, because that is what slot machines do.  Indeed, slot machines are designed to be eye-catching.  It is plausible that the lights on the slot machine that Pena was seated at are always flashing, such that the fact the lights were flashing before Pena's fall does not indicate that Pena was using the machine.  After closer review of the Accident Video, however, the Court determines that that is not the case here.  First, the Accident Video shows that Pena is seated at a slot machine next to two other slot machines that are not in use.  See Accident Video at 00:10-00:14.  The other two slot machines are illuminated, but they are not flashing like Pena's machine is flashing.  See Accident Video at 00:10-00:14.  Second, later portions of the Accident Video shows Pena returning to the same slot machine after his fall.  See Accident Video at 04:00-04:10.  When Pena sits back down at the slot machine, it is not flashing.  See Accident Video at 04:00-04:10.  Pena then hits a button on the slot machine, and the machine begins flashing again.  See Accident Video at 04:11-04:25.  The Court determines that the flashing lights indicate that the machine is in use.  Accordingly, the Court concludes that the flashing lights on the slot machine prior to Pena's fall indicate that Pena was using the slot machine before his fall.

Security Camera Footage of Incident at 00:12-00:15, filed March 9, 2022 (Doc. 60)("Accident Video"). Pena stood up and took several steps forward, away from the slot machine. See Accident Video at 00:16-00:17. A Buffalo Thunder employee moved between Pena and the slot machine. See Accident Video at 00:16-00:18. Pena lost his balance and fell backwards. See Accident Video at 00:18-00:25. Pena grabbed at a chair for balance while falling. See Accident Video at 00:18-00:25. The employee reached out to Pena. See Accident Video at 00:18-00:25. Pena fell to the ground. See Accident Video at 00:18-00:25.

After Pena's fall, Buffalo Thunder employees moved chairs out of Pena's way. See Accident Video at 02:43-3:07.[3] Pena got up. See Accident Video at 03:07-3:09. Pena then moved to a chair at a nearby slot machine and sat down. See Accident Video at 03:11-03:21. Pena remained seated at that slot machine while employees worked on the machine that Pena had been playing on and the other slot machines next to it. See Accident Video at 3:21-3:56. Pena then got up and returned to the machine he had been playing on after the employees had finished working on it. See Accident Video at 03:57-4:20. Pena resumed playing on the slot machine. See Accident Video at 4:20-4:25. In all, the entire incident -- Pena getting up from the slot machine, falling, getting up from the ground, moving to the chair, waiting, and returning to the slot machine -- lasted just over a minute and thirty seconds. See Accident Video at 2:38-4:12.

---

[3]The Court notes that its citations to the portions of the Accident Video pre-fall are all within the Accident Video's first thirty seconds, while the Court's citations to the portions of the Accident Video post-fall are all several minutes into the Accident Video. The Court clarifies that Pena was not on the ground for several minutes. The Court's citations are several minutes apart because the Accident Video shows the fall from multiple angles, but the shots from the various angles are all combined into one video. The Court found different angles helpful in determining what happened at various points before, during, and after Pena's fall. Accordingly, the Court's citations to the Accident Video span several minutes of footage, when, in reality, Pena's fall and time on the ground lasted a matter of seconds.

## PROCEDURAL BACKGROUND

The Court summarizes the relevant procedural background in turn.  The Court begins with the gaming compact at issue.  Next, it provides an overview of the underlying State tort suit. Finally, the Court summarizes the procedural background in this federal suit.

### 1.   Pojoaque Gaming Compact.

On August 31, 2017, the State of New Mexico and the Pojoaque Pueblo executed the Indian Gaming Compact Between the State of New Mexico and the Pojoaque Pueblo (dated August 31, 2017), filed June 15, 2021 (Doc. 36-8)("Pojoaque Gaming Compact").  The Pojoaque Gaming Compact § 8 provides:

> A.   Policy Concerning Protection of Visitors.  The safety and protection of visitors to a Gaming Facility is a priority of the Tribe, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation.  To that end, in this Section, and subject to its terms, the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in Tribal, State, or other court of competent jurisdiction) at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise.  For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that the IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.
>
> . . . .
>
> D.   Specific Waiver of Immunity and Choice of Law.  The Tribe, by entering into this Compact and agreeing to the provisions of this Section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of ten million dollars ($10,000,000) per occurrence, asserted as provided in this Section.  This is a limited waiver and does not waive the Tribe's immunity from suit for any other purpose. The Tribe shall ensure that a policy of insurance that it acquires to fulfill the requirements of this Section shall include a provision under which the insurer agrees not to assert the defense of sovereign immunity on behalf of the insured, up to the limits of liability set forth in this Paragraph.  The Tribe and the State agree

that in any claim brought under the provisions of this Section, New Mexico law shall govern if the claimant pursues the claim in State Court, and the tribal law of the forum shall apply if the claim is brought in Tribal Court.

E.      Election by Visitor.  A visitor having a claim described in this Section may pursue that claim in binding arbitration, or Tribal, State, or other court of competent jurisdiction. The visitor shall make a written election that is final and binding upon the visitor . . . .

Pojoaque Gaming Compact § 8, at 4-5.[4]

### 2.    <u>Initiating State Tort Suit</u>.

On January 25, 2017, Pena filed suit in New Mexico State court in Santa Fe County in the First Judicial District Court.  <u>See</u> State Complaint at 1.  The State Complaint asserts claims for negligence and negligent hiring, training, supervision, staffing and retention.  <u>See</u> State Complaint ¶¶ 28-36, 43-44 at 6-8, 9-10.  The State Complaint brings the claims against a number of individuals, and against several corporate entities -- including Pojoaque Pueblo and Buffalo Thunder -- under the respondeat superior, vicarious liability, and joint venture theories of liability. <u>See</u> State Complaint at 1; <u>id.</u> ¶¶ 37-42, 45-54, at 8-9, 10-12.  The State Complaint alleges that "Pena suffered damages including but not limited to serious injury to his body, past and future medical expenses, lost household activities, loss of life's enjoyment, diminished activities of daily living, lost wages, severe emotional and physical pain and suffering, diminution in quality of life, and incidental and other damages . . . ."  State Complaint ¶ 36, at 8.

---

[4]The Pojoaque Gaming Compact has two separate paginations, one in the Court's electronic filing system's header at the top of the page in blue text, and another at the bottom of the page in the footer in black text.  The two paginations do not align.  Accordingly, the Court's citations to the page numbers refer to the page numbers that the Court's electronic filing system provides at the top of the page.

3.      **State Motion to Dismiss**.

Buffalo Thunder moved to dismiss the State Complaint.  See No. D-101-CV-201700216,

Defendant's Motion to Dismiss, filed October 11, 2019 (1st Judicial District Court, Santa Fe

County)("State MTD").  In the State MTD, Buffalo Thunder raises three key arguments.  See State

MTD at 1-7.  First, Buffalo Thunder asserts that the State court lacks subject matter jurisdiction

because "Congress possesses plenary power over Indian affairs" and absent "congressional

consent" federal courts have jurisdiction over Indian law issues.  State MTD at 1-2 (citing Cohen's

Handbook of Federal Indian Law § 7.03[1][a][ii] (Nell Jessup Newton ed., 2012)("Cohen's

Handbook")).  Buffalo Thunder invokes two federal cases -- Pueblo of Santa Ana v. Nash, 972 F.

Supp. 2d 1254 (D.N.M. 2013)(Hansen, J.)("Nash") and Navajo Nation v. Dalley, 896 F.3d 1196

(10th Cir. 2018)("Dalley") -- for the proposition that "Indian self-governance and sovereignty are

so ingrained in federal law and so inviolate, that they may not be waived even by agreement, unless

federal law expressly authorizes such a waiver."  State MTD at 2-5.  Second, the State MTD also

emphasizes that "[s]overeign immunity is perforce jurisdictional and that it protects the Tribe and

tribal entities from suit here.  State MTD at 2.  Finally, the State MTD asserts that the State court

should dismiss the suit because New Mexico's "infringement test" indicates that State court

jurisdiction would infringe on Tribal jurisdiction and, therefore, divests the State court of

jurisdiction.  See State MTD at 5-7 (citing Hinkle v. Abeita, 2012-NMCA-074 ¶ 4, 283 P.3d 877

878).

Pena opposed the State MTD.  See No. D-101-CV-201700216, Plaintiff's Response to

Defendant's Motion to Dismiss, filed November 1, 2019 (1st Judicial District Court, Santa Fe

County)("State MTD Response").  In the State MTD Response, Pena raises three primary

arguments.  See State MTD Response at 3.  First, Pena contends that Buffalo Thunder's arguments

regarding jurisdiction are "premature" because there may be a gaming compact between the Pueblo and Pojoaque and the State that governs jurisdiction over personal injury suits in Indian country. State MTD Response at 4-10 (relying in part on <u>Doe v. Santa Clara Pueblo</u>, 2005-NMCA-110 ¶ 4, 118 P.3d 203, 205 ("<u>Santa Clara Pueblo</u>"), to demonstrate that gaming compacts can impact jurisdiction, but acknowledging it is "uncertain" whether such a gaming compact exists here). Pena indicates that he located "a copy of what he believes to be a Gaming Compact" between the State and Pojoaque Pueblo online and that it "contains language permitting the shifting of jurisdiction over personal injury lawsuits like Plaintiff's from tribal courts to [State courts]." MTD Response at 7-10.

Second, Pena asserts that IGRA permits the State court to exercise jurisdiction in this case, because IGRA permits State law to govern matters "directly related to, and necessary for, the licensing and regulation" of Class III gaming.[5]   MTD Response at 10 (quoting 25 U.S.C. § 2710(d)(3)(C)). Pena avers that, by extension, IGRA permits State courts to exercise jurisdiction where it is "'necessary for the enforcement' of those [gaming] laws." MTD Response at 10 (citing <u>Doe v. Santa Clara Pueblo</u>, 2007-NMSC-008 ¶ 11, 141 N.M. 269, 273, 154 P.3d 644, 648 (quoting § 2710(d)(3)(C)). Pena asserts that he was engaged in Class III gaming activities at the time of his fall, and, therefore, that his injuries "relate to" Class III gaming activities, such that the State court has jurisdiction over his suit. State MTD Response at 13-16. Finally, Pena asserts that <u>Nash</u> and <u>Dalley</u> are distinct and do not require dismissal. <u>See</u> State MTD Response at 16-20. Pena adds

---

[5]As discussed in greater detail below, IGRA establishes three classes of gaming. <u>See</u> 25 U.S.C. § 2703(6)-(8). In short, Class I gaming refers to "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6). Class II gaming refers to "bingo" and "other games similar to bingo." 25 U.S.C. § 2703(7). Class III gaming encompasses "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8).

that, even if <u>Nash</u> and <u>Dalley</u> were analogous, they would not bind the State court, because they are federal cases.  <u>See</u> State MTD Response at 20-21.

Buffalo Thunder replied to the arguments Pena raises in the State MTD Response.  <u>See</u> No. D-101-CV-201700216, Defendant's Reply Supporting Motion to Dismiss, filed November 20, 2019 ((1st Judicial District Court, Santa Fe County)("State MTD Reply").  In the State MTD Reply, Buffalo Thunder asserts that "IGRA does <u>not</u> permit such jurisdiction shifting."  State MTD Reply (emphasis in original).  Instead, Buffalo Thunder contends that IGRA applies "only for the regulation of activities that are <u>directly related to the activity of Indian gaming itself</u>," and that <u>Dalley</u> and <u>Nash</u> establish that personal injuries at casinos are not gaming activity within IGRA's meaning.  State MTD Reply at 1-2 (emphasis in original).

**4.     First Order Denying State MTD.**

On January 8, 2020, the Honorable Bryan Biedscheid, District Judge, Division VI, County of Santa Fe, First Judicial District Court, State of New Mexico denied the State MTD.  <u>See</u> No. D-101-CV-201700216, Order on Defendant's Motion to Dismiss, filed January 8, 2020 (1st Judicial District Court, Santa Fe County)("First State MTD Order").  In the First State MTD Order, Judge Biedscheid establishes:

> The Court finds that allegations in bullets 4-7 of Plaintiff's Response to Defendant's Motion to Dismiss, if taken as true, state facts tending to establish that activities of a casino employee caused or contributed to causing Plaintiff's fall and injuries.  The Court further finds that Buffalo Thunder, Inc. has waived sovereign immunity under Indian Gaming Regulatory Act and the gaming compact entered into with the State of New Mexico as to claims for personal injury occurring on its premises in circumstances where it is alleged that the activities of a casino employee caused or contributed to causing the alleged accident and injuries.

First State MTD Order at 1.  Accordingly, Judge Biedscheid dismisses the State MTD.  <u>See</u> First State MTD Order at 2.

5.     **Second Order Denying State MTD**.

On March 18, 2020, Judge Biedscheid amended the First State MTD Order.  See No. D-101-CV-201700216, Amended Order on Defendant's Motion to Dismiss, filed March 18, 2020 (1st Judicial District Court, Santa Fe County)("Second State MTD Order").  In the Second State MTD Order, Judge Biedscheid states

> The Court finds that the Gaming Compact entered into between the State of New Mexico and Defendant Buffalo Thunder waives sovereign immunity as to claims for personal injury occurring on its premises in circumstances where it is alleged that the activities of a casino employee caused or contributed to an alleged accident or injury, and the Plaintiff was actively engaged in a gaming activity at the time of his alleged injury.

Second State MTD Order at 2.  Accordingly, Judge Biedscheid dismisses the State MTD, but permits the parties to file an immediate appeal.  See Second State MTD Order at 2.

6.     **Unsuccessful State Appeal of Second State MTD Order**.

Buffalo Thunder applied for an interlocutory appeal of the Second State MTD Order.  See No. D-101-CV-201700216, Application for Interlocutory Appeal, filed January 22, 2020 (1st Judicial District Court, Santa Fe County)("State Appeal Application").   In the State Appeal Application, Buffalo Thunder alleges that "the District Court erred in concluding that allegations of proximate cause suffice to waive sovereign immunity and confer subject matter jurisdiction" on the State court.  State Appeal Application at 6.  The State Appeal Application restates many of the arguments that Buffalo Thunder raises in the State MTD and asks the court to permit the appeal to the address the question "[w]hether the district court erred in denying [Buffalo Thunder's] Motion to Dismiss on grounds of sovereign immunity in this tort action for money damages arising out of a slip and fall incident on Indian casino premises."  State Appeal Application at 5.  The Court of Appeals of New Mexico denied the State Appeal Application.  See No. D-101-CV-201700216,

Order Denying Application for Interlocutory Appeal (dated July 16, 2020)(N.M. Ct. App.), filed

September 29, 2020 (1st Judicial District Court, Santa Fe County).

### 7.   **Initiating Federal Proceedings.**

The Plaintiffs initiated this action on February 26, 2020.  See Complaint for Declaratory

Judgment, filed February 26, 2020 (Doc. 1)("Complaint").  In the Complaint, the Plaintiffs

> seek an Order . . . declaring (1) that the Indian Gaming Regulatory Act, 25 U.S.C.
> § 3701 *et seq.*, does not permit the shifting of jurisdiction from tribal courts to state
> courts over private personal injury lawsuits brought against tribes or tribal entities
> with respect to claims arising in Indian Country, even when the lawsuit alleges that
> the acts of tribal employees were a cause of the alleged harm, and; (2) that the Hon.
> Bryan Biedscheid, Division VI District Judge of the First Judicial District Court,
> lacks jurisdiction over the Plaintiffs in the case captioned *Rudy Pena v. Buffalo
> Thunder, Inc.*, No. D-101-CV-2017-00216.

Complaint at 1.  More specifically, the Plaintiffs raise two claims.  See Complaint ¶¶ 17-22.D, at

5-6.   First, the Plaintiffs assert that Judge Biedscheid lacks subject-matter jurisdiction over the

suit such that "Judge Biedscheid's ruling and action in presiding over the Pena lawsuit have

deprived [Buffalo Thunder] of its liberty interest secured by the due process clause of the 14th

Amendment to the U.S. Constitution," and ask the Court to issue an order "enjoining Rudy Pena

from pursuing such claims in state court."  Complaint ¶¶ 17-20, 22.C, at 5, 6.  Second, the Plaintiffs

contend that Pena is "infringing on Pojoaque's right to exercise jurisdiction over reservation affairs

through its tribal court" and ask the Court to issue a declaratory judgment

> that the IGRA does not permit the shifting of jurisdiction from tribal courts to state
> court over personal injury lawsuits brought against tribes or tribal gaming
> enterprises for alleged wrongs arising or occurring within Indian country, even
> when the lawsuit alleges that the acts of tribal employees were a cause of the alleged
> harm

and that "the New Mexico state courts do not have jurisdiction over lawsuits such as the Pena lawsuit even when such lawsuits allege that the acts of tribal employees were a cause of the alleged harm."  Complaint ¶¶ 22-22.B, at 5-6.

      8.    **SJ Motion**.

On June 15, 2021, Pojoaque Pueblo and Buffalo Thunder moved for summary judgment. See SJ Motion at 1.  The SJ Motion Opening Brief begins by emphasizing federal supremacy in the Indian law context.  See SJ Motion Opening Brief at 2-3.  The Plaintiffs underscore that "Congress possesses plenary power over Indian affairs" and that "state courts are generally divested of jurisdiction [over Indian law cases] as a matter of federal law."  SJ Motion Opening Brief at 3 (citing Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 15 (1987)).  The Plaintiffs stress that New Mexico State courts apply federal law -- like federal Indian law -- only in the narrowest of circumstances.  See SJ Motion Opening Brief at 3-4.

Next, the Plaintiffs aver that Nash and Dalley "established [Buffalo Thunder's] entitlement to summary judgment in this case."  SJ Motion Opening Brief at 4-5 (citing Nash, 972 F. Supp. 2d at 1254; Dalley, 896 F.3d at 1196).  The Plaintiffs contend that in Nash, the Tenth Circuit "ruled that IGRA does not authorize ceding subject matter jurisdiction over negligence-based personal injury claims that arise on tribal lands," because "*IGRA only waives tribal sovereign immunity in a narrow category of cases involving issues of licensing and regulation of gaming activities*."  SJ Motion Opening Brief at 4 (citing Nash, 972 F. Supp. 2d at 1266)(emphasis in original).  Second, the Plaintiffs aver that Dalley establishes that "Congress authorized waiver of sovereign immunity under IGRA only for the regulation of activities that are directly related to the regulation and licensing of Indian gaming."  SJ Motion Opening Brief at 4-5 (citing Dalley, 896 F.3d at 1210).  The Plaintiffs assert that "*Nash and Dalley* reaffirm that the principles of Indian

- 13 -

self-governance and sovereignty are so ingrained in federal law and so inviolate, that they may not be waived even by agreements such as Plaintiffs' gaming compact . . . ." SJ Motion Opening Brief at 5.  The Plaintiffs further contend that Pena's allegation that Buffalo Thunder employees caused his fall does not change the jurisdictional analysis, because causation "is merely a proof element common to every tort.  It possesses no distinctive or magical jurisdiction invoking qualities."  SJ Motion Opening Brief at 6.  The Plaintiffs emphasize that IGRA shifts jurisdiction from federal to State courts only in instances that are "necessary for the enforcement of the laws and regulations, [and] that are directly related to, and necessary for, the licensing and regulation of the playing of Class III games."  SJ Motion Opening Brief at 7 (quoting 25 U.S.C. § 2710(d)(3)(C)).

Next, the Plaintiffs ask the Court to issue a "bright-line standard" proscribing State jurisdiction in cases involving torts in Indian casinos.  SJ Motion Opening Brief at 7-13.  The Plaintiffs point to Dalley's footnote 7.  See SJ Motion Opening Brief at 7 (citing Dalley, 896 F.3d at 1210 n.7).  They contend that Dalley footnote 7 leaves "the door open a crack as to the possibility of future facts conceivably giving rise to a sovereign immunity waiver for torts occurring on casino premises" and ask the Court to "shut that door."  SJ Motion Opening Brief at 7 (citing Dalley, 896 F.3d at 1210 n.7).  The Plaintiffs aver that Dalley footnote 7 is "merely exemplary of the flaws common to *dicta*," because "no tort claim should ever be deemed directly related to the licensing and regulation of Indian gaming."  SJ Motion Opening Brief at 9.  The Plaintiffs assert that "it is high time for a bright-line rule on this point" in an effort to "avoid revisiting settled Indian law subject matter jurisdictional issues whenever a new tort law fact scenario arises at an IGRA-regulated gaming facility."  SJ Motion Opening Brief at 9.  "The resolution of tort claims occurring on casino premises, no matter how directly they may arise from the activity itself, bears no relationship whatsoever to IGRA's overarching goal . . . [concerning the] licensing and regulation

of gaming activity." SJ Motion Opening Brief at 10.  The Plaintiffs re-emphasize Tribal sovereign immunity and assert that it is "incumbent upon the state courts to simply uphold the rights of a co-equal sovereign to manage such peripheral things as tort claims arising on their premises."  SJ Motion Opening Brief at 11-12.  "It is an affront to Indian sovereignty to be repeatedly subjected to the indignity and expense of being hailed into the courts of another sovereign and forced to defend against claims such as this . . . ."  SJ Motion Opening Brief at 12.

The Plaintiffs also note the differences between the First State MTD Order and the Second State MTD Order.  See SJ Motion Opening Brief at 7-9 (citing First State MTD Order at 1; Second State MTD Order at 1).  Specifically, the Plaintiffs note Judge Biedscheid made a finding in the Second State MTD Order that Pena was "actively engage in gaming activity" at the time he fell, SJ Motion Opening Brief at 8 (quoting Second State MTD Order at 1), but that he did not make that finding in the First State MTD Order, see SJ Motion Opening Brief at 7-8 (citing First State MTD Order at 1).  The Plaintiffs ask the Court to "disregard[]" Judge Biedscheid's finding that Pena was engaged in Class III gaming at the time he fell.  SJ Motion Opening Brief at 8.  The Plaintiffs contend that the Accident Video shows that Pena was not gaming at the time he fell.  See SJ Motion Opening Brief at 8 (citing Accident Video).  The Plaintiffs contend that, even if Pena was gaming when he fell, "no unintentional tort occurring on casino premises should ever be deemed directly related to the regulation and licensing of Class III gaming."  SJ Motion Opening Brief at 9.

Next, the Plaintiffs assert that the Court should exercise its authority to issue the requested declaratory relief.  SJ Motion Opening Brief at 13-15.  The Plaintiffs explain that the Tenth Circuit has announced a five-factor rule for determining when a district court should issue declaratory relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

SJ Motion Opening Brief at 13-14 (quoting Gerhardt v. Mares, 179 F. Supp. 3d 1006, 1057 (D.N.M. 2016)(Browning, J.)(quoting St. Paul Fire & Marine Ins. Co. v. Runyon, 53 F.3d 1167, 1169 (10th Cir. 1995))).   The Plaintiffs assert that their claims meet all five factors, because: (i) declaratory relief would settle the conflict; (ii) declaratory relief would be useful in clarifying the jurisdictional question; (iii) no procedural fencing is involved; (iv) declaratory relief would reduce friction between the federal, State, and Tribal courts; and (v) there is no superior remedy. See SJ Motion Opening Brief at 14.

Finally, the Plaintiffs contend that various abstention doctrines do not apply to this suit. See SJ Motion Opening Brief at 15-19.  First, the Plaintiffs contend that abstention under Brillhart, 316 U.S. at 495, is not required, because Brillhart abstention does not apply where a plaintiff seeks declaratory and injunctive relief.  See SJ Motion Opening Brief at 15-16 (citing THI of N.M. at Las Cruces, LLC v. Fox, 727 F. Supp. 2d 1195, 1203 (D.N.M. 2010)(Browning, J.)).  Second, the Plaintiffs aver that abstention under Colorado River, 424 U.S. at 819, is not appropriate, because this case concerns a federal issue and does not involve an ulterior motive.  See SJ Motion Opening Brief at 17-18.  Third, the Plaintiffs assert that abstention under Younger, 401 U.S. at 43-45, is inapplicable, because this case involves a "paramount" federal issue.  SJ Motion Opening Brief at 18 (citing Navajo Nation v. Rael, No CIV 16-0888, 2017 WL 3025917, at *6 (D.N.M. April 11, 2017)(Johnson, C.J.)).

9.      **Pena SJ Motion Response.**

Pena opposes the SJ Motion.  <u>See</u> Pena SJ Motion Response at 1.  First, Pena highlights that IGRA authorizes Tribes and States to enter into gaming compacts that allow the Tribes and the States to dictate applicable law and jurisdiction.  <u>See</u> Pena SJ Motion Response at 3-5 (citing 25 U.S.C. § 2710(d)(3)(C)).  Pena concedes that "Congress did not define the terms 'directly relate to, and necessary for, the licensing and regulation of' Class III gaming,'" Pena SJ Motion Response at 7 (quoting 25 U.S.C. § 2710(d)(3)(C), but that the legislative history and Congress' use of the word "may" indicate that Congress intended to give States and Tribes broad negotiating power through IGRA, Pena SJ Motion Response at 7-11.  Pena contends that gaming compacts under IGRA are "a congressional authorized exception to the general rule that authorization for jurisdiction shifting must be express."  Pena SJ Motion Response at 10.

According to Pena, it follows that Congress intended for IGRA to permit States and Tribes provide "a forum and choice of law for the adjudication of personal injury claims of casino patrons," because such authority is "closely related to the regulation of Class III gaming."  Pena SJ Motion Response at 11.  Pena emphasizes that Congress intended States to have a greater role in promoting "safety, law, and public policy" in Tribal casinos when it passed IGRA.  Pena SJ Motion Response at 11.  Pena asserts that, in keeping with that goal, Congress permits States to negotiate for jurisdiction over casino tort suits "to ensure that patrons . . . who are engaged in Class III gaming activity are not exposed to unwarranted dangers . . . ."  Pena SJ Motion Response at 12.  Pena states that the Plaintiffs' narrower reading of IGRA overlooks IGRA's legislative history and Congress' intent to grant the States and Tribes broad power to negotiate under IGRA.  Pena SJ Motion Response at 12-13.

Third, Pena asserts that <u>Nash</u> and <u>Dalley</u> do not entitle the Plaintiffs to summary judgment. <u>See</u> Pena SJ Motion Response at 5-7.  Pena contends that <u>Nash</u> is factually distinct, because it concerns the service of alcohol at a wedding near an Indian casino, not Class III gaming.  <u>See</u> Pena SJ Motion Response at 5 (citing <u>Nash</u>, 972 F. Supp. 2d at 1264).  Similarly, Pena asserts that <u>Dalley</u> is also factually distinct, because it involves a slip-and-fall in a casino bathroom, and not a slip-and-fall on a casino floor while someone is engaging in Class III gaming.  <u>See</u> Pena SJ Motion Response at 6 (citing <u>Dalley</u>, 896 F.3d at 1210).

Fourth, Pena asserts that Pojoaque Gaming Compact § 8.A., at 4, waives Pojoaque Pueblo's immunity from State personal injury suit.  <u>See</u> Pena SJ Motion Response at 14-15.  Pena asserts that Pojoaque Gaming Compact § 8.A., at 4, establishes that Pojoaque Pueblo "waives its defense of sovereign immunity" for visitors' claims up to $100,000.00, and permits visitors to "elect to proceed in state district court unless a state or federal court finally determines that "IGRA does not permit the shifting of jurisdiction . . . . ."  Pena SJ Motion Response at 14 (citing Pojoaque Gaming Compact § 8.A., at 4, but not providing citation for internal quotation).  Pena contends, in other words, that "Pueblo of Pojoaque agreed to jurisdiction shifting 'unless IGRA does not permit' it.  Nothing in IGRA prohibits the agreement embodied in Section 8."  Pena SJ Motion Response at 15.

Finally, Pena asserts that Tribes have "independent authority," separate from IGRA, to waive sovereign immunity, so long as they do so "clearly."  Pena SJ Motion Response at 15-16 (quoting <u>C&L Enterprises v. Citizen Band of Potawatomi Indian Tribe</u>, 532 U.S. 411, 419 (2001)("<u>C&L Enterprises</u>")).  Pena asserts that, even if IGRA does not permit jurisdiction shifting, <u>C&L Enterprises</u> permits jurisdiction shifting so long as it is clear.  <u>See</u> Pena SJ Motion Response at 15-16 (citing <u>C&L Enterprises</u>, 532 U.S. at 419).  Here, Pena avers that Pojoaque Pueblo

"clearly" waived its sovereign immunity when it agreed to Pojoaque Gaming Compact § 8.A., at 4.  Pena SJ Motion Response at 15-16 (quoting <u>C&L Enterprises</u>, 532 U.S. at 419).

      **10.**    <u>**Biedscheid SJ Motion Response**</u>.

      Judge Biedscheid also opposes the SJ Motion.  <u>See</u> Biedscheid SJ Motion Response at 1. First, Judge Biedscheid asserts that he correctly determined that he has jurisdiction over Pena's State tort suit, because Pojoaque Gaming Compact § 8, at 4, "waiv[es] the Pueblo's sovereign immunity and permit[s] visitors to gaming facilities to bring claims in state court."  Biedscheid SJ Motion Response at 4-6 (citing Pojoaque Gaming Compact § 8.A., 8.D., at 4).  He emphasizes that the Pojoaque Gaming Compact gives visitors filing suit against the Pojoaque Pueblo a choice of venue "in Tribal, State, or other court of competent jurisdiction," and that his exercise of jurisdiction is consistent with that clause.  Biedscheid SJ Motion Response at 5 (citing Pojoaque Gaming Compact § 8.A., at 4).

      Second, Judge Biedscheid explains that the Pojoaque Gaming Compact § 8, at 4-5, is consistent with IGRA, which permits "jurisdictional agreements" that are "necessary for the enforcement of . . . laws and regulations" that are "'directly related to, and necessary for, the licensing and regulation of' the playing of Class III games."  Biedscheid SJ Motion Response at 6 (quoting <u>Dalley</u>, 896 F.3d at 1210 (quoting 25 U.S.C. § 2710(d)(3)(C)(i))).  He asserts that "IGRA is best interpreted as permitting jurisdictional agreements regarding tort claims arising out of gaming activity, as a means of regulating dangers arising during those activities."  Biedscheid SJ Motion Response at 8.  He acknowledges that State tort laws -- and, by extension, State tort suits -- can be a means of regulating gaming.  <u>See</u> Biedscheid SJ Motion Response at 7-9 (citing <u>Dalley</u>, 896 F.3d at 1210 n.7).  Judge Biedscheid also acknowledges that IGRA's legislative history and statutory context support the conclusion that "gaming compacts may include provisions to regulate

health and safety." Biedshceid SJ Motion Response at 9 (citing <u>Pueblo of Santa Ana v. Kelly</u>, 104 F.3d 1546, 1554 (10th Cir. 1997)("[T]he legislative history of [IGRA] is replete with references to the need to accommodate tribal and state interests . . . respect for state interest relating to Class III gaming was . . . of great concern"); S. Rep. 446 at *13, 100th Congress (1988)("A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the *State's public policy, safety, law and other interests* . . . (emphasis in Biedsheid SJ Motion Response, but not in S. Rep. 446)). Nevertheless, Judge Biedscheid emphasizes that "*Dalley* held that jurisdictional agreements in gaming compacts could not reach tort claims only tangentially related to gaming activity." Biedscheid SJ Motion Response at 12 (citing <u>Dalley</u>, 896 F.3d at 1207). He underscores that Congress "did 'not intend that [gaming] compacts be used as a subterfuge for imposing State jurisdiction on tribal lands.'" Biedscheid SJ Motion Response at 12 (quoting S. Rep. 446 at *14).

Third, Judge Biedscheid asserts that he properly concluded that he has subject-matter jurisdiction over Pena's suit. <u>See</u> Biedscheid SJ Motion Response at 13-15. He contends that the facts support a finding that "Pena was injured while engaged in gaming activity." Biedscheid SJ Motion Response at 13-14. It follows, according to Judge Biedscheid, that the "facts fall within the waiver of sovereign immunity in the Gaming Compact." Biedscheid SJ Motion Response at 14. Additionally, Judge Biedschied rejects the Plaintiffs' argument that the Court should disregard Judge Biedscheid's finding that Pena was engaged in gaming activity, because Judge Biedscheid included it only in the Second State MTD order and not in the First State MTD Order. <u>See</u> Biedscheid SJ Motion Response at 15. Judge Biedscheid contends that the Court should focus on the "operative, amended order," the Second State MTD Order. Biedscheid SJ Motion Response at 15. He asserts that "injunctive relief would only be available only if Judge Biedscheid were to

violate a declaratory decree of this court."  Biedscheid SJ Motion Response at 15 (quoting SJ

Motion Opening Brief at 15 n.8).  Finally, Judge Biedscheid avers that the Court should not grant

the requested injunctive relief.  See Biedscheid SJ Motion Response at 15-16.  He adds that the

Anti-Injunction Act prevents the Court from issuing the requested injunctive relief.  See

Biedscheid SJ Motion Response at 15 (citing Nash, 854 F. Supp. 2d at 1143-44; 28 U.S.C. § 2283).

     **11.**    **SJ Motion Reply.**

     The Plaintiffs reply in support of their SJ Motion.  See Plaintiffs' Reply Memorandum in

Support of Motion for Summary Judgment (Doc 36-1), filed August 3, 2021 (Doc. 44)("SJ Motion

Reply").  The Plaintiffs first assert that the "record does not include claims that [Pena] was engaged

in gaming" when he fell, because the State Complaint does not assert that Pena was gaming at the

time of his fall.  SJ Motion Reply at 1 (citing State Complaint ¶ 24, at 6).  The Plaintiffs note that

Pena did not submit an affidavit to the State court alleging that he was gaming when he fell until

after Judge Biedscheid ruled on the State MTD.  See SJ Motion Reply at 1.  "There is accordingly

no admissible evidentiary support in the record before this Court for the after-the-fact assertion by

Defendants that Mr. Pena was engaged in Class III gaming activity at the time of his fall."  SJ

Reply at 2.  The Plaintiffs implore the Court to "disregard" Pena's allegation that he was gaming

and review the SJ Motion in light of the facts that Judge Biedscheid had before him when he ruled

on the SJ Motion.  SJ Motion Reply at 2-3.

     Second, the Plaintiffs emphasize that Pena's fall is not subject to the Pojoaque Gaming

Compact, because it was "tangential" to gaming.  SJ Motion Reply at 3-4 (quoting Dalley, 896

F.3d at 1207, 1210).  The Plaintiffs assume arguendo that Pena was using a slot machine before

he fell.  See SJ Motion Reply at 3.  They assert that there is no "direct link" between Pena's gaming

and his fall, which Dalley requires to permit State jurisdiction. SJ Motion Reply at 4 (citing Dalley,

896 F.3d at 1207-08).  "His fall occurred when he stood and moved away from the slot machine .

. . . His fall did not actually involve playing his slot machine . . . . It occurred merely in proximity

to a slot machine he <u>had been</u> playing."  SJ Motion Reply at 4 (emphasis in original).

Second, the Plaintiff's contend that the Court should not put undue weight on IGRA's

legislative history, because federal courts, both in <u>Dalley</u> and in <u>Nash</u>, examined "the <u>unambiguous</u>

<u>structure</u> of IGRA and . . . concluded that if Congress had intended 'to permit tribes to allocate

jurisdiction [over tort claims], it could have crafted language to effectuate that purpose, but it did

not do so.'"  SJ Motion Reply at 5 (quoting <u>Dalley</u>, 896 F.3d at 1211 (alteration in SJ Motion

Reply, but not in <u>Dalley</u>))(emphasis in original).  The Plaintiffs underscore that "Congress has

'authorized' the tribes and states to make such jurisdiction-altering agreements 'in only a few

specific instances' . . . ."  SJ Motion Reply at 5 (quoting <u>Dalley</u>, 896 F.3d at 1205 (no citation

given for internal quotation)). The Plaintiffs emphasize that Congress was not concerned with slip-

and-falls in Indian country when it passed IGRA, but instead wanted to combat organized crime

in casinos.  <u>See</u> SJ Motion Reply at 6.

Finally, the Plaintiffs assert that "tort law is not directly related to or necessary for the

regulation of Class III gaming."  SJ Motion Reply at 7.  The Plaintiffs assert that, in <u>Dalley</u>, the

Tenth Circuit scrutinized IGRA and found no evidence that "IGRA contemplate[s] jurisdiction-

shifting for torts occurring on gaming premise . . . ."  SJ Motion Reply at 8 (citing <u>Dalley</u>, 896

F.3d at 1210).  The Plaintiffs concede that "tort law can fairly be viewed as a form of regulation,"

but contend that "the argument that this is a basis for inferring Congress intended to allow

jurisdiction-shifting does not follow."  SJ Motion Reply at 9.   The Plaintiffs reiterate that "the

vindication of civil wrongs arising from tortious conduct at casinos is conceptually remote to the

core purpose of IGRA."  SJ Motion Reply at 9.  They add that "torts occurring at casinos are

indistinct from torts occurring elsewhere in Indian Country such that the happenstance of occurrence at a casino gives rise to no logical basis for displacing the long-standing rule that such occurrences are to be dealt with by Indians applying their laws in their courts." SJ Motion Reply at 9-10.

12.     **Hearing on the SJ Motion.**

The Court held a hearing on the SJ Motion on February 4, 2022. See February 4 Clerk's Minutes at 1. At the February 4 hearing, the Court first heard argument from the Plaintiffs. See Draft of Hearing Transcript at 3:1-3 (taken February 4, 2022)(Court)("February 4 Tr.").[6] The Plaintiffs began with Dalley and Nash. See February 4 Tr. at 3:20-21 (Harwood). The Plaintiffs contended that "Congress wasn't thinking about tort law at all when it enacted IGRA," but that it was "thinking about far more important, [pervasive], and destructive influences that could come to bear on Indian gaming, i.e. the infiltration of criminal enterprises, and the endless inventiveness of man when it comes to doing so. And that was the focus of IGRA." February 4 Tr. at 4:17-24 (Harwood). The Plaintiffs asserted that "Congress basically limited the things that can be subject to agreements on jurisdiction shifting to things that are directly related to and necessary for the licensing and regulation of . . . Indian gaming." February 4 Tr. at 5:1-5 (Harwood). The Plaintiffs reiterated that it should not allow Dalley footnote 7 to lead it astray, because footnote 7 is "dicta," and this case is not factually analogous to the examples provided in footnote 7. February 4 Tr. at 5:13-6:2 (Harwood)(citing Dalley, 896 F.3d at 1210 n.7). The Plaintiffs then described the Accident Video and explained that it shows that "the fellow is sitting at a gaming machine, he's

_____

[6]The Court's citations to the transcript of the February 4 hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

not actually operating it.  He's asked to move, he gets up, and you know then he loses his balance and one of the employees helps him to the floor."  February 4 Tr. 6:24-7:3 (Harwood).  The Plaintiffs asserted that Pena's fall does not have "anything to do with" the examples the Tenth Circuit provides in Dalley footnote 7.  February 4 Tr. at 7:20 (Harwood).

The Plaintiffs also reiterated their request that the Court "rule more broadly" than Dalley and foreclose cases like this in the future from being heard in State court.  February 4 Tr. at 8:1-4 (Harwood).  The Plaintiffs averred that "Congress must have intended something broader." February 4 Tr. at 8:15-16 (Harwood).  Additionally, the Plaintiffs contended that "Indian tribes applying Indian law in Indian courts can just as well uphold the relatively pedestrian policies underlying the tort law as can any state."  February 4 Tr. at 9:1-4 (Harwood).

The Court then heard argument from the Defendants, beginning with Pena.  See February 4 Tr. at 9:24-10:3 (Court).  Pena asserted the parties "disagree on several issues of material fact" and "a key issue of law."  February 4 Tr. at 10:4-7 (Solon).  Pena reminded the Court that "no New Mexico State or federal court has ever made a final determination that IGRA prohibits the shifting of jurisdiction over visitors' personal injury suits to state court."  February 4 Tr. at 10:15-19 (Solon).  Pena asserted that, as a result, the Plaintiffs' contention that Judge Biedscheid does not have jurisdiction is baseless.  See February 4 Tr. at 10:12-25 (Solon).  Pena stated that the resolution of the jurisdictional question at issue will require "key facts . . . that are either disputed or still unknown," including "what exactly Mr. Pena was doing at the time of the subject incident." February 4 Tr.at 11:12-25 (Solon).

Pena then described his version of events. Pena stated that he was "playing a slot machine immediately before the incident occurred," and that Pena's affidavit and the Accident Video corroborate Pena's version of events. February 4 Tr. at 11:10-17 (Solon).  Pena reiterated that he

was seated at and playing on a slot machine when Buffalo Thunder employees "demanded he move" so they could "change out the cash box." February 4 Tr. at 12:4-11 (Solon). Pena described that he told the employees that he has multiple sclerosis and that he needed "a cane or walker to move." February 4 Tr. at 12:4-11 (Solon). Pena stated that a "casino employee essentially disregarded the information that Mr. Pena provided to him about his physical limitations and disability that this employee again demanded that Mr. Pena move immediately." February 4 Tr. at 12:14-25 (Solon). Mr. Pena asserted that he "felt intimidated and rushed" and "that he attempted to move out of the way too quickly and he lost his balance and fell to the floor." February 4 Tr. at 13:1-5 (Solon). Pena reiterated that determining whether Pena was gaming before he fell is a material fact, because it bears on whether IGRA permits jurisdiction shifting in his case. See February 4 Tr. at 13: 13-20 (Solon). "With so many key facts that are either disputed or without the benefit for full discovery still unknown, the Plaintiffs in the case simply cannot meet the burden of proof that's required for them today." February 4 Tr. at 13:24-14:3 (Solon).

Pena then returned to the legal issues presented. He stated that "the Nash case and the Dalley case did not create some blanket rule that IGRA prohibits the shifting of jurisdiction over visitor personal injury suits to state court." February 4 Tr. at 14:23-15:1 (Solon). Pena averred that Nash and Dalley "both left the door open for the shifting of jurisdiction over visitors' personal injury suits to state court." February 4 Tr. at 15:15-17 (Solon). He emphasized that federal courts have "specifically declined the opportunity to completely close the door on the shifting of jurisdiction over visitor personal injury suits to state court." February 4 Tr. at 15:24-16:3 (Solon). Specifically, he noted that Dalley establishes that "personal injury suits like the one in that case were not directly related to or necessary for the licensing and regulation of Class III gaming," but

- 25 -

left open "the possibility that injuries arising from gaming activity may be a proper subject of jurisdiction." February 4 Tr. at 16:24-17:6 (Solon).  He contended that this case is one such case "[b]ecause Mr. Pena's injuries arose from gaming activity." February 4 Tr. at 17:7-8 (Solon).

Next, the Court heard from Judge Biedscheid.  See February 4 Tr. at 20:4-9 (Court, Sydow). Judge Biedscheid "wanted to touch on a few reasons why [he] was correct to determine that he has jurisdiction" over Pena's State court suit.  February 4 Tr. at 20:14-16 (Sydow).  First, Judge Biedscheid argued that he was correct in determining that he has jurisdiction, because Pena was gaming immediately before he fell, and that he moved away from the machine so that employees could engage in "gaming maintenance." February 4 Tr. at 20:18-25 (Sydow).  Judge Biedscheid stated that Dalley footnote 7 "contemplates" allowing suits like Pena's -- i.e., suits that directly stem from gaming activity -- to be brought in State court.  February 4 Tr. at 23:7 (Sydow)(citing Dalley, 896 F.3d at 1210 n.7).  Second, Judge Biedscheid asserted that IGRA's legislative record suggests that Congress passed IGRA with the intent of permitting a "pretty broad scope of negotiation between states and tribes," specifically for issues concerning "public safety." February 4 Tr. at 10-13 (Sydow).  The Court asked whether the fact that Pena was sitting at a slot machine is "the critical fact that puts [this case] over into allowing the state court to exercise jurisdiction." February 4 Tr. at 24:7-10 (Court).  Judge Biedscheid replied that several facts combined are "enough . . . to support state court jurisdiction." February 4 Tr. at 24:11-15 (Sydow).  The Court also asked about the underlying state case's status.  See February 4 Tr. at 24:16-17 (Court).  Judge Biedscheid explained that the parties moved for an interlocutory appeal of his Second State MTD Order, but that the New Mexico Court of Appeals denied the motion.  See February 4 Tr. at 25:2-6 (Sydow).

The Court gave the Plaintiffs the last word on the SJ Motion.  See February 4 Tr. at 26:7-9 (Court).  Once again, the Plaintiffs accused the Defendants of relying on "newly added factual allegations."  February 4 Tr. at 26:25-27:1 (Harwood).   The Plaintiffs asserted that "[t]he fact of the matter was he was not engaged in gaming activities at this time . . . and he was certainly not engaged in the kind of gaming activity that was referenced in the dicta in [Dalley] footnote 7." February 4 Tr. at 27:18-22 (Harwood).  The Plaintiffs underscored that Dalley establishes that Class III "related only to activity actually involving in the playing of a game . . . and not activities occurring in proximity to but not inextricably intertwined with, the betting of chips, the folding of a hand or such like."  February 4 Tr. at 28:9-13 (Harwood)(quoting Dalley. 896 F.3d at 1207).  The Plaintiffs reiterated that, even if Pena was gaming before he fell, he was not gaming at the time he fell, such that his claims concerning his fall cannot properly be brought in State court.  See February 4 Tr. at 27:18-22 (Harwood).

The Court asked "what's the basis . . . for you asking for a bright line rule" that suits like Pena's suit cannot be brough in State court.  February 4 Tr. at 28:14-17 (Court).  The Plaintiffs responded that it is "prudentially [a] good thing to do," because "these scenarios are going to recur."  February 4 Tr. at 28:24-29:2 (Harwood).  In support of that contention, the Plaintiffs gestured to a similar case they brought, which is pending before the Honorable Margaret Strickland, United States District Judge for the United States District Court for the District of New Mexico, Pueblo of Pojoaque v. Wilson, No. CIV 21-0373 MIS/JHR (D.N.M. 2021).[7]  The Plaintiffs asserted that, together, these cases show that "there is every reason for the courts to take a broader look at Dalley, and more

_____

[7]Since the February 4, 2022, hearing on the SJ Motion, Judge Strickland has issued her decision on the plaintiff's motion for summary judgment in Pueblo of Pojoaque v. Wilson.  See 619 F. Supp. 3d 1095 (D.N.M. 2022)(Strickland, J.)("Wilson").  The Court discusses Wilson in greater detail below.

importantly at what Congress apparently intended and stated in language in IGRA. . . ."  February 4

Tr. at 29:3-19 (Court, Harwood).

The Court indicated that it is "not going to go as far" as issuing a bright-line rule that casino

visitor personal injury suits can never be brought in State Court.  February 4 Tr. at 31:12-13

(Court).  The Court stated that it would study the federal caselaw more closely, and "determine

the line" between facts that give rise to State court jurisdiction and facts that do not give rise to

State court jurisdiction.  February 4 Tr. at 31:18 (Court).  The Court indicated that it would be

"faithful" to that line and Tenth Circuit precedent.  February 4 Tr. at 31:23 (Court).

### 13.   Court's Order on the SJ Motion.

On March 17, 2022, the Court entered an Order denying the SJ Motion.  See Order, filed

March 17, 2022 (Doc. 61)("SJ Motion Order").  In the SJ Motion Order, the Court concludes that

"Plaintiffs Pojoaque Pueblo and Buffalo Thunder are not entitled to summary judgment, because

the Anti-Injunction Act, 28 U.S.C. § 2283, bars the Court from issuing the requested injunction,

and the Court must abstain from issuing a declaratory judgment under Younger . . . ."  SJ Motion

Order at 2.  With respect to the Anti-Injunction Act, the Court explains:

> The Anti-Injunction Act prevents federal courts from enjoining State court
> proceedings except under three narrow circumstances: (i) when Congress has
> "expressly authorized" an injunction; (ii) the injunction is "necessary in aid of [the
> federal district court's] jurisdiction"; and (iii) the injunction is necessary to "protect
> or effectuate" a previous judgment in federal district court.  28 U.S.C. § 2283.  See
> Tooele Cnty. v. United States, 820 F.3d 1183, 1188 (10th Cir. 2016).  These three
> exceptions are "narrow and are not to be loosely construed."  Tooele Cnty. v. United
> States, 820 F.3d at 1188 (citing Smith v. Bayer Corp., 564 U.S. 29 (2011)).
> Although Pojoaque Pueblo and Buffalo Thunder purport to request only a
> declaratory judgment, they ask that the declaratory judgment include an injunction.
> See Complaint ¶ 21, at 5-6.  Pojoaque Pueblo and Buffalo Thunder do not indicate
> where Congress may have expressly authorized the requested injunction, nor can
> the Court, on its own, identify where Congress may have expressly authorized it.
> Moreover, the requested injunction is not necessary to protect the Court's
> jurisdiction, because a State court considering a federal question does not impinge

on the Court's jurisdiction.  See Tafflin v. Levitt, 493 U.S. 455, 458 (1990)("[S]tate courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States.").  Finally, there is no previous judgment in federal district court that the requested injunction is being asked to protect or effectuate.  The Anti-Injunction Act, therefore, prevents the Court from granting the requested relief and enjoining the State court proceedings.

SJ Motion Order at 3-4.

Similarly, with respect to Younger abstention, the Court explains:

Under the abstention doctrine that the Supreme Court of the United States of America articulates in Younger, "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the state forum provides an adequate avenue for relief. Weitzel v. Div. of Occupational & Prof'l Licensing, 240 F.3d 871, 875 (10th Cir. 2001)(quoting Rienhardt v. Kelly, 164 F.3d 1296, 1302 (10th Cir. 1999).  A court should abstain from entertaining cases that implicate the Younger doctrine, as long as an adequate opportunity is afforded in the State court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999).  For the Court to abstain under Younger, the requested relief: (i) must interfere with an ongoing State judicial proceeding; (ii) must involve important State interests; and (iii) the State proceeding must provide an adequate opportunity to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982)[("Middlesex")]; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d 1162, 1177-78 (10th Cir. 2001.  See also Bellotti v. Baird, 428 U.S. 132, 143 n.10 (1976)(noting that if all three conditions mandating abstention exist clearly in the record, courts should address Younger abstention sua sponte); Morrow v. Winslow, 94 F.3d 1386, 1390-91 & n.3 (10th Cir. 1996).  Before examining the three-factor test, the Court first must address whether Younger abstention is applicable. Circumstances warranting Younger abstention are "'exceptional,'" and include "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 73 (2013)[("Sprint")](quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).

Younger abstention is warranted here, because this case is "'exceptional'" and includes "'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Sprint . . . , 571 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. at 368).  Although the State case is a civil tort suit, it involves an order that is uniquely in furtherance of the state courts' ability to

perform its judicial function, because the requested injunction would interfere with the execution of Judge Biedscheid's Amended Order on Defendant's Motion to Dismiss, filed June 25, 2021 (Doc. 36-5) . . . and would "do so on grounds that challenge the very process by which," Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14 (1987), the Biedscheid Order was obtained, namely, by asking a State court to determine its own jurisdiction under an agreement the State has with a tribe, and by answering a question of federal law.   Moreover, Pojoaque Pueblo and Buffalo Thunder's requested injunctive relief "interfere with ongoing state proceedings," Columbia Fin. Corp. v. Stork, 811 F.3d 390, 393 (10th Cir. 2016), and would "have the practical effect of enjoining the state proceedings," ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund, 754 F.3d 754, 759 (9th Cir. 2014).   See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 672 (10th Cir. 2020)(noting that Younger applies to "requests directly or indirectly to thwart state court compliance processes"); Joseph A. ex rel. Corrine Wolfe v. Ingram, 275 F.3d 1253, 1272 (10th Cir. 2002)("Younger governs whether the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly.").

In addition, the State proceeding provides an adequate opportunity for Pojoaque Pueblo and Buffalo Thunder to raise their federal claims.   In the Biedscheid Order, Judge Biedscheid concludes that he has jurisdiction under the Indian Gaming Compact Between the State of New Mexico, filed June 25, 2021 (Doc. 36-8)("Compact").   See Biedscheid Order at 1-2.   The Court of Appeals of New Mexico denied Buffalo Thunder's application for an interlocutory appeal.   See Order Denying Application for Interlocutory Appeal at 1, filed June 25, 2021 (Doc. 36-7).   Buffalo Thunder's next step could have been to appeal to the Supreme Court of New Mexico and make the same argument that it makes before the Court here -- that IGRA, as interpreted in Navajo Nation v. Dalley, 896 F.3d 1196, 1210-18 (10th Cir. 2018), bars Judge Biedscheid's interpretation of the Compact -- but there is no indication that Buffalo Thunder petitioned for a writ of certiorari.   See N.M.S.A. § 34-5-14(B).   Moreover, Buffalo Thunder could preserve the error for a subsequent appeal in the State system.   Instead, however, Pojoaque Pueblo and Buffalo Thunder ask the Court, in effect, to review the Biedscheid Order and serve as an appellate court to give them the relief that the Court of Appeals of New Mexico would offer.   Because, therefore, the challenge relates to "pending state proceedings, proper respect for the ability of state courts to resolve questions presented in state-court litigation mandates that the federal court stay its hand." Pennzoil Co. v. Texaco, Inc., 481 U.S. at 14.   Moreover, even if Pojoaque Pueblo and Buffalo Thunder do not fit within any of Younger's three circumstances, "a necessary concomitant of Younger is that a party in [a federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the District Court."   Huffman v. Pursue, Ltd., 420 U.S. 592, 608 (1975).   Under Younger, the Court must abstain.

SJ Motion Order at 4-7.  By contrast, the Court determined that the Brillhart, Rooker-Feldman,

and Colorado River doctrines do not apply to this case.   See SJ Motion Order at 7-10.

In the alternative, the Court reasoned that if it did not abstain, it would still deny the SJ

Motion.  See SJ Motion Order at 11.  The Court explains:

> First, if the Court did not abstain, it would hold that there is no genuine
> dispute of material fact that Pena was not engaged in Class III gaming activities
> when he fell.  See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. at 323.
> The parties purport to dispute whether Pena was playing a slot machine, and thus
> engaged in Class III gaming activities, when he fell.  See . . . [SJ Motion Opening
> Brief] at 1 . . . (asserting that Pena was "seated at" a "slot machine" when he fell);
> . . . [Biedscheid SJ Motion Response] at 3 . . . (asserting that it is undisputed that
> Pena "was sitting at a slot machine" when he fell); . . . [Pena SJ Motion Response]
> . . . at 3 . . . (contending that Pena was "engaged in a 'Class III' gaming activity"
> when he fell)(no citation for quotation); . . . [SJ Motion Reply] at 1-7 . . . (arguing
> that Pena was not participating in Class III gaming when he fell).  The record does
> not support the dispute.  The video of the accident shows Pena turning around,
> standing up and moving several feet away from the machine, and a Buffalo Thunder
> employee coming between Pena and the machine.  See . . . [Accident Video] at
> 00:12-00:17 . . . .  The Accident Video shows Pena stably stand up for a moment
> before he loses his balance and falls backwards toward the machine.  See Accident
> Video at 00:18-00:20.  Pena successfully stood and was facing away from the
> machine, and a Buffalo Thunder employee came between Pena and the machine
> before Pena fell.  See Accident Video at 00:18-00:20.  Because the record blatantly
> contradicts the contention that Pena was playing the slot machine when he fell, the
> court would, if it did not abstain, reject the parties' purported dispute whether
> Pena's fall was part of his Class III gaming activities.  See Scott v. Harris, 550 U.S.
> 372, 378-81 (2007)("When opposing parties tell two different stories, one of which
> is blatantly contradicted by the record, so that no reasonable jury could believe it,
> a court should not adopt that version of the facts for purposes of ruling on a motion
> for summary judgment."); Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1312 (10th
> Cir. 2009)(noting that, at the summary judgment stage, a plaintiff's version of the
> facts must find support in the record, meaning that, "'[w]hen opposing parties tell
> two different stories, one of which is blatantly contradicted by the record, so that
> no reasonable jury could believe it, a court should not adopt that version of the
> facts'")(quoting York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)).
> Thus, if the Court did not abstain, it would conclude that there is no genuine dispute
> of material fact that Pena was not playing a slot machine or any ongoing gaming
> activity when he fell.

> Accordingly, if the Court did not abstain, it would hold that, because Pena
> was not playing a slot machine or any gaming activity when he fell, Pena was not

engaged in Class III gambling activity when his accident at Buffalo Thunder Casino happened.  Under IGRA, Class III gambling activity is the "most closely regulated" gaming, and "includes casino games, slot machines, and horse racing."  Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 785 (2014)[("Bay Mills")].  See 25 U.S.C. § 2703(8)(defining Class III gaming as "all forms of gaming that are not class I gaming or class II gaming").  Class III gaming activities under IGRA "relates only to activities actually involved in the *playing* of the game, and not to activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike."  Navajo Nation v. Dalley, 896 F.3d at 1207 (emphasis in Navajo Nation v. Dalley).  Even if the accident occurs just after playing a slot machine, slipping and falling near a slot machine is not "inextricably intertwined with" the gaming activity.  Navajo Nation v. Dalley, 896 F.3d at 1207. Simply because an accident occurs . . . at a casino on Tribal land does not necessarily mean that the accident's victim is engaged in Class III gaming activity under IGRA.  See Navajo Nation v. Dalley, 896 F.3d at 1208 (concluding the IGRA "does not authorize tribes to allocate to states jurisdiction over tort claims" arising from a slip-and-fall incident in a bathroom of a casino on the Navajo Nation, because the tort claim "does not relate to the licensing and regulation of gambling itself").  Because Pena was not participating in a Class III gaming activity when he fell, therefore, the tort claims arising from Pojoaque Pueblo and Buffalo Thunder's conduct are not "directly related to, and necessary for, the licensing and regulation" of Class III gaming activities.  25 U.S.C. § 2710(d)(3)(C)(i).  See Navajo Nation v. Dalley, 896 F.3d at 1208.  Judge Biedscheid concluded correctly that, because Pena's accident was "proximately caused by the conduct of the Gaming Enterprise," he has jurisdiction over Pena's State tort suit.  [Pojoaque Gaming] Compact [§ 8.A.,] at 4.  See [Second State MTD Order] . . . at 1-2.  IGRA, however, does not permit Tribal-State compacts to shift to State courts jurisdiction to hear tort suits arising from conduct that is not directly related to playing Class III games. See Navajo Nation v. Dalley, 896 F.3d at 1210 . . . .  Falling near a slot machine is no more "directly related to, and necessary for, the licensing and regulation of" the playing of Class III gaming than is "the safety of walking surfaces in Class III casino restrooms."  Navajo Nation v. Dalley, 896 F.3d at 1210.  Nevertheless, although there [is] no genuine dispute that Pena was not engaged in Class III gaming activities when he fell, and although the Compact -- but not IGRA -- permits Judge Biedscheid to exercise jurisdiction over Pena's State tort suit, Pojoaque Pueblo and Buffalo Thunder are not entitled to judgment as a matter of law, because the Court abstains from entering judgment in Pojoaque Pueblo and Buffalo Thunder's favor.  Pojoaque Pueblo and Buffalo Thunder, therefore, are not entitled to summary judgment.  See Fed. R. Civ. P. 56(a).

SJ Motion Order at 11-13 (footnote omitted).  For these reasons, the Court denies the SJ Motion.

See SJ Motion Order at 14.  The Court informs the parties, however, that it will "issue a

Memorandum Opinion at a later date fully detailing its rationale for its decision." SJ Motion Order at 1 n.1.

14.   **Reconsider Motion**.

Before the Court could "issue a Memorandum Opinion at a later date fully detailing its rationale for its decision," SJ Order at 1 n.1, the Plaintiffs filed the Reconsider Motion, asking the Court to reconsider its SJ Motion Order, see Reconsider Motion at 1. The Plaintiffs begin by contending that the Court made "a key analytical misapprehension which led to erroneous *Younger* abstention." Plaintiffs' Memorandum in Support of Motion to Reconsider Order Denying Motion for Summary Judgment (Doc. 61) at 2, filed April 4, 2022 (Doc. 64-1)("Reconsider Motion Opening Brief")(italics in original). The Plaintiffs explain that the Court's IGRA analysis "tracks perfectly" Tenth Circuit IGRA precedent, but that it goes "awry" when "it states 'Judge Biedscheid concluded correctly that, because Pena's accident was "proximately caused by the conduct of the gaming enterprise," he has jurisdiction over Pena's State tort suit.'" Reconsider Motion Opening Brief at 2-3 (quoting SJ Motion Order at 13). The Plaintiffs also point out that the SJ Motion Order asserts that "Judge Biedscheid has jurisdiction over the state court law suit under the Compact but not under IGRA; and that plaintiffs may in general avoid exclusive tribal jurisdiction over such claims by including proximate cause allegations . . . ." Reconsider Motion Opening Brief at 3 (paraphrasing SJ Motion Order at 13, 14 n.5). The Plaintiffs argue that the "problem" with the Court's analysis is that it overlooks Dalley, which, according to the Plaintiffs, "finally determines that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court," which "necessarily includes slip-and-fall claims 'proximately caused by . . . the gaming enterprise.'" Reconsider Motion Opening Brief at 3 (no citation given for internal quotation). In other words, the Plaintiffs allege that "*Dalley* voids [§ 8, at 4-5,] of the [Pojoaque Gaming]

Compact, at least as to slip and fall claims."   Reconsider Motion Opening Brief at 4 (citing Pojoaque Gaming Compact § 8, at 4-5).  The Plaintiffs aver that, "[i]f on reconsideration the Court agrees then as set forth below, it must also reverse its *Younger* conclusion."  Reconsider Motion Opening Brief at 4.

Next, the Plaintiffs assert that it was "premature and wrong" for the Court to apply <u>Younger</u> to the "Plaintiffs' unripe claim for injunctive relief."  Reconsider Motion Opening Brief at 5.  The Plaintiffs concede that "injunctive relief would be available only if the state court were to violate this Court's declaration of federal law."  Reconsider Motion Opening Brief at 5.  The Plaintiffs assert that they were aware of that limitation when they drafted their Complaint and are "careful merely to request that the Court <u>authorize</u> them to seek injunctive relief in the event the state court were to proceed with the Pena lawsuit following the declaration of federal law."  Reconsider Motion Opening Brief at 5 (emphasis in original).  The Plaintiffs assert that "[t]his distinction is important," because the Plaintiffs do not ask the Court "to tread on Judge Biedscheid's jurisdictional toes," because they are seeking "nothing more than a multi-step prognostication." Reconsider Motion Opening Brief at 5.

Ultimately, the Plaintiffs clarify that their SJ Motion "seeks only a declaration of federal law, not an order enjoining state court proceedings."  Reconsider Motion Opening Brief at 6.  With respect to their declaratory relief claim, the Plaintiffs emphasize that federal courts "'have a strict duty to exercise the jurisdiction that is conferred upon them by Congress' and 'to say what the law is.'"  Reconsider Motion Opening Brief at 6 (quoting <u>Courthouse News v. Admin. Offices of the Courts</u>, No. CIV 21-0710 JB/LF, 2021 WL 4710644, at *36 (D.N.M. October 8, 2021)(Browning, J.)("<u>Courthouse News</u>")).  The "Plaintiffs respectfully submit that it is this Court's duty to declare that federal law does not permit the shifting of subject matter jurisdiction over Pena's claim to

New Mexico's state courts."  Reconsider Motion Opening Brief at 7.  The Plaintiffs assert "[w]hat the state court then chooses to do with that declaration is a matter for another day."  Reconsider Motion Opening Brief at 7.

Next, the Plaintiffs contend that the "*Younger* predicates are unmet" in this case. Reconsider Motion Opening Brief at 7.  The Plaintiffs assert that "no exceptional circumstances warrant abstention," and that the state interests at issue are "insufficient as a matter of law." Reconsider Motion Opening Brief at 7.  The Plaintiffs also add that "courts are only to address *Younger* abstention *sua sponte* when all three elements mandating abstention are clearly present." Reconsider Motion Opening Brief at 7 (citing Courthouse News, 2021 WL 4710644, at *23).  The Plaintiffs conclude by arguing that they are not required to exhaust their State court remedies by "plead[ing] their case before New Mexico's Supreme Court."  Reconsider Motion Opening Brief at 8.  They contend that, in cases seeking declarations of federal Indian law, "the *Younger* inquiry ends . . . with the finding that federal interests under federal law predominate, and state interests are subordinate."  Reconsider Motion Opening Brief at 8 (citing Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.2d 709, 714 (10th Cir. 1989)).

### 15.   Pena Reconsider Motion Response.

Pena responds to the Reconsider Motion.  See Defendant Rudy Pena's Response to Plaintiffs' Motion to Reconsider Order Denying Summary Judgment, filed April 18, 2022 (Doc. 67)("Pena Reconsider Motion Response").  In the Pena Reconsider Motion Response, Pena asserts two primary arguments: (i) that "the Court has properly abstained under *Younger*"; and (ii) that "the Court has properly applied the Anti-Injunction Act."  Pena Reconsider Motion Response at 3.  As to Younger, Pena asserts that Dalley is "nowhere near as broad as Plaintiffs imagine it to be," and that Dalley does not "finally determine[] that IGRA does not permit the shifting of

jurisdiction over visitors' personal injury suits to state court." Pena Reconsider Motion Response at 4.   Pena contends that, even if the Plaintiffs' reading of <u>Dalley</u> is correct, that "it does not compute that the Court 'must also reverse its *Younger* conclusion," because Plaintiffs have failed to demonstrate how those two propositions are sufficiently intertwined . . . ." Pena Reconsider Motion Response at 4 (no citation given for internal quotation).   As to the Anti-Injunction Act, Pena emphasizes that the Plaintiffs have "repeated[ly]" asked for injunctive relief, but now seek to "minimize the effect" of their own request for injunctive relief.   Pena Reconsider Motion Response at 4.   For these reasons, Pena asks the Court to deny the Reconsider Motion.   <u>See</u> Pena Reconsider Motion Response at 4-5.

16. <u>**Biedscheid Reconsider Motion Response**</u>.

Judge Biedscheid also responds to the Reconsider Motion.   <u>See</u> Honorable Bryan Biedscheid's Response to Plaintiffs' Motion to Reconsider Order Denying Summary Judgment, filed May 2, 2022 (Doc. 69)("Biedscheid Reconsider Motion Response").   Judge Biedscheid first notes that the Reconsider Motion is premature, because the Court has not issued a full opinion on the SJ Motion.   <u>See</u> Biedscheid Reconsider Motion Response at 1-2.   Judge Biedscheid avers that "[i]f the parties are going to litigate the wisdom of the Court's ruling . . . such litigation should occur after the Court has fully set forth its reasoning."   Biedscheid Reconsider Motion Response at 2.

In the alternative, Judge Biedscheid contends that, if the Court considers the Reconsider Motion, it should deny the Reconsider Motion.   <u>See</u> Biedscheid Reconsider Motion Response at 1.   Judge Biedscheid first asserts that the Court's Anti-Injunction Act analysis is correct.   <u>See</u> Biedscheid Reconsider Motion Response at 2-4.   Judge Biedshceid states that the Plaintiffs have not "provide[d] any basis for reconsidering the Court's ruling" on the Anti-Injunction Act, because

the Plaintiffs have not demonstrated that this case falls under one of the Anti-Injunction Act's three exceptions.  Biedscheid Reconsider Motion Response at 2-3.

Judge Biedscheid also explains that the Plaintiffs think that the injunctive relief they seek is "too contingent to count."  Biedscheid Reconsider Motion Response at 3.   Judge Biedscheid rejects that argument and asserts that the Plaintiffs cannot avoid the Anti-Injunction Act's "comity purposes" by stating its requested relief is "contingent."  Biedscheid Reconsider Motion Response at 3-4.  Judge Biedscheid asserts that, if the Plaintiffs are correct and the Anti-Injunction Act does not bar their request for contingent injunctive relief, then "*Brillhart* abstention would apply." Biedscheid Reconsider Motion Response at 3.  He adds that "the practical effect of . . . an injunction would be to halt state court proceedings, including the state court's determination of its own jurisdiction.  The need for abstention . . . exists regardless of the procedural mechanism." Biedscheid Reconsider Motion Response at 6.

Next, Judge Biedscheid asserts that the Court's Younger analysis is correct.   See Biedscheid Reconsider Motion Response at 4-8.  Judge Biedscheid contends that the Court is correct in finding that "all three elements needed for Younger abstention exist."  Biedscheid Reconsider Motion Response at 4.  He elaborates that the requested declaratory relief would interfere with Sate proceedings by "stopping" the State proceedings, and that the State action provides an adequate forum to consider the federal questions presented.   Biedscheid Reconsider Motion Response at 4-5.  He adds that "[t]he Court also correctly determined that the state court's examination of its jurisdiction under IGRA and the state-tribal compact was 'uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Biedscheid Reconsider Motion Response at 5 (quoting SJ Motion Order at 5).  Finally, Judge Biedscheid contends that "the Court was correct to hold that *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975), requires a party

to exhaust state court remedies before avoiding *Younger* abstention in federal court."  Biedscheid Reconsider Motion Response at 7 (citing SJ Order at 7).

17.    **Reconsider Motion Reply.**

The Plaintiffs reply in support of their Reconsider Motion.  See Plaintiffs' Reply to Defendants' Responses (Docs. 67 & 69) to Motion to Reconsider Order Denying Motion for Summary Judgment (Doc. 61), filed May 3, 2022 (Doc. 70)("Reconsider Motion Reply").  The Plaintiffs begin by reiterating that they seek "only a declaration of federal law; not injunctive relief. Their [SJ Motion] expressly *excluded* injunctive relief."  Reconsider Motion Reply at 2 (emphasis in original).  They clarify that, "at the time of summary judgment[, injunctive relief is] nothing more than a future possibility, the fact which Plaintiffs respectfully assert the court misapprehended in its abstention analysis . . . ."  Reconsider Motion Reply at 2.

The Plaintiffs then point to a recent Tenth Circuit decision, Ute Indian Tribe of the Uintah and Ouray Reservation v. Lawrence, 22 F.4th 892 (10th Cir. 2022)("Lawrence").  The Plaintiffs contend that the Tenth Circuit in Lawrence, "citing *Dalley*, held that the state court lacked subject matter jurisdiction over the contract dispute because the statute at issue failed to evince clear congressional subject matter jurisdiction-shifting authorization."  Reconsider Motion Reply at 3 (citing Lawrence, 22 F.4th at 903, 907).  The Plaintiffs add that, "[m]ore importantly, the Tenth Circuit concluded that absent such clear congressional jurisdiction-shifting authorization, and therefore absent any basis for state court jurisdiction, *Younger* abstention was per se inapplicable."  Reconsider Motion Reply at 3 (citing Lawrence, 22 F.4th at 903, 907 n.17).  The Plaintiffs assert that, "[e]ven had the Plaintiffs here requested injunctive relief in their summary judgment motion, Lawrence supports the argument that this Court could have granted that relief as well, notwithstanding the Anti-Injunction Act."  Reconsider Motion Reply at 4.

18.     **Hearing on the Reconsider Motion**.

The Court held a hearing on the Reconsider Motion on July 25, 2022.  See July 25 Clerk's Minutes at 1.  The Court first heard from the Plaintiffs.  See Draft Transcript of Hearing at 3:11-13 (taken July 25, 2022)("July 25 Tr.")(Court).[8]  The Plaintiffs began with the Court's Anti-Injunction Act analysis.  See July 25 Tr. at 3:25-4:2 (Harwood).  The Plaintiffs highlighted that their "summary judgment motion did not request that the court issue an injunction."  July 25 Tr. at 4:10-11 (Harwood).  The Court asked: "So when you used the word injunction in your papers that I was writing an order on, what was I supposed to think if you were not asking for an injunction?  What was I supposed to think about those words when you were using them?"  July 25 Tr. at 4:13-17 (Court).  The Plaintiffs responded that the Court was "correct" in that the Plaintiffs ask for an injunction in the Complaint, but reiterated that "if you look more closely" at the SJ Motion, the Plaintiffs ask only for declaratory relief.   July 25 Tr. at 4:18-22 (Harwood).  The Court then asked "What should a federal court be spending its time giving declaratory judgments, advisory opinions, if the state court can ignore them and I have no way to enforce them? .  .  . Is that really, is that proper . . . ?"  July 25 Tr. at 5:2-7 (Court).  The Plaintiffs replied: "Absolutely."  July 25 Tr. at 5:9 (Harwood).  The Court queried: "[W]hy is that?  What good does it do anybody?"  July 25 Tr. at 5:10-11 (Court).  The Plaintiffs responded that this case is in the "right place" in federal court, because "it's a question of exclusive federal law."  July 25 Tr. at 5:12-17 (Harwood).  The Court responded that federal court is the Plaintiffs' "preferred place," but that federal jurisdiction is not "exclusive" and that "state courts decide federal issues all the

---

[8]The Court's citations to the transcript of the July 25 hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

time." July 25 Tr. at 5:18-20 (Court).  The Plaintiffs responded that it is not their position to say

the "state couldn't decide" the issue presented, but that Indian law is "an area of the law where the

state has the least interest . . . It's an area where the federal government has preempted the field."

July 25 Tr. 6:2-6 (Harwood).  The Court asked: "How are you using the word preempt?  I mean

preempt has some very serious consequences in federal court."  July 25 Tr. at 6:15-17 (Court).

The Plaintiffs clarified that "preempt" was not the right word and that they simply mean to

emphasize that "Indian subject matter jurisdiction is . . . of paramount importance in the federal

law." July 25 Tr. at 6:24-7:3 (Harwood). The Court then asked whether it is "productive" for the

Court to issue the requested injunctive relief, when the Plaintiffs could get similar relief from the

New Mexico State courts.  July 25 Tr. at 7:22-8:5 (Court).  The Plaintiffs responded that the Santa

Clara Pueblo decision hurts their position in State court, and that their request for relief in federal

court is "no different than what the plaintiffs asked the court to do in the Nash case."  July 25 Tr.

at 8:6-17 (Harwood).   The Plaintiffs added that it is their position that the Tenth Circuit's recent

decision in Lawrence permits the Court to issue the requested injunctive relief.  See July 25 Tr. at

9:7-10:13 (Harwood).

   Next, the Plaintiffs returned to IGRA and Dalley.  See July 25 Tr. at 10:17-19 (Harwood).

The Plaintiffs asserted that the Court "correctly conclude[s] that IGRA does not authorize tribes

to seek jurisdiction over slip and fall clients because they aren't directly related to and necessary

for the licensing and regulation of Class 3 gaming."  July 25 Tr. at 10:20-24 (Harwood).   The

Plaintiffs noted that, in the SJ Motion Order, the Court establishes that Pojoaque Gaming Compact

§ 8, at 4-5, permits jurisdiction shifting, but that IGRA does not.  See July 25 Tr. at 11:14-12:2

(Harwood)(citing SJ Motion Order at 13).  "The problem, Your Honor . . .  [is that] the Dalley case

invalidated [the] jurisdiction shifting provision [in] New Mexico's gaming compact.  Dalley finally

determines as a matter of federal law that at least as to slip and falls, tribes could not give away jurisdiction to the state courts in their gaming compact." July 25 Tr. at 12:3-11 (Harwood).  The Plaintiffs added: "Dalley basically says that subject matter jurisdiction over claims like that was never the Pueblo's to give away absent congressional authorization, and [the Tenth Circuit] found none after [an] exhaustive analysis of IGRA." July 25 Tr. at 12:16-19 (Harwood). The Plaintiffs asserted that the Court's conclusion that Judge Biedscheid has jurisdiction under the Pojoaque Gaming Compact "cannot be reconciled" with Dalley. July 25 Tr. at 13:1 (Harwood).

Next, the Plaintiffs addressed the Court's Younger analysis.  See July 25 Tr. at 13:5-6 (Harwood).  The Plaintiffs contended that the requested relief will not "interfere" with the State proceedings, because the Plaintiffs merely ask the Court to "declare the federal law applicable," and that the Court's declaration would provide "guidance" to the State court.  July 25 Tr. at 14:9-16 (Harwood).   The Plaintiffs emphasized that "federal courts [have an] obligation to hear and decide a case," and that that obligation is "virtually unflagging."   July 25 Tr. at 15:11-13 (Harwood).   The Plaintiffs invoked the Court's Courthouse News decision and argued that it establishes that, "when a party seeks only a declaration of federal law and not an injunction, the federal court's duty to declare the law overrides" the State court's ability to hear the case.  July 25 Tr. at 16:7-11 (Harwood).  The Plaintiffs stressed that "the federal nature of the law and issues" at play in this case reduce the State's interest in exercising jurisdiction over this case.   July 25 Tr. at 17:18-22 (Harwood). The Court asked the Plaintiffs to "characterize the interplay" between the Complaint and the SJ Motion.  July 25 Tr. at 16:19-22 (Court).  The Plaintiffs conceded that, with "the wisdom of hindsight," they "probably should have . . . called [it] a motion for partial summary judgment," because they are only asking for declaratory relief at this stage.  July 25 Tr. at 16:23-25 (Harwood).

- 41 -

Next, the Plaintiffs added that Pena and Judge Biedscheid "do not have a right to voice their opinions . . . on the abstention issue," because they "waive their right to do so." July 25 Tr. at 19:5-9 (Harwood).  The Plaintiffs reminded the Court that they raised the abstention issue in their SJ Motion Opening Brief, but that neither Pena nor Judge Biedscheid "had any response to it." July 25 Tr. at 19:10-114 (Harwood).  The Plaintiffs asserted that the Plaintiffs and the Court alone should handle the abstention question.  See July 25 Tr. at 19:16-23 (Harwood).

Finally, the Plaintiffs addressed the so-called exhaustion issue.  See July 25 Tr. at 19:24-20:1 (Harwood).  The Court clarified that it is not "correct" to call that portion of the Court's SJ Motion Order an "exhaustion" analysis.  July 25 Tr. at 20:2-5 (Court). The Court elaborated that this portion of the SJ Motion Order clarifies that a "state can decide a federal issue," and that the remedy for addressing a problem with a State decision on federal law is "to go through the [State] appellate procedures" and "not to come over to the [federal] district court."  July 25 Tr. at 20:2-21 (Court).  The Plaintiffs acknowledged that they "may have got[ten] the tint wrong," July 25 Tr. at 21:1 (Harwood), but nevertheless emphasized that "federal courts have almost uniformly agreed that they have a duty" to declare federal Indian law when asked by an Indian Tribe.   July 25 Tr. at 22:7-12 (Harwood).

The Court asked: "How would we know that a state court does not have jurisdiction at the pleading stage?" July 25 Tr. at 22:23-25 (Harwood).  The Plaintiffs replied that "[i]t doesn't matter how well pleaded the state court claim is"; what matters is whether the tort "is within the scope of Dalley and Nash."  July 25 Tr. at 24:11-14 (Harwood).  The Court expressed its concern that jurisdiction in cases like these "turn[]" on the facts and "there can be disputes about the facts." July 25 Tr. at 24:19-20 (Court).  The Court stated: "I don't know how a federal court can say the state court doesn't have jurisdiction if there is factual disputes about what happened."  July 25 Tr.

at 24:24-25:1 (Court). The Plaintiffs replied that, because the Tenth Circuit left the door open for State jurisdiction in Dalley "dicta" and footnote 7, the facts impacting jurisdiction "have to be adjudicated." July 25 Tr. at 25:25-26:4 (Harwood).

The Court then heard the Defendants' argument. See July 25 Tr. at 29:22-23 (Court). Pena had nothing to add beyond his briefing. See July 25 Tr. at 29:24-30:2 (Solon). The Court asked Judge Biedscheid about his position on Lawrence. See July 25 Tr. at 30:5-22 (Court). Judge Biedscheid explained that the Tenth Circuit in Lawrence determined that "there was no state court jurisdiction," but that it did not address Younger, but "presupposed Colorado River abstention and the Anti-Injunction Act did not apply in footnotes." July 25 Tr. at 31:11-16 (Sydow). Judge Biedscheid noted that the facts bear on jurisdiction in these cases, and added that "the State court should have th[e] opportunities on summary judgment or at trial to make those jurisdictional fact determinations and abstention permits that." July 25 Tr. at 32:8-11 (Sydow).

Judge Biedscheid then raised three arguments. See July 25 Tr. at 32:12-15 (Sydow). First, Judge Biedscheid argued that the Reconsider Motion is "premature," because the Court had not issued a full opinion on the matter. July 25 Tr. at 32:14 (Sydow). Second, Judge Biedscheid addressed the injunction issue. See July 25 Tr. at 33:18 (Sydow). Judge Biedscheid rejected the Plaintiffs' contention that they are not seeking an injunction, because the Complaint contains a claim for injunctive relief, and "the complaint is an objective barometer . . . whether an injunction is being requested or not." July 25 Tr. at 33:21-34:2 (Sydow). Further, Judge Biedscheid contended that, if the Court determines that the Plaintiffs are not seeking an injunction, then Brillhart abstention applies. See July 25 Tr. at 34:14-19 (Sydow). Third, Judge Biedscheid addressed the abstention issue. See July 25 Tr. at 35:14 (Sydow). Judge Biedscheid contended that Younger's first and third factors are not contested. See July 25 Tr. at 35:14-15 (Sydow). On

the second Younger factor -- State interest -- Judge Biedscheid asserted that the State interests at issue are significant, because "[j]urisdictional determinations are fundamental . . . for the state court." July 25 Tr. at 36:1-3 (Sydow). Additionally, Judge Biedscheid asserted that the Pojoaque Gaming Compact is a "sovereign to sovereign compact that has tremendous importance for the state." July 25 Tr. at 36:6-8 (Sydow). Judge Biedscheid added that, if the Court changes its Younger analysis and determines that Younger abstention does not apply, then Colorado River abstention applies. See July 25 Tr. at 36:10-11 (Sydow). Judge Biedscheid elaborated that "there have been significant state court proceedings already." July 25 Tr. at 36:22-23 (Sydow).

Judge Biedscheid also responded to the Plaintiffs' waiver argument. See July 25 Tr. at 38:21-15 (Sydow). Judge Biedscheid characterized the Plaintiffs' waiver argument as "iron[ic]," because the Plaintiffs raised the argument for the first time at the July 25, 2022, hearing, which, according to Judge Biedscheid, suggests that the Plaintiffs waived their waiver argument by failing to raise it earlier. July 25 Tr. at 28:25-39:5 (Sydow). Judge Biedscheid also noted that, even if the Defendants waived their abstention argument, the Court can raise abstention sua sponte. See July 25 Tr. at 39:5-6 (Sydow). Judge Biedscheid concluded by asserting that "[t]here is an easy remedy" available to the Plaintiffs in the State appellate courts, and that the Court should "let the state courts do their jobs." July 25 Tr. at 40:6-8 (Sydow). Judge Biedscheid added that, if the Court issues the requested declaratory judgment, the declaratory judgment would be tantamount to an advisory opinion, because Judge Biedscheid is not bound to follow it. See July 25 Tr. at 41:6-12 (Sydow).

The Court gave the Plaintiffs the last word on the Reconsider Motion. See July 25 Tr. at 43:15-16 (Court). The Plaintiffs began by returning to Lawrence. See July 25 Tr. at 44:20-23 (Harwood). The Plaintiffs asserted that Lawrence underscores that, "when a case brought against

a tribe or its members [that] arises from conduct in Indian country, state courts lack jurisdiction absent clear Congressional authorization." July 25 Tr. at 45:20-24 (Harwood). The Plaintiffs also suggested that Lawrence "may well" establish that there is an exception to the Anti-Injunction Act that allows the Court to issue the requested injunctive relief. July 25 Tr. at 49:7 (Harwood). The Plaintiffs asserted that the Court can "lime the facts" to a slip and fall having nothing to do with the playing of Class 3 games," and "give us the injunctive relief requested in the complaint," or "a more global opinion." July 25 Tr. at 49:10-18 (Harwood). The Plaintiffs also rejected Judge Biedscheid's suggestion that their requested declaratory judgment would be an advisory opinion, because the Court would retain the power to issue an injunction if Judge Biedscheid did not follow the Court's declaratory judgment. See July 25 Tr. at 46:8-10 (Harwood). The Plaintiffs implored the Court not to "avoid [its] duty to declare federal law." July 25 Tr. at 48:17 (Harwood).

The Court indicated that it intends to "roll" its decision on the Reconsider Motion into its decision on the SJ Motion, and issue one Memorandum Opinion handling both motions. July 25 Tr. at 49:23-4 (Court). The Court stated that it wants to study Tenth Circuit caselaw more closely, but that it is nonetheless not "inclined to change anything" in the SJ Motion Order. July 25 Tr. at 50:5-15 (Court). The Court informed the parties that it would write a full Memorandum Opinion, but that the parties should be patient with the Court given that it has to rule on both motions and has a heavy criminal case load. See July 25 Tr. at 50:12-19 (Court).

### 19.   Reconsider Motion Order.

On March 6, 2023, the Court entered an Order denying the Reconsider Motion. See Order, filed March 6, 2023 (Doc. 87)("Reconsider Motion Order"). In the Reconsider Motion Order, the Court stands by the analysis it provided at the hearing on the Reconsider Motion. See Reconsider Motion Order at 1-2. Nevertheless, the Court states that it will "issue at a later date . . . a

Memorandum Opinion more fully detailing its rationale for th[e] decision."  Reconsider Motion Order at 1 n.1.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[9]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its

---

[9]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.").  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th

Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Liberty Lobby, 477 U.S. at 250.   A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).   Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.

> "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat'l Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89 (1968)("Cities Service")] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . [(1967)](per curiam), or is not significantly probative, Cities Service, [391 U.S.] . . . at 290, . . . summary judgment may be granted."

Liberty Lobby, 477 U.S. at 249.  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting Cities Service, 391 U.S. at 289).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970))).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicts the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explains:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .   When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.   Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations and emphasis in Scott v. Harris).  The Tenth Circuit applies this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explains:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cnty., third and fourth alterations in York v. City of Las Cruces).  "The Tenth Circuit, in *Rhoads v. Miller*, [352 F. App'x 289 (10th Cir. 2009)(unpublished)[10],] explained that the blatant contradictions of

―――――――――――

[10]Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009) is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp.,

728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir.

2012)(unpublished).

Parties may allege new claims in motions for summary judgment. See Evans v.

McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in

a motion for summary judgment, a court treats the motion for summary judgment as a request to

amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v.

Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91. While the purpose of "fact pleading" is to give

defendants fair notice of claims against them "without requiring the plaintiff to have every legal

theory or fact developed in detail before the complaint is filed and the parties have opportunity for

---

In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Rhoads v. Miller, Lymon v. Aramark Corp., 499 F. App'x 771 (10th Cir. 2012), Jones v. United States, 355 F. App'x 117 (10th Cir. 2009), Rocky Mountain Gun Owners v. Williams, 671 F. App'x 1021 (10th Cir. 2016), Catanach v. Thomson, 718 F. App'x 595 (10th Cir. 2017), Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016), Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007), Read v. Klein, 1 F. App'x 866 (10th Cir. 2001), and Buck v. Myers, 244 F. App'x 193 (10th Cir. 2007) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion.

discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case."  Evans v. McDonald's Corp., 936 F.2d at 1091.

## LAW REGARDING MOTIONS TO RECONSIDER

Motions to reconsider in civil cases fall into three categories:

(i) a motion to reconsider filed within [twenty-eight][11] days of the entry of judgment is treated as a motion to alter or amend the judgment under rule 59(e); (ii) a motion to reconsider filed more than [twenty-eight] days after judgment is considered a motion for relief from judgment under rule 60(b); and (iii) a motion to reconsider any order that is not final is a general motion directed at the Court's inherent power to reopen any interlocutory matter in its discretion.  See Price v. Philpot, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005).

Pedroza v. Lomas Auto Mall, Inc., 258 F.R.D. 453, 462 (D.N.M. 2009)(Browning, J.).  See Computerized Thermal Imaging, Inc. v. Bloomberg. L.P., 312 F.3d 1292, 1296 (10th Cir. 2002). While the civil rules are not expressly applicable to criminal cases, the courts have used the principles somewhat interchangeably.  See United States v. Christy, 739 F.3d at 539-40; United States v. Huff, 782 F.3d 1221, 1223-24 (10th Cir. 2015).  The case law for the civil side can inform when a motion to consider is appropriate in a criminal case.  See United States v. Christy, 739 F.3d

---

[11]Former rule 59 used to provide for a ten-day period after entry of judgment to file motions to reconsider.  In 2009, the rule was amended, extending the filing period to twenty-eight days:

Experience has proved that in many cases it is not possible to prepare a satisfactory post-judgment motion in 10 days, even under the former rule that excluded intermediate Saturdays, Sundays, and legal holidays. These time periods are particularly sensitive because Appellate Rule 4 integrates the time to appeal with a timely motion under these rules. Rather than introduce the prospect of uncertainty in appeal time by amending Rule 6(b) to permit additional time, the former 10-day periods are expanded to 28 days.

Federal Rules of Civil Procedure, Rule 59, Legal Information Institute, https://www.law.cornell.edu/rules/frcp/rule_59.

at 534, 539-40 (10th Cir. 2014); United States v. DeLeon, No. CR 15-4268 JB, 2016 WL 7242579, at *29 (D.N.M. October 28, 2016)(Browning, J.).

1.   **Motions for Reconsideration Under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure.**

Courts may treat motions for reconsideration as a rule 59(e) motion when the movant files within twenty-eight days of a court's entry of judgment.  See Price v. Philpot, 420 F.3d at 1167 n.9.  If the movant files outside that time period, courts should treat the motion as seeking relief from judgment under rule 60(b).  See Price v. Philpot, 420 F.3d at 1167 n.9.  "[A] motion for reconsideration of the district court's judgment, filed within [rule 59's filing deadline], postpones the notice of appeal's effect until the motion is resolved."  Jones v. United States, 355 F. App'x 117, 121 (10th Cir. 2009)(unpublished).  The time limit in rule 59(e) is now twenty-eight days from the entry of a judgment.  See Fed. R. Civ. P. 59(e).

Whether a motion for reconsideration should be considered a motion under rule 59 or rule 60 is not only a question of timing, but also "depends on the reasons expressed by the movant." Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc., 680 F.3d 1194, 1200 (10th Cir. 2011).  Where the motion "involves 'reconsideration of matters properly encompassed in a decision on the merits,'" a court considers the motion under rule 59(e).  Phelps v. Hamilton, 122 F.3d 1309, 1323-24 (10th Cir. 1997)(quoting Martinez v. Sullivan, 874 F.2d 751, 753 (10th Cir. 1989)).  In other words, if the reconsideration motion seeks to alter the district court's substantive ruling, then it should be considered a rule 59 motion and be subject to rule 59's constraints.  See Phelps v. Hamilton, 122 F.3d at 1324.  In contrast, under rule 60,

> [o]n motion and just terms, the court may relieve a party or its legal representatives from a final judgment, order, or proceeding for the following reasons:
>
> (1)    mistake, inadvertence, surprise, or excusable neglect;

- 54 -

(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

> Neither a rule 59 nor a rule 60 motion for reconsideration are appropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion . . . .  Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice.

Servants of the Paraclete v. Does, 204 F.3d at 1012.  "[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." Servants of the Paraclete v. Does, 204 F.3d at 1012.  A district court has considerable discretion in ruling on a motion to reconsider.  See Phelps v. Hamilton, 122 F.3d at 1324.

Rule 60 authorizes a district court to, "[o]n motion and just terms[,] . . . relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons," including "any other reason that justifies relief." Fed. R. Civ. P. 60(b).  A court cannot enlarge the time for filing a rule 59(e) motion.  See Brock v. Citizens Bank of Clovis, 841 F.2d 344, 347 (10th Cir. 1988)(holding that district courts lack jurisdiction over untimely rule 59(e) motions); Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., No. 11-0103, 2012 WL 869000, at *2

(D.N.M. Mar. 8, 2012)(Browning, J.)("The Court may not extend the time period for timely filing motions under Rule 59(e) . . . ."). "A motion under rule 59 that is filed more than 28 days after entry of judgment may be treated as a Rule 60(b) motion for relief from judgment." 12 James Wm. Moore, Moore's Federal Practice § 59.11[4][b], at 59-32 (3d ed. 2012). Nevertheless, a court generally will not treat an untimely rule 59(e) motion as a rule 60(b) motion when the party is seeking "'reconsideration of matters properly encompassed in a decision on the merits' contemplated by Rule 59(e)." Jennings v. Rivers, 394 F.3d 850, 854 (10th Cir. 2005).

Under some circumstances, parties can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority. See Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . ."). Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or to comply with deadlines. See Yapp v. Excel Corp., 186 F.3d at 1231. If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault. See Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. 380, 394 (1993); Cashner v. Freedom Stores, Inc., 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); Pelican Prod. Corp. v. Marino, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding that attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics. See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. LP, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962)).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002).

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  Moore, supra, § 60.48[2], at 60-182. Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863 (quoting Ackermann v. United States, 340 U.S. 193 (1950)).

Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. at 202 ("The comparison

[of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured."  Pierce v. Cook & Co., 518 F.2d at 723.  However, when the post-judgment change in the law did not arise in a related case, we have held that "[a] change in the law or in the judicial view of an established rule of law" does not justify relief under Rule 60(b)(6).  Collins v. City of Wichita, 254 F.2d 837, 839 (10th Cir. 1958).

Van Skiver v. United States, 952 F.2d at 1244-45.

## 2. **Motions to Reconsider Interlocutory Orders.**

Considerable confusion exists among the bar regarding the proper standard for a district court to apply when ruling on a motion to reconsider one of its prior "interlocutory" or "interim" orders, i.e., an order that a district court issues while the case is ongoing, as distinguished from a final judgment.  This confusion originates from the fact that neither the Federal Rules of Civil Procedure nor the Federal Rules of Criminal Procedure mention motions to reconsider, let alone set forth a specific procedure for filing them or a standard for analyzing them.  A loose conflation in terminology in Servants of the Paraclete v. Does, which refers to rule 59(e) motions in civil cases -- "motion[s] to alter or amend a judgment" -- as "motions to reconsider,"[12] compounded

---

[12]The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, who authored Servants of the Paraclete v. Does, refers to rule 59(e) motions as "motions to reconsider" several times throughout the opinion.  204 F.3d at 1005.  He uses the term "motion to reconsider" as an umbrella term that can encompass three distinct motions: (i) motions to reconsider an

that baseline confusion.  Fed. R. Civ. P. 59(e) (emphasis added); Servants of the Paraclete v. Does, 204 F.3d at 1005.

Final judgments are different from interlocutory orders.   See Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). In addition to ripening the case for appeal, see 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts . . . ."), the entry of final judgment narrows the district court's formerly plenary jurisdiction over the case in three ways.  First, for the first twenty-eight days after the entry of a civil judgment, when the court can entertain motions under rules 50(b), 52(b), 59, and 60, the district court's jurisdiction trumps that of the Court of Appeals.  See Fed. R. App. P. 4(a)(4)(B).  Even if a party files a notice of appeal, the Court of Appeals will wait until after the district court has ruled on the post-judgment motion to touch the case.  See Fed. R. App. P. 4(a)(4)(B).  Second, after twenty-eight days, when the court may consider motions under rule 60, if a party has filed a notice of appeal, the Court of Appeals'

---

interlocutory order, which no set standard governs, save that the district court must decide them "before the entry of . . . judgment," Fed. R. Civ. P. 54(b); (ii) motions to reconsider a judgment made within twenty-eight days of the entry of judgment, which the Servants of the Paraclete v. Does standard governs; and (iii) motions to reconsider a judgment made more than twenty-eight days after the entry of judgment, which rule 60(b) governs.  There is arguably a fourth standard for motions to reconsider filed more than a year after the entry of judgment, as three of the rule 60(b) grounds for relief expire at that point.

Much confusion could be avoided by using the term "motion to reconsider" exclusively to refer to the first category, "motion to amend or alter the judgment" exclusively to refer to the second category, and "motion for relief from judgment" exclusively to refer to the third category (and arguable fourth category).  These are the terms that the Federal Rules of Civil Procedure -- and other Courts of Appeals -- use to describe (ii) and (iii).  The Court agrees with Judge Kelly -- and all he likely meant by using motion to reconsider as an umbrella term is -- that, if a party submits a motion captioned as a "motion to reconsider" after an entry of final judgment, the court should evaluate it under rule 59(e) or 60(b), as appropriate, rather than rejecting it as untimely or inappropriate.

jurisdiction trumps the district court's, and the district court needs the Court of Appeals' permission even to grant a rule 60 motion.  Third, after twenty-eight days, if no party has filed a notice of appeal, district courts may consider motions under rule 60.

Final judgments implicate two important concerns militating against giving district courts free reign to reconsider their judgments.  First, when a case is not appealed, there is an interest in finality.  The parties and the lawyers expect to go home, quit obsessing about the dispute, and put the case behind them, and the final judgment -- especially once the twenty-eight day window of robust district court review and the thirty-day window of appeal have both closed -- is the disposition upon which they are entitled to rely.  Second, when a case is appealed, there is the need for a clean jurisdictional handoff from the district court to the Court of Appeals.  "[A] federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously," as doing so produces a "danger [that] a district court and a court of appeals w[ill] be simultaneously analyzing the same judgment."  Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58-59 (1982).

The Court of Appeals needs a fixed record on which to base its decisions -- especially given the collaborative nature of appellate decision-making -- and working with a fixed record requires getting some elbow room from the district court's continued interference with the case.  The "touchstone document" for this jurisdictional handoff is the notice of appeal, not the final judgment, see Griggs v. Provident Consumer Discount Co., 459 U.S. at 58 ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir. 1987)("Filing a timely notice of appeal pursuant to Fed. R. App. P. 3 transfers the matter from the district court to the court of

appeals. The district court is thus divested of jurisdiction. Any subsequent action by it is null and void."); Kirtland v. J. Ray McDermott & Co., 568 F.2d 1166, 1170 (5th Cir. 1978)("[I]t is the filing of the appeal, not the entering of a final judgment, that divests the district court of jurisdiction."), but, because the final judgment starts the parties' thirty-day clock for filing a timely notice of appeal, the Federal Rules of Civil Procedure and the Tenth Circuit have chosen to curtail the district court's jurisdiction over the case in the roughly month-long period of potentially overlapping trial- and appellate-court jurisdiction that immediately follows the entry of final judgment, see Servants of the Paraclete v. Does, 204 F.3d at 1009 (noting that post-final judgment motions at the district court level are "not intended to be a substitute for direct appeal").

Rather than suddenly divesting the district court of all jurisdiction over the case -- potentially resulting in the district court being unable to rectify easily fixable problems with the final judgment before the case goes to the Tenth Circuit, or even requiring appeal of a case that might otherwise not need to be appealed -- the Federal Rules of Civil Procedure set forth a jurisdiction phased de-escalation process, wherein the district court goes from pre-final judgment plenary jurisdiction, to limited review for the first twenty-eight days post-final judgment, and, finally, to solely rule 60 review after twenty-eight days. In defining the "limited review" that rule 59(e) allows a district court to conduct in the twenty-eight-day flux period, the Tenth Circuit incorporates traditional law-of-the-case grounds -- the same grounds that inform whether a court should depart from an appellate court's prior decision in the same case -- into rule 59(e). See United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998)(departing from the law-of-the-case doctrine in three exceptionally narrow circumstances: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would

work a manifest injustice"); <u>Servants of the Paraclete v. Does</u>, 204 F.3d at 1012 (incorporating those grounds into rule 59(e)).

Neither of these concerns -- finality nor jurisdictional overlap -- is implicated when a district court reconsiders one of its own interlocutory orders.  The Federal Rules do not specifically mention motions to reconsider interlocutory orders, but rule 54(b) of the Federal Rules of Civil Procedure makes the following open-ended proclamation about their mutability:

> When an action presents more than one claim for relief -- whether as a claim, counterclaim, crossclaim, or third-party claim -- or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.  Otherwise, <u>any order or other decision</u>, however designated, <u>that adjudicates fewer than all the claims</u> or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and <u>may be revised at any time before the entry of a judgment</u> adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b)(emphases added).  Rule 54(b) thus (i) provides that a district court can freely reconsider its prior rulings; and (ii) puts no limit or governing standard on the district court's ability to do so, other than that it must do so "before the entry of judgment."  Fed. R. Civ. P. 54(b).

The Tenth Circuit has not cabined district courts' discretion beyond what rule 54(b) provides: "[D]istrict courts generally remain free to reconsider their earlier interlocutory orders." <u>Been v. O.K. Indus.</u>, 495 F.3d at 1225.  In the Tenth Circuit, "law of the case doctrine has no bearing on the revisiting of interlocutory orders, even when a case has been reassigned from one judge to another."  <u>Rimbert v. Eli Lilly & Co.</u>, 647 F.3d 1247, 1252 (10th Cir. 2011)(citing <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225).  In this context, "the doctrine is merely a 'presumption, one whose strength varies with the circumstances.'"  <u>Been v. O.K. Indus., Inc.</u>, 495 F.3d at 1225 (quoting <u>Avitia v. Metro. Club of Chi., Inc.</u>, 49 F.3d 1219, 1227 (7th Cir. 1995)).  In short, a district court can use whatever standard it wants to review a motion to reconsider an interlocutory order.

It can review the earlier ruling de novo and essentially reanalyze the earlier motion from scratch, it can review the ruling de novo but limit its review, it can require parties to establish one of the law-of-the-case grounds, or it can refuse to entertain motions to reconsider altogether.

The best approach, in the Court's eyes, is to analyze motions to reconsider differently depending on three factors.  Cf. Been v. O.K. Indus., Inc., 495 F.3d at 1225 ("[T]he doctrine is merely a 'presumption, one whose strength varies with the circumstances.'").  First, the Court should restrict its review of a motion to reconsider a prior ruling in proportion to how thoroughly the earlier ruling addressed the specific findings or conclusions that the motion to reconsider challenges.  How "thoroughly" a point was addressed depends both on the amount of time and energy the Court spent on it, and on the amount of time and energy the parties spent on it -- in briefing and orally arguing the issue, but especially if they developed evidence on the issue.  A movant for reconsideration thus faces a steeper uphill challenge when the prior ruling was on a criminal suppression motion, class certification motion, or preliminary injunction,[13] than when the

---

[13]The Court typically makes findings of fact and conclusions of law in ruling on these motions.  At first glance, it appears that the Federal Rules of Civil Procedure set forth additional standards -- beyond that which applies to other interlocutory orders -- for amending findings of fact and conclusions of law:

> **Amended or Additional Findings.**  On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings -- or make additional findings -- and may amend the judgment accordingly.  The motion may accompany a motion for a new trial under Rule 59.

Fed. R. Civ. P. 52(b)(bold in original).  This rule appears to limit motions to reconsider orders with findings of fact and conclusions of law to 28 days.  The rule's use of the term "entry of judgment," its reference to rule 59, and its adoption of the same time period that applies to motions to alter or amend a judgment, all lead the Court to conclude, however, that rule 52(b) -- and its 28-day time limit -- does not apply to interlocutory orders.  The time limit applies only to findings of fact and conclusions of law supporting a case-ending judgment -- such as those entered after a bench trial -- and to those giving rise to an interlocutory appeal that, if filed, divests the district court of its jurisdiction -- such as those entered in support of a preliminary injunction.

prior ruling is, e.g., a short discovery ruling.  The Court should also look, not to the overall thoroughness of the prior ruling, but to the thoroughness with which the Court addressed the exact point or points that the motion to reconsider challenges.  A movant for reconsideration thus faces an easier task when he or she files a targeted, narrow-in-scope motion asking the Court to reconsider a small, discrete portion of its prior ruling than when he or she files a broad motion to reconsider that rehashes the same arguments from the first motion, and essentially asks the Court to grant the movant a mulligan on its earlier failure to present persuasive argument and evidence.

Second, the Court should consider the case's overall progress and posture, the motion for reconsideration's timeliness relative to the ruling it challenges, and any direct evidence that the parties may produce, and use those factors to assess the degree of reasonable reliance the opposing party has placed in the Court's prior ruling.  See 18B Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Vikram David Amar, Richard D. Freer, Helen Hershkoff, Joan E. Steinman & Catherine T. Struve, Federal Practice & Procedure § 4478.1 (2d ed.)("Stability becomes increasingly important as the proceeding nears final disposition . . . .  Reopening should be permitted, however, only on terms that protect against reliance on the earlier ruling.").  For example, if a defendant (i) spends tens of thousands of dollars removing legacy computer hardware from long-term storage; then (ii) obtains a protective order in which the Court decides that the defendant need not produce the hardware in discovery; then (iii) returns the hardware to long-term storage, sustaining thousands more in expenses; and (iv) several months pass, then the plaintiffs should face a higher burden in moving the Court to reconsider its prior ruling that they faced in fighting the Motion for Protective order the first time.

Third, the Court should consider the Servants of the Paraclete v. Does grounds.  The Court should be more inclined to grant motions for reconsideration if the movant presents (i) new

controlling authority -- especially if the new authority overrules prior law or sets forth an entirely new analytical framework; (ii) new evidence -- especially if the movant has a good reason why the evidence was not presented the first time around; or (iii) a clear indication -- one that manifests itself without the need for in-depth analysis or review of the facts -- that the Court erred. These three factors should influence the degree to which the Court restricts its review of a prior ruling, but they do not necessarily mean that the Court should always apply a deferential standard of review. The Court should pause before applying a standard of review to its own interlocutory orders that is more deferential than the standard that the Court of Appeals will apply to it, unless the Court concludes that the alleged error in the prior ruling was harmless, or the party moving for reconsideration waived its right to appeal the alleged error by not raising the appropriate argument. Even in circumstances where the Court concludes that it is insulated from reversal on appeal, there are principled reasons for applying a de novo standard. After all, if the Court was wrong in its earlier decision, then, generally speaking, it is unjust to maintain that result -- although the Court should weigh this injustice against any injustice that would result from upending the parties' reliance on the earlier ruling, which is the balancing test that the three factors above represent.

What the Court means by "restricting its review" is less about applying a deferential standard of review -- although that may be appropriate in some circumstances -- and more about reducing (i) the depth of the Court's analysis the second time around -- thus conserving judicial resources; and (ii) the impositions that relitigation of the prior ruling will impose on the party opposing the motion for reconsideration. The Court should consider the time and expense that the party opposing reconsideration spent in winning the earlier ruling, and should try to prevent that party from having to bear the same impositions again. Even if the Court ultimately analyzes a motion to reconsider under the same standard that it analyzed the motion which produces the

earlier ruling, it should analyze the motion in a different way -- one focused on reducing the litigation burdens of the party opposing reconsideration. For example, when a party moves the Court for a preliminary injunction, standard practice is that the Court holds an evidentiary hearing as a matter of course, regardless whether it looks as if the party has a good chance of prevailing. If the party loses and the Court denies the injunction, however, and the party moves for reconsideration, the party should not be entitled to the presumption of an evidentiary hearing merely because he or she received that presumption the first time the Court considered the motion.

In light of these statements, it is perhaps better to characterize the increased burden that a movant for reconsideration faces as one of production and not of persuasion. The Court analyzes motions to reconsider by picking up where it left off in the prior ruling -- not by starting anew. Parties opposing reconsideration can do the same, and they may stand on whatever evidence and argument they used to win the earlier ruling. Movants for reconsideration, on the other hand, carry the full burden of production: they must persuade the Court, using only the evidence and argument they put before it, that it should change its prior ruling; they must do all of the legwork, and not rely on the Court to do any supplemental fact-finding or legal research; and they must convincingly refute both the counterarguments and evidence that the opposing party used to win the prior ruling and any new arguments and evidence that the opposing party produces while opposing the motion to reconsider. Unlike the motion that produced the prior ruling, a motion to reconsider is not -- and is not supposed to be -- a fair fight procedurally. The deck is stacked against a movant for reconsideration, and if such a movant hopes to prevail, he or she must have not only a winning legal position, but the work ethic and tenacity to single-handedly lead the Court to his or her way of thinking.

## LAW REGARDING IGRA

The United States Congress passed IGRA in 1988 to "balance the interests of states, tribes, and the federal government" with respect to gaming in Indian Country.   Cohen's Handbook § 12.02.  IGRA's legislative history is essential to understanding its meaning.  Accordingly, the Court begins by providing an overview of key, pre-IGRA caselaw.  Second, the Court summarizes IGRA's legislative history. Next, the Court surveys IGRA's key provisions.  Finally, the Court provides an overview of key constitutional challenges to IGRA.

### 1.      Pre-IGRA Caselaw Concerning Indian Gaming.

It is a foundational principle of federal Indian law that Indian Tribes are "'domestic dependent nations' that exercise 'inherent sovereign authority.'"  Bay Mills, 572 U.S. at 787 (quoting Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 509 (1991)). Because Tribes are considered distinct sovereigns, courts have held that they "are subordinate only to the federal government."  Texas v. United States, 497 F.3d 491, 493 (5th Cir. 2007)(citing California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 (1987)("Cabazon Band")).  See Bay Mills, 572 U.S. at 787 (noting that Indian Tribes are "separate sovereigns pre-existing the Constitution")(quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56 (1978)).  In other words, courts have determined that Indian Tribes are generally not subject to State authority, and are usually only "subject to plenary control by Congress."  Bay Mills, 572 U.S. at 787 (citing United States v. Lara, 541 U.S. 193, 200 (2004)).

Historically, courts have determined that States have limited authority in Indian Country. See, e.g., Alaska v. Native Vill. of Venetie, 522 U.S. 520, 527 n.1 (1998)(explaining that in Indian Country, "[g]enerally speaking, primary jurisdiction . . . rests with the Federal Government and the Indian tribe inhabiting it, and not with the States . . . .").  Additionally, the Supreme Court of

the United States has clarified that States generally lack regulatory authority over Indians in Indian Country.  See Bryan v. Itasca Cnty., 426 U.S. 373, 376 n.2 (1976)("Bryan")(citing McClanahan v. Ariz. State Tax Comm'n, 411 U.S. 164, 172 (1973)("the policy of leave Indians free some state jurisdiction and control is deeply rooted in the Nation's history" (quoting Rice v. Olson, 324 U.S. 786, 789 (1945)).

Before IGRA, States' abilities to regulate Indian gaming was a controversial issue in the federal courts.  In the 1970s and early 1980s, federal courts differed on whether States could regulate Indian gaming.  Compare Oneida Tribe of Indian of Wis. v. Wisconsin, 518 F. Supp. 712 (W.D. Wis. 1981)(Crabb, C.J.)(holding that a Wisconsin State regulation concerning Bingo does not apply to the Oneida Reservation) with United States v. Dakota, 796 F.2d 186 (6th Cir. 1986)(holding that gaming activity in the Keweenaw Bay Indian Community violated Michigan State law, and, by extension, the Organized Crime Control Act of 1970).  The Courts of Appeals attempted to address the conflict.  For example, in Seminole Tribe v. Butterworth, 658 F.2d 310 (5th Cir. 1981)("Seminole Tribe"), the United States Court of Appeals for the Fifth Circuit determined that a Florida State bingo regulation was a civil regulation that could not be applied to the Seminole Indian Tribe.  See 658 F.2d at 315-16 (relying on Bryan for the proposition that State civil regulations cannot be enforced against Tribes).  Similarly, in Barona Group of the Capitan Grande Band of Mission Indians v. Duffy, 694 F.2d 1185 (9th Cir. 1982)("Barona Group"), the United States Court of Appeals for the Ninth Circuit concluded that State and local Bingo regulations in San Diego County, California did not apply to Bingo games played on the Barona Group of the Capitan Grande Band of Mission Indians' land.  See 694 F.2d at 1189.  After Seminole Tribe and Barona Group "[t]he state of the law . . . was clear.  Where the laws of a sate prohibited gambling for all persons as a matter of criminal law, tribes within that state could not

engage in, or license and regulate, gambling." Franklin Ducheneaux, The Indian Gaming Regulatory Act: Background and Legislative History, 24 Ariz. St. L.J. 99, 110 (2010)("IGRA Background").

The Supreme Court addressed the Indian gaming regulation issue in 1987 in Cabazon Band. In Cabazon Band the Supreme Court established that State gaming regulations do not apply to Indian Tribes. See Cabazon Band, 480 U.S. at 221-22. More specifically, in Cabazon Band, the Supreme Court held that States lack regulatory authority over gambling activities occurring on Indian lands, because Congress had not expressly provided for such authority. See 480 U.S. at 214, 221-22. The Supreme Court added that State laws "may be applied to tribal Indians on their reservations if Congress has expressly so provided." Cabazon Band, 480 U.S. at 207. Accordingly, "unless and 'until Congress acts, the tribes retain' their historic sovereign authority." Bay Mills, 572 U.S. at 788 (quoting United States v. Wheeler, 435 U.S. 313, 323 (1978)).

2.   **IGRA's Legislative History.**

The Supreme Court's decision in Cabazon Band "opened the door for the expansion of gaming in Indian country free of state regulatory control," Cohen's Handbook § 12.01, and "gaming seemed an ideal source of revenue" for Tribes, IGRA Background at 111. Accordingly, in the mid- to late 1980s, "there was a mini-explosion" in Indian gaming. IGRA Background at 111. "The rapid growth of gaming activities on Indian reservations and the perceived vacuum in legal authority at either the state or federal level caused political outcries from state and local authorities." IGRA Background at 112.

In response to that outcry, in 1983, the United States House of Representatives considered the Indian Gambling Control Act. See H.R. 4566, 98th Cong. (1983); IGRA Background at 116-18 (providing a section-by-section analysis of the Indian Gambling Control Act). The Indian

Gambling Control Act's "primary purpose . . . was to federally pre-empt any possible state regulation of gambling activities by Indian tribes or individuals in Indian country." IGRA Background at 116. The Indian Gaming Control Act faced steep "tribal opposition" and never advanced to the Senate. IGRA Background at 122.

The following term, "the legislative battle over Indian gaming began in earnest. . . . ." IGRA Background at 124. In 1985, the House and the Senate considered numerous resolutions concerning Indian gaming regulation. See 131 Cong. Rec. H1835-03 (1985); 131 Cong. Rec. S4113-03 (1985); 131 Cong. Rec. H2957-05 (1985); 131 Cong. Rec. H6980-05 (1985); 131 Cong. Rec. S4113-03 (1985). Although all of the resolutions that the House and Senate considered attempted to establish means of regulating Indian gaming federally, these resolutions "still sought to protect the right of tribal sovereignty and self-government in the regulation of gaming on Indian land." IGRA Background at 149. In these years, "Congress continued to assert the right of tribes to regulate their own affairs and the importance of gaming revenue to strong tribal governments." IGRA Background at 149. Ultimately, none of the resolutions materialized into law in the 99th Congress. See IGRA Background at 125-47 (summarizing the various resolutions' trajectories through the House and Senate).

"Seven bills were introduced in the 1st session of the 100th Congress relating to Indian gaming." IGRA Background at 151. See, e.g., H.R. 964, 100th Cong. (1987); H.R. 1079, 100th Cong. (1987); H.R. 2507, 100th Cong. (1987); H.R. 3605, 100th Cong. (1987); S. 1301, 100th Cong. (1987); S. 1841, 100th Cong. (1987). In February, 1987 -- six days before the Supreme Court announced its Cabazon Band decision -- Senator Daniel Inouye, United States Senator from Hawaii and Chair of the Senate Committee on Indian Affairs, introduced one such bill, Senate Bill 555. See IGRA Background at 160; S. 555, 100th Cong. (1987). In June, 1987, the Senate

Committee on Indian Affairs held a hearing on Senate Bills 555 and 13-1.  See IGRA Background at 161.  Assistant Attorney General Victoria Toensing, who represented the Department of Justice at the hearing, rejected Senate Bill 1303, because "it proposes such an ineffective regulatory structure."  IGRA Background at 162 (quoting Gaming Activities on Indian Reservations and Lands: Hearing on S. 555 and 1303 Before the Select Committee on Indian Affairs at 254-55, 100th Cong. (1987)("Senate Bill 555 Hearing Record")).  By contrast, Toensing preferred Senate Bill 555, because it ensures that the federal government will "have the fundamental authority necessary to regulate gaming effectively . . . . , [but] relies primarily on self-regulation by the tribes."  IGRA Background at 162 (quoting Senate Bill 555 Hearing Record at 261).

While Senate Bill 555 was pending in the Senate, the Supreme Court handed down Cabazon Band.  See IGRA Background at 163.  The decision "was the primary motivating force behind the eventual negotiation of Indian gaming legislation that was at least minimally acceptable to all parties."  IGRA Background at 163.  The negotiations began in late 1987 and continued into early 1988.  See IGRA Background at 164.  They were "often tense, volatile, and acrimonious."  IGRA Background at 164.   The negotiations focused primarily "on how to deal with class III gaming."  IGRA Background at 164.  The disputes regarding the regulation of class III gaming at the negotiations "resulted in the Tribal-State compact concept."  IGRA Background at 165.  The parties to the negotiations consolidated the negotiations' outcome into "compromise language," which they presented to the Senate Committee on Indian Affairs "as a substitute" for the original Senate Bill 555.  IGRA Background at 165.

In May, 1988, the Senate Committee on Indian Affairs took up Senate Bill 555's amended version.  See IGRA Background at 165.  Shortly thereafter, the Committee issued its report on Senate Bill 555.  See IGRA Background at 165; S. Rep. No. 100-446 (1988)("Committee Report").

The Committee Report states:

> S. 555 recognizes the primary tribal jurisdiction over bingo and card parlor operations although oversight and certain other powers are vested in a federally established National Indian Gaming Commission.  For class III casino, parimutuel and slot machine gaming, the bill authorizes tribal governments and State government to enter into tribal-State compacts to address regulatory and jurisdictional issues.

Committee Report at 3.

In September, 1988, the full Senate took up consideration of Senate Bill 555.  See IGRA Background at 166.  On September 15, 1988, Senator Inouye made comments when he introduced the bill on the Senate Floor.  See IGRA Background at 166.  Senator Inouye explained: "The Committee has attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land."  IGRA Background at 166 (quoting 134 Cong. Rec. S12,649 (daily ed. September 15, 1988).  Later that day, the Senate passed Senate Bill 555, as amended, by voice vote.  See IGRA Background at 168.  The House passed Senate Bill 555, as amended on September 26, 1988.  See IGRA Background at 169.  President Reagan signed the Bill -- IGRA -- into law on October 17, 1988.  See 25 U.S.C. §§ 2701-21.

### 3.    IGRA's Primary Provisions.

IGRA encompasses many aspects of Indian gaming.  See 25 U.S.C. §§ 2701-21.  25 U.S.C. § 2701 lays out the primary legislative findings underlying IGRA:

The Congress finds that --

> (1)    numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

> (2)    Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian

> gaming, but does not provide standards for approval of such contracts;

> (3)   existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

> (4)   a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

> (5)   Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

25 U.S.C. § 2701.   Similarly, Congress memorialized IGRA's policy objectives in 25 U.S.C. § 2702:

> The purpose of this Act is --

> (1)   to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

> (2)   to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

> (3)   to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

25 U.S.C. § 2702.  Section 2703 lays out several key definitions, including:

> (6)   The term "class I gaming" means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations.

(7)

    (A)    The term "class II gaming" means --

        (i)    the game of chance commonly known as bingo (whether or not electronic, computer, or other technologic aids are used in connection therewith) --

            (I)    which is played for prizes, including monetary prizes, with cards bearing numbers or other designations,

            (II)    in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or electronically determined, and

            (III)    in which the game is won by the first person covering a previously designated arrangement of numbers or designations on such cards,

including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo, and

        (ii)    card games that --

            (I)    are explicitly authorized by the laws of the State, or

            (II)    are not explicitly prohibited by the laws of the State and are played at any location in the State,

but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games.

    (B)    The term "class II gaming" does not include --

        (i)    any banking card games, including baccarat, chemin de fer, or blackjack (21), or

        (ii)    electronic or electromechanical facsimiles of any game of chance or slot machines of any kind,

> (C)     Notwithstanding any other provision of this paragraph, the term "class II gaming" includes those card games played in the State of Michigan, the State of North Dakota, the State of South Dakota, or the State of Washington, that were actually operated in such State by an Indian tribe on or before May 1, 1988, but only to the extent of the nature and scope of the card games that were actually operated by an Indian tribe in such State on or before such date, as determined by the Chairman . . .

> (8)     The term "class III gaming" means all forms of gaming that are not class I gaming or class II gaming.

25 U.S.C. § 2703.  25 U.S.C. § 2704 establishes the National Indian Gaming Commission, which a Commissioner leads.  See 25 U.S.C. § 2704.  See also 15 U.S.C. §§ 2705, 2706 (laying out the Commissioner's powers and the Commission's powers, respectively).

Section 2710 governs jurisdiction over the three classes of gaming.  See 25 U.S.C. § 2710.  Specifically, sub-section (a) provides that "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this chapter," 25 U.S.C. § 2710(a)(1), and that "[a]ny class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter," 25 U.S.C. § 2710(a)(2).  Sub-section (b) governs Class II gaming regulation.  See 25 U.S.C. § 2710(b).

Similarly, sub-section (d) governs Class III gaming regulation.  See 25 U.S.C. § 2710(d).  It establishes:

> (1)     Class III gaming activities shall be lawful on Indian lands only if such activities are --

>> (A)     authorized by an ordinance or resolution that --

>>> (i)     is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

>>> (ii)     meets the requirements of subsection (b), and

>>> (iii)     is approved by the Chairman,

(B)     located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C)     conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

25 U.S.C. § 2710(d)(1).  In other words, 25 U.S.C. § 2710(d)(1)(C) requires States and Tribes to

enter into gaming compacts.  See 25 U.S.C. § 2710(d)(1)(C).  Sub-section (d)(3) elaborates on the

gaming compacts:

(3)

(A)     Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.   Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

(B)     Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

(C)     Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to --

(i)      the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii)     the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii)    the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv)    taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v)    remedies for breach of contract;

(vi)    standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii)    any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3).

**4.**    **Constitutional Challenges to IGRA**.

After Congress passed IGRA, States and Tribes began testing its limits in the courts. "With one significant exception, constitutional challenges to IGRA have not succeeded." Cohen's Handbook § 12.02[2] (footnote omitted). That "significant exception" is the Supreme Court's decision in Seminole Tribe v. Florida, 517 U.S. 44 (1996)(Rehnquist, C.J.)("Seminole Tribe"). In Seminole Tribe, the Supreme Court considered the constitutionality of a key IGRA provision -- 25 U.S.C. § 2710(d)(7) -- which, at the time, abrogated State sovereign immunity in cases where a State failed to engage in good faith bargaining with a Tribe to create a gaming compact. See Seminole Tribe, 517 U.S. at 47, 50; 25 U.S.C. § 2710(d)(7). The dispute arose after the Seminole Tribe of Florida attempted to engage in good faith negotiations with Florida, but Florida declined. See Seminole Tribe, 517 U.S. at 51. Seminole Tribe filed suit against Florida in the United States District Court for the Southern District of Florida, and Florida moved to dismiss on the grounds that it was entitled to sovereign immunity. See Seminole Tribe, 517 U.S. at 52. The Honorable Stanley Marcus, then United States District Judge for the United States District Court for the Southern District of Florida, denied the motion, see Seminole Tribe v. State, 801 F. Supp. 655

(S.D. Fla. 1992)(Marcus, J.), and Florida sought interlocutory appeal.  The United States Court of Appeals for the Eleventh Circuit reversed Judge Marcus' decision.  See Seminole Tribe v. Florida, 11 F.3d 1016, 1019 (11th Cir. 1994).

The Supreme Court affirms the Eleventh Circuit and holds that neither the Indian Commerce Clause, nor the Interstate Commerce Clause provide Congress the authority to abrogate State sovereign immunity in IGRA suits.  See Seminole Tribe, 517 U.S. at 72-73.  More specifically, the Court establishes that 25 U.S.C. § 2710(d)(7) evinces Congress' "unmistakably clear" intent to abrogate State sovereign immunity, 517 U.S. at 56, but ultimately holds that Congress did not abrogate State sovereign immunity "pursuant to a valid exercise of power," 517 U.S. at 58 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)).  Accordingly, the Supreme Court strikes 25 U.S.C. § 2710(d)(7), but preserves the remainder of IGRA.  See Seminole Tribe, 517 U.S. at 72-73.

Several years later, in Bay Mills, the Supreme Court confronted the inverse issue: whether IGRA abrogates Tribal sovereign immunity.  See 572 U.S. at 785.  In Bay Mills, the Bay Mills Indian Community and Michigan entered into a gaming compact that permits Bay Mills conduct Class III gaming on Indian land.  See 572 U.S. at 786.  Several years later, Congress created a land trust in and around Vanderbilt, Michigan.  See 572 U.S. at 786.  Congress specified that, if a Tribe purchases land from the land trust, that land is considered Indian land.  See 572 U.S. at 786. Although the land trust is roughly 125 miles from the Bay Mills reservation, Bay Mills purchased property through the land trust and opened a casino on it.  See 572 U.S. at 786.  Michigan then filed suit against Bay Mills in a Michigan federal district court, seeking to enjoin it from operating the new casino.  See 572 U.S. at 787.  Michigan alleged that the new casino violated the Michigan-Bay Mills gaming compact and IGRA, because it existed outside Indian territory.  See 572 U.S. at

787.  The district court issued a preliminary injunction, and the United States Court of Appeals for

the Sixth Circuit vacated on the grounds that Bay Mills is immune from Michigan's suit.  See 572

U.S. at 787.

    The Supreme Court affirms the Sixth Circuit.  See 572 U.S. at 788.  The Supreme Court

begins by restating the long-held principle that "Indian tribes are 'domestic dependent nations'

that exercise 'inherent sovereign authority.'"  Bay Mills, 572 U.S. at 788 (quoting Okla. Tax

Comm'n v. Citizen Band Potawatomi Tribe, 498 U.S. 505, 509 (1991)(quoting Cherokee Nation

v. Georgia, 5 Pet. 1, 17 (1831))).  The Supreme Court reiterates that the Tribes' statuses as nations

entitles them to qualified sovereign immunity that Congress has the power to abrogate.  See 572

U.S. at 788-89 (citing Kiowa Tribe of Okla. v. Mnf'g Techs. Inc., 523 U.S. 751, 756 (1998)).  The

Supreme Court notes, however, that, if Congress abrogates Tribal immunity, it must abrogate that

immunity clearly and unequivocally.  See 572 U.S. at 790.  The Supreme Court states: "The upshot

is this: Unless Congress has authorized Michigan's suit, our precedents demand that it be

dismissed."  572 U.S. at 791.  The Supreme Court determines that 25 U.S.C. § 2710(d)(7)(A)(ii)

"partially abrogates tribal sovereign immunity" in cases where a Tribe conducts Class III gaming

on Indian land in violation of a gaming compact.  572 U.S. at 791.  The Supreme Court determines,

however, that Bay Mills "falls outside that term's ambit."  572 U.S. at 791.

> [25 U.S.C. § 2710(d)(7)(A)(ii)] authorizes a State to sue a tribe to "enjoin a class
> III gaming activity located on Indian lands and conducted in violation of any
> Tribal–State compact." . . . . A key phrase in that abrogation is "on Indian lands"
> -- three words reflecting IGRA's overall scope (and repeated some two dozen times
> in the statute).  A State's suit to enjoin gaming activity on Indian lands (assuming
> other requirements are met) . . . falls within § 2710(d)(7)(A)(ii); a similar suit to
> stop gaming activity off Indian lands does not.  And that creates a fundamental
> problem for Michigan.  After all, the very premise of this suit -- the reason Michigan
> thinks Bay Mills is acting unlawfully -- is that the Vanderbilt casino is outside
> Indian lands. . . . By dint of that theory, a suit to enjoin gaming in Vanderbilt is
> correspondingly outside § 2710(d)(7)(A)(ii)'s abrogation of immunity.

Bay Mills, 572 U.S. at 791.

Michigan protested that Bay Mills engages in Class III gaming activity off of Indian land,

because it engages in "administrative action" related to gaming, like licensing, off Indian land.

572 U.S. at 791-92.  The Supreme Court rejects that argument, stating:

> [T]hat argument comes up snake eyes, because numerous provisions of IGRA show
> that "class III gaming activity" means just what it sounds like -- the stuff involved
> in playing class III games.  For example, § 2710(d)(3)(C)(i) refers to "the licensing
> and regulation of [a class III gaming] activity" and § 2710(d)(9) concerns the
> "operation of a class III gaming activity."  Those phrases make perfect sense if
> "class III gaming activity" is what goes on in a casino -- each roll of the dice and
> spin of the wheel.  But they lose all meaning if, as Michigan argues, "class III
> gaming activity" refers equally to the off-site licensing or operation of the games.
> (Just plug in those words and see what happens.)  See also §§ 2710(b)(2)(A),
> (b)(4)(A), (c)(4), (d)(1)(A)(similarly referring to class II or III "gaming activity").
> The same holds true throughout the statute. Section 2717(a)(1) specifies fees to be
> paid by "each gaming operation that conducts a class II or class III gaming activity"
> -- signifying that the gaming activity is the gambling in the poker hall, not the
> proceedings of the off-site administrative authority.

572 U.S. at 792.  Finally, the Supreme Court notes that, because Cabazon Band "left fully intact

a State's regulatory power over tribal gaming outside Indian territory -- which . . . is capacious"

-- the "problem Congress set out to address in IGRA . . . arose in Indian lands alone."  Bay Mills,

572 U.S. at 794.  Accordingly, the Supreme Court observes that "[e]verything -- literally

everything -- in IGRA affords tools (for either state or federal officials) to regulate gaming on

Indian lands, and nowhere else."  Bay Mills, 572 U.S. at 795.

### LAW REGARDING JURISDICTION IN PERSONAL INJURY SUITS ARISING IN INDIAN COUNTRY CASINOS UNDER IGRA

Whether IGRA permits Tribes to shift jurisdiction from Tribal to State court in cases

involving gaming-adjacent personal injury suits is the subject of controversy in State and federal

courts.  The New Mexico State courts weighed in on the issue in Santa Clara Pueblo, 2005-NMCA-

110, 138 N.M. at 198, 118 P.3d at 203.  The controversy in <u>Santa Clara Pueblo</u> arose after a fourteen-year-old girl was kidnapped from a casino parking lot on the Santa Clara Pueblo.  <u>See</u> 2005-NMCA-110 ¶ 3, 138 N.M. at 200, 118 P.3d at 205.  The Santa Clara Pueblo has a gaming compact with New Mexico that establishes that Santa Clara Pueblo "waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury . . . up to the amount of fifty million dollars," and "agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election."  2005-NMCA-110 ¶ 6, 138 N.M. at 201, 118 P.3d at 206.  In keeping with the compact, the girl's family filed suit against Santa Clara Pueblo in New Mexico State court.  <u>See</u> 2005-NMCA-110 ¶ 3, 138 N.M. at 200, 118 P.3d at 205.  Santa Clara Pueblo moved to dismiss the suit on the grounds that the State court lacked subject-matter jurisdiction.  <u>See</u> 2005-NMCA-110 ¶ 3, 138 N.M. at 200, 118 P.3d at 205.  The State court denied Santa Clara Pueblo's motion on the grounds that the compact permitted the girl's family to file suit in State court.  <u>See</u> 2005-NMCA-110 ¶ 4, 138 N.M. at 200, 118 P.3d at 205.

Santa Clara Pueblo appealed.  <u>See</u> 2005-NMCA-110 ¶ 3, 138 N.M. at 200, 118 P.3d at 205.  On appeal, Santa Clara Pueblo argued: (i) "absent a grant of jurisdiction from the United States Congress, state courts are powerless to hear cases that arise on tribal land"; (ii) "IGRA does not constitute such a grant of jurisdiction": and (iii) "IGRA does not allow a state and a tribe to enter into a compact that shifts jurisdiction over personal injury claims to state courts."  2005-NMCA-110 ¶ 4, 138 N.M. at 200, 118 P.3d at 205.   The Court of Appeals of New Mexico disagrees with Santa Clara Pueblo's arguments.  <u>See</u> 2005-NMCA-110 ¶ 9, 138 N.M. at 201, 118 P.3d at 206.  It explains:

Pursuant to the IGRA and the Compact Negotiation Act, New Mexico and Santa Clara entered negotiations to form a compact to permit Santa Clara to offer Class III gaming on its tribal land. The Compact that emerged from their "good faith negotiations" devotes an entire section to defining the mechanism by which visitors may be compensated for their injuries. In particular, the Compact expressly allows visitors to bring their claims in state court. Because the State and Santa Clara negotiated and agreed to address remedies for visitor injuries in the Compact, it is apparent that both parties themselves determined that apportioning jurisdiction over the claims of injured visitors was "directly related to, and necessary for, the licensing and regulation of [Class III gaming] activity." *See* §§ 2710 (d)(3)(C)(i), (ii).

2005-NMCA-110 ¶ 10, 138 N.M. at 201-02, 118 P.3d at 206-07.

The Court of Appeals of New Mexico acknowledges that, as a general matter, Tribal courts have jurisdiction over suits by non-Indians against Tribes concerning injuries that occurred in Indian territory. See 2005-NMCA-110 ¶ 7, 138 N.M. at 201, 118 P.3d at 206. It notes, however, that "Congress may confer jurisdiction over such a suit on a state court." 2005-NMCA-110 ¶ 7, 138 N.M. at 201, 118 P.3d at 206. Therefore, the Court of Appeals of New Mexico reasons that the question before it is whether Congress intended to confer such jurisdiction when it passed IGRA. See 2005-NMCA-110 ¶ 8, 138 N.M. at 201, 118 P.3d at 206. The court answers that question in the affirmative and explains:

A consistent theme emerges from [IGRA's] legislative history: Congress recognized the gravity of the tribal-state conflict but chose not to impose a universal, nationwide solution. Instead, Congress created a mechanism by which each tribe and each state could negotiate over how to apportion jurisdiction over tribal gaming. *See* S. Rep. No. 100-446, at 13 (noting "that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises"). The resulting tribal-state "compact may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between." S. Rep. No. 100-446, at 14; *see Gallegos* [*v. Pueblo of Tesuque*], 2002-NMSC-012, ¶ 10, 132 N.M. 207, 46 P.3d 668 (noting that "according to Congress, a state court may exercise jurisdiction over a tribe pursuant to the IGRA when a tribe and a state have consented to such an arrangement in a gaming compact"). The language of the IGRA is consistent with this theme. *See* [Gallegos v.Pueblo of Tesuque] . . . , 2002-NMSC-012, ¶ 10, 132 N.M. 207, 46 P.3d 668] (noting that "the language of

- 82 -

the IGRA allows the states and the tribes to negotiate with respect to jurisdiction"). The Act provides very general guidance on what issues a tribal-state compact may address and leaves the scope of each compact to be determined by the states and the tribes. *See* 25 U.S.C. § 2710(d); 134 Cong. Rec. at S12651 (statement of Haw. Sen. Daniel Inouye)(noting that "the idea [behind the compact approach] is to create a consensual agreement between the two sovereign governments and it is up to those entities to determine what provisions will be in the compacts"); see [134 Cong. Rec. at S12651] . . . (statement of Wash. Sen. Daniel Evans)(noting that Congress "intend[s] that the two sovereigns -- the tribes and the [s]tates -- will sit down together in negotiations on equal terms and come up with a recommended methodology for regulating [C]lass III gaming on Indian lands"); *see also* S. Rep. No. 100-446, at 14 (noting that 25 U.S.C. § 2710(d)(3)(C) lists the "broad areas" that may be addressed in a tribal-state compact).

2005-NMCA-110 ¶ 15, 138 N.M. at 203, 118 P.3d at 208. In sum, the Court of Appeals of New Mexico has "no difficulty concluding that the State and Santa Clara acted within the scope of the IGRA when they formed the Compact," including the provision that permits jurisdiction shifting for personal injury suits. 2005-NMCA-110 ¶ 17, 138 N.M. at 203-04, 118 P.3d at 208-09.

The Honorable C. Leroy Hansen, United States District Judge for the United States District Court for the District of New Mexico addresses the same issue in <u>Nash</u>, but comes to the opposite conclusion as the Court of Appeals of New Mexico. <u>See</u> 972 F. Supp. 2d at 1254. In <u>Nash</u>, Desiree Mendoza, Michael Mendoza, and Dominic Montoya attended a wedding at the Star Casino, which sits on Santa Ana Pueblo land. <u>See</u> 972 F. Supp. 2d at 1256, 1258. Casino employees overserved D. Mendoza, M. Mendoza, and Montoya. <u>See</u> 972 F. Supp. 2d at 1257. After leaving the wedding, the three were involved in a car accident, and D. Mendoza and M. Mendoza were killed. <u>See</u> 972 F. Supp. 2d at 1257. Representatives for D. Mendoza, M. Mendoza, and Montoya filed suit against the casino in New Mexico State court. <u>See</u> 972 F. Supp. 2d at 1257. The Honorable Nan Nash, Judge for the Second Judicial District Court of New Mexico, dismissed the suit on the grounds that the State court lacked jurisdiction, because the plaintiffs should have filed in Tribal court. <u>See</u> F. Supp. 2d at 1258.

On appeal, the Court of Appeals of New Mexico reversed Judge Nash's decision.  See Nash, 972 F. Supp. 2d at 1258; Mendoza v. Tamaya Enterprises, Inc., 2010-NMCA-074, 148 N.M. 534, 238 P.3d 903 ("Mendoza I").  More specifically, the Court of Appeals of New Mexico determined that the Santa Ana Pueblo's gaming compact with New Mexico waives New Mexico's "sovereign immunity in connection with claims for compensatory damages for bodily injury or property damage, and that any claim could be brought in state district court."  Nash, 972 F. Supp. 2d at 1258 (paraphrasing Mendoza I, 2010-NMCA-074 ¶¶ 23-24, 148 N.M. at 541-42, 238 P.3d at 910-11).  The Supreme Court of New Mexico affirmed.  See Nash, 972 F. Supp. 2d at 1258; Mendoza v. Tamaya Enterprises, Inc., 2011-NMSC-030, 150 N.M. 258, 258 P.3d 1050 ("Mendoza II").  The Supreme Court of New Mexico agreed that the compact "unambiguously agreed to proceed in state court for claims involving injuries proximately caused by the conduct of the Casino."  Mendoza II, 2011-NMSC-030 ¶ 15, 150 N.M. at 2258, 258 P.3d at 1055.  For that reason, the Supreme Court of New Mexico asserts that "our state courts may exercise jurisdiction over this case."  Mendoza II, 2011-NMSC-030 ¶ 3, 150 N.M. at 258, 258 P.3d at 1052.

Santa Ana Pueblo then filed suit in federal court, seeking: (i) injunctive relief prohibiting Judge Nash from exercising jurisdiction over the suit; and (ii) a declaratory judgment establishing that IGRA "does not permit the shifting of jurisdiction from tribal courts to state courts over personal injury lawsuits brought against tribes or tribal gaming enterprises, for alleged wrongs arising or occurring within Indian country . . . ."  Nash, 972 F. Supp. 2d at 1255.  The defendants moved for summary judgment.  See 972 F. Supp. 2d at 1255.  In ruling on the motion for summary judgment, Judge Hansen recognizes that "tribal courts retain exclusive jurisdiction over claims arising on tribal lands against tribes."  972 F. Supp. 2d at 1263 (citing Williams v. Lee, 358 U.S. 217, 220 (1959)).  Judge Hansen adds that, "[a]s a matter of federal law, an Indian tribe is subject

to suit only where Congress has authorized the suit or the tribe has waived its immunity."  972 F.

Supp. 2d at 1263 (quoting Kiowa Tribe of Okla. v. Mnf'g Techs. Inc., 523 U.S. at 754).

In keeping with that principle, Judge Hansen determines that the "first inquiry before the

Court is whether Congress, by way of the IGRA, has authorized tribes and states to agree to shifting

jurisdiction from tribal court to state court, thereby allowing the state to exercise jurisdiction over

tribal defendants in visitors' personal injury lawsuits arising on Indian land."  972 F. Supp. 2d at

1263.  Judge Hansen "concludes that the IGRA does not permit such . . . jurisdictional shifting."

972 F. Supp. 2d at 1263.  In so concluding, Judge Hansen states:

> [25 U.S.C. § 2710(d)(3)(c)(ii)], the only subparagraph in this section of the statute that mentions jurisdiction, permits an allocation of jurisdiction between the State and the Indian tribe, only as necessary for the enforcement of laws and regulations of the State or Indian tribe, that are directly related to, and necessary for, licensing and regulation of class III gaming activities.  The Court finds no justification for concluding that the IGRA intends the extension of state court jurisdiction for any other purpose than resolution of issues involving the licensing and regulation of class III gaming.  A personal injury claim arising from the negligent serving of alcohol has no bearing whatsoever on the licensing or regulation of class III gaming activities.  Regulation of the service of alcohol does nothing to further the IGRA's three stated purposes.
>
> Having read all of the legislative history cited to it by both parties, and in many other reported cases, the Court finds no support in the legislative history of the statute, sufficient to persuade it that the claim in the underlying state court litigation is within the categories of issues that may be allocated to state court jurisdiction.  For each statement contained in the legislative record on one side of the issue, the Court has found a countervailing statement.  For example, in the Report of the Senate Indian Affairs Committee at 3083, cited by the Mendoza Defendants, in discussing the strong and serious presumptions that must provide the framework for negotiations, such factors as "promoting public safety as well as law and order on tribal lands" are mentioned immediately prior to "realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders."  Given the ambiguity and randomness of parsing through and placing absolute reliance on isolated portions of legislative history, the Court has opted instead to rely on the clear statutory language and structure of the IGRA.  *See Colorado River Indian Tribes v. National Indian Gaming Comm.*, 383 F. Supp. 2d 123, 139 (D.D.C.

2005)("The statutory language and the structure of the IGRA are clear, and so resort to the legislative history of the statute is unnecessary.").

Congress could have worded subparagraph (ii) in a way that obviously or necessarily included a shifting of jurisdiction over such claims as the one in the underlying state court litigation, as a permissible topic for negotiations of compacts. It did not do so. Even allowing that there are many issues to be resolved in negotiating compacts, the IGRA takes a narrow view of what jurisdiction shifting may occur, and the language it employs is restrictive rather than expansive.

972 F. Supp. 2d at 1264-65 (footnote omitted).

Next, Judge Hansen addresses "the second prong of its analysis . . . whether the language in Section 8 of the Compact can be construed as a legally effective waiver of immunity and an agreement, by the Pueblo, to be subject to state court jurisdiction in the underlying state court litigation." 972 F. Supp. 2d at 1265. Judge Hansen answers that question in the negative and explains:

As noted above, the stated scope and purposes of the IGRA solely relate to the operation, regulation and oversight of Indian gaming. The Court's conclusion . . . above, that the IGRA does not authorize jurisdiction-shifting in the underlying state litigation, is not affected in any way by the language of the Compact. Section 8 of the Compact is nothing more than an agreement between the parties, the negotiated scope of which is controlled by § 2710(d)(3)(C).

While there is sparse case law that addresses this precise issue, the Tenth Circuit has addressed the issue of tribal waiver of immunity under the IGRA, on a couple of occasions.

. . . .

The limited case law in the Tenth Circuit supports this Court's restrictive interpretation of the IGRA and conclusion that a waiver of tribal sovereign immunity, in a compact entered into pursuant to the IGRA, can be valid only in the narrow category of cases where compliance with the IGRA's provisions is at stake.

For these reasons, the non-tribal Defendants' effort to invoke Section 8 of the Compact as a basis for state-court jurisdiction in this matter fails. "The IGRA limits permissible subjects of negotiation in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with IGRA's stated purposes . . . ." *Rincon Band of Luiseno Mission Indians v.*

- 86 -

> *Schwarzenegger*, 602 F.3d 1019, 1028-29 (9th Cir. 2010). The language in Section 8 of the Compact cannot bootstrap the claims in the underlying state court litigation as coming within the scope of § 2710(d)(3)(C)(i), (ii) or (vii). Simply put, the negotiated terms of the Compact cannot exceed what is authorized by the IGRA.

972 F. Supp. 2d at 1266 (footnote omitted). For these reasons, Judge Hansen declares "that the New Mexico state court has no jurisdiction over the underlying state court litigation." 972 F. Supp. 2d at 1267.

The Tenth Circuit confronts the same question in <u>Dalley</u>. <u>See</u> 896 F.3d at 1196. In <u>Dalley</u>, Harold McNeal slipped and fell at the Northern Edge Navajo Casino in the Navajo Nation. <u>See</u> 896 F.3d at 1200. The Navajo Nation has a gaming compact with New Mexico that establishes that the Navajo Nation "waive[s] its sovereign immunity for personal-injury lawsuits brought by visitors to its on-reservation gaming facilities" and that "state courts to take jurisdiction over such claims." 896 F.3d at 1200. Pursuant to that compact, McNeal filed suit against Navajo Nation in New Mexico State court. <u>See</u> 896 F.3d at 1200. Navajo Nation moved to dismiss the State court action on the grounds that the State court lacks jurisdiction. <u>See</u> 896 F.3d at 1200. The Honorable Bradford J. Dalley, Judge for the 11th Judicial District of New Mexico, denied the motion. <u>See</u> 896 F.3d at 1200.

Navajo Nation then sought declaratory relief against McNeal and Judge Dalley in federal court. <u>See</u> 896 F.3d at 1200. Specifically, Navajo Nation requested a declaration "that [the] Indian Gaming Regulatory Act does not permit the shifting of jurisdiction from tribal courts to state courts over personal injury lawsuits brought against tribes or tribal gaming enterprises, and that the New Mexico state courts do not have jurisdiction over [such] lawsuits." 896 F.3d at 1203 (first alteration in <u>Dalley</u>). The Honorable Martha Vazquez, United States District Judge for the United States District Court for the District of New Mexico, granted summary judgment for McNeal and

Judge Dalley, holding "that IGRA permitted tribes and states to agree to shift jurisdiction to the state courts and that Navajo law did not prohibit such an allocation of jurisdiction." 896 F.3d at 1200. Specifically, Judge Vazquez determined that 25 U.S.C. § 2710(d)(3)(C)(i) and (ii) permit jurisdiction shifting, because they allow gaming compacts to address "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity" and "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations," respectively. 25 U.S.C. § 2710(d)(3)(C)(i), (ii). See 896 F.3d at 1206. Alternatively, Judge Vazquez determined that 25 U.S.C. § 2710(d)(3)(C)(vii) permits jurisdiction shifting, because it allows gaming compact provisions that address "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). See 896 F.3d at 1206. Navajo Nation appealed. See 896 F.3d at 1200.

On review, the Tenth Circuit reverses and determines "that IGRA, under its plain terms, does not authorize an allocation of jurisdiction over tort claims of the kind at issue here." 896 F.3d at 1200. The Tenth Circuit begins its analysis by providing an overview of IGRA's history and key provisions. See 896 F.3d at 1200-02. Next, it determines that it has jurisdiction over the appeal, see 896 F.3d at 1203-04, and then proceeds to the merits, see 896 F.3d at 1204. The Tenth Circuit explains that "[i]t is axiomatic that absent clear congressional authorization, state courts lack jurisdiction to hear cases against Native Americans arising from conduct in Indian country." 896 F.3d at 1204 (citing Williams v. Lee, 358 U.S. 217, 223 (1959)). "Consequently, congressional approval is necessary -- i.e., it is a threshold requirement that must be met -- before states and tribes can arrive at an agreement altering the scope of a state court's jurisdiction over matters that occur on Indian land." 896 F.3d at 1205. The Tenth Circuit notes, however, that

"Congress has 'authorized' the tribes and states to make such jurisdiction-altering agreements 'in only a few specific circumstances'; the area of tribal-state gaming compacts represents one such circumstance."  896 F.3d at 1205 (quoting Cohen's Handbook § 707[4]).

Having laid out those foundational principles, the Tenth Circuit addresses IGRA's plain text, specifically the three 25 U.S.C. § 2710(d)(3) subsections that the district court relied on: (i), (ii), and (vii).  See 896 F.3d at 1207.  The Tenth Circuit reasons that, "at bottom, the parties' dispute [regarding subsections (i) and (ii)] relates to the scope of the term 'class III gaming activity.'"  896 F.3d at 1207 (no citation given for internal quotation).  The Tenth Circuit turns to the Supreme Court's decision in Bay Mills, and states that it "leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the playing of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike."  896 F.3d at 1207.

> Put another way, if individuals are not participating in Class III gaming activities on Indian land . . . when they are allegedly harmed by a tortfeasor, we are hard-pressed to see how tort claims arising from their activities could be "directly related to, and necessary for, the licensing and regulation" of Class III gaming activities.

896 F.3d at 1207-08 (no citation given for internal quotation).

The Tenth Circuit recognizes that the district court below and New Mexico State courts reach the opposite conclusion, in part, because personal injury litigation is a form of regulating class III gaming.  See 896 F.3d at 1209.  The Tenth Circuit disagrees with that logic, and states:

> While we are comfortable assuming that tort, and more specifically personal-injury lawsuits, constitute a type of regulation, we are unable to discern how applying this form of regulation to a slip-and-fall event, like Mr. McNeal's, is "directly related to, and necessary for the licensing and regulation," § 2710(d)(3)(C)(i), of Class III gaming activity, as Bay Mills conceives of it.  For example, whether a casino employee is negligent in cleaning up spilled water on the floor which results in a patron falling has nothing to do with the actual regulation or licensing of Class III gaming, viz., "each roll of the dice and spin of

the wheel." *Bay Mills*, 134 S.Ct. at 2032.  Put differently, just as the licensing or regulation of gaming activity only directly relates to things akin to "gambling in the poker hall" and not to "the proceedings of the off-site administrative authority," [Bay Mills, 134 S. Ct.] at 2033, it also does not relate to claims arising out of occurrences that happen in proximity to -- but not as a result of -- the hypothetical card being dealt or chip being bet.  Therefore, when viewed through the prism of *Bay Mills*, we respectfully conclude that the reading of IGRA that we adopt here is the correct one, and that the district court and the New Mexico Supreme Court are mistaken.

896 F.3d at 1209.  The Tenth Circuit adds in a footnote, however, that

[O]ur holding only pertains to the circumstances presented here.  More specifically, we do not intend by this holding to categorically negate the possibility that certain classes of tort or personal-injury claims stemming from conduct on Indian land might conceivably satisfy the statutory conditions for tribal allocation of jurisdiction to the states under our plain reading of clauses (i) and (ii) of IGRA.  Consider, for example, a casino patron at a roulette table: during the course of the game, an errant ball flies and hits the patron in the eye, causing damage to the patron.  Or, in a different situation, a patron is playing on a dysfunctional slot machine that electrocutes the patron, again resulting in some harm.  In both of those instances, it is at least arguable that the patron's injuries resulted directly from gaming activity, within the meaning of *Bay Mills*, i.e., "what goes on in a casino -- each roll of the dice and spin of a wheel."  134 S.Ct. at 2032.  Assuming arguendo this is so, the harmed plaintiffs could argue -- at least colorably -- that the tort laws they plan to invoke in their claims are "civil laws and regulations . . . directly related to, and necessary for, the licensing and regulation, of" the gaming activities that caused them harm, and that the allocation of jurisdiction was "necessary for the enforcement" of those tort laws.  § 2710(d)(3)(C)(i), (ii).  In short, the hypothetical plaintiffs could argue (at least colorably) that the tribe running the casino at issue would have been authorized under IGRA's plain terms to allocate jurisdiction to the state over their tort claims.  We need not and do not express any opinion on whether such hypothetical plaintiffs -- or similarly situated ones -- could succeed on such an argument because the circumstances of those plaintiffs are not before us.  The McNeals' circumstances are.  And what is clear in a slip-and-fall case, like this one, is that a plaintiff's harm cannot plausibly be said to have resulted from gaming activity, within the meaning of *Bay Mills* -- that is, from the playing of dice, the pulling of a slot machine, or other participation in Class III gambling.  And such a plaintiff, like the McNeals, cannot argue that the tribe would have been authorized under IGRA's plain terms to shift jurisdiction over his or her tort claims to the state courts.

896 F.3d at 1210 n.7.  In sum, the Tenth Circuit concludes that "clauses (i) and (ii), by their plain meaning, do not authorize tribes to allocate during the compacting process jurisdiction to state courts for tort claims such as the McNeals' arising on Indian land."  896 F.3d at 1211.

Finally, the Tenth Circuit addresses whether § 2710(d)(3)(C)(vii)'s catch-all provision permits jurisdiction shifting.  See 896 F.3d at 1211.  The Tenth Circuit determines that subsection (vii) does not permit jurisdiction shifting.  See 896 F.3d at 1218.  It explains:

> To be sure, clause (vii) functions as a catch-all provision, and, consequently, Congress expressed its scope in broad terms, to encompass "any other subjects that are directly related to the operation of gaming activities," § 2710(d)(3)(C)(vii).  But the key word here is "other."  Typically, statutory language is given its "ordinary, everyday" meaning, unless the context suggests otherwise.  *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006) . . . .  And applying the ordinary and everyday meaning of the word "other" in clause (vii), it becomes patent that Congress did not intend for that clause to address the "subjects" covered in the preceding clauses of subsection (C) -- including the jurisdictional-allocation subject of clause (ii).
>
> Nor could one persuasively argue that the term "other" in clause (vii) authorizes the allocation of jurisdiction with respect to subjects other than those covered by the jurisdictional-allocation language of clause (ii).  In our view, a well-established canon of statutory construction -- the negative-implication canon (i.e., the canon expressio unius est exclusio alterius) would fatally undercut such an argument.  That canon provides that the "expressi[on] [of] one item of [an] associated group or series excludes another left unmentioned."  *N.L.R.B. v. SW Gen., Inc.*, . . . 137 S. Ct. 929, 940 . . . (2017) . . . .
>
> Here, clause (ii) is the only clause in subsection (C) that expressly addresses the allocation of jurisdiction between states and tribes.  And, as our reasoning [above] . . . demonstrates, it does so in specific terms -- albeit by cross-reference -- to clause (i).  That is, by its use of the language "such laws and regulations," clause (ii) expressly refers back to the "laws and regulations" of clause (i) -- which are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i).  And it contemplates tribal-state compacting regarding the allocation of criminal and civil jurisdiction "necessary for the enforcement" of the laws and regulations specified in clause (i).  § 2710(d)(3)(C)(ii).  Thus, the allocation of jurisdiction referenced in clause (ii) pertains solely to the allocation that is "necessary for the enforcement of the laws and regulations," id., that are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i) -- that is,

"what goes on in a casino -- [that is,] *each roll of the dice and spin of the wheel*," *Bay Mills*, 134 S.Ct. at 2032 (emphasis added).

Therefore, clause (ii)'s specific textual expression (by cross-reference) of matters covered by its jurisdictional allocation reasonably indicates that Congress did not envision that any distinct subjects -- such as tort claims arising from a casino's failure to safely maintain floors in its restrooms -- would provide the grounds for a jurisdictional allocation.

896 F.3d at 1212-23 (footnote omitted).  In the end, the Tenth Circuit concludes "that IGRA, under its plain terms, does not authorize tribes to allocate to states jurisdiction over tort claims like those brought by the McNeals here."  896 F.3d at 1218.

Judge Strickland confronts the same issue in Wilson.  See 619 F. Supp. 3d at 1095.  In Wilson, Henry Martinez slipped and fell in the Cities of Gold Casino on the Pojoaque Pueblo.  See 619 F. Supp. 3d at 1089.  Hernandez filed suit against Cities of Gold and Pojoaque Pueblo in New Mexico State court.  See 619 F. Supp. 3d at 1089.  Pojoaque Pueblo moved to dismiss the suit on the grounds that the State court lacked jurisdiction.  See 619 F. Supp. 3d at 1089.  The Honorable Matthew J. Wilson, Judge for the 1st Judicial District of New Mexico, denied the motion.  See 619 F. Supp. 3d at 1089.  While the State action was still pending before Judge Wilson, Pojoaque Pueblo filed suit in federal court seeking a declaratory judgment that Judge Wilson lacks subject matter jurisdiction over the State action.  See 619 F. Supp. 3d at 1089.  Pojoaque Pueblo moved for summary judgment, see 619 F. Supp. 3d at 1089, and Judge Wilson asked the court to abstain from deciding the case under Brillhart and the Declaratory Judgment Act, see 619 F. Supp. 3d at 1089.

Judge Strickland grants Pojoaque Pueblo's summary judgment motion.  See 619 F. Supp. 3d at 1104.  Judge Strickland begins her analysis with Judge Wilson's abstention argument.  See 619 F. Supp. 3d at 1100-02.   Judge Strickland explains that, under Brillhart, a court should

consider five factors in determining whether to exercise jurisdiction over a claim for declaratory

relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

Wilson, 619 F. Supp. 3d at 1101 (quoting State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 983

(10th Cir. 1994)(quoting Allstate Ins. Co. v. Green, 825 F.2d 1061, 1063 (6th Cir. 1987)))(brackets

in Wilson and State Farm Fire & Cas. Co. v. Mhoon, but not Allstate Ins. Co. v. Green).  Judge

Strickland reasons that the first and second factors weigh against abstention, because a declaratory

judgment would resolve the controversy and, therefore, be useful in clarifying the parties' legal

relations.  See 619 F. Supp. 3d at 1101.  Next, Judge Strickland determines that Pojoaque Pueblo

is not engaged in procedural fencing.  See 619 F. Supp. 3d at 1101.  Additionally, she determines

that the requested relief would increase friction between the parties, but that there is not an alternate

remedy that would be more effective.  See 619 F. Supp. 3d at 1102.  For these reasons, Judge

Strickland declines to abstain under Brillhart.  See 619 F. Supp. 3d at 1102.

Next, Judge Strickland moves onto the case's merits.  See 619 F. Supp. 3d at 1102.  Judge

Strickland acknowledges that, "[a]lthough Dalley did not 'categorically negate the possibility' that

some tort claims might properly be heard in state court . . . the possibility was sharply curtailed."

Wilson, 619 F. Supp. 3d at 1102 (quoting Dalley, 896 F.3d at 1210 n.7).  Judge Strickland quotes

Dalley's footnote 7, but determines that "the circumstances of Mr. Martinez's injury are easily

distinguishable" from the situations described in Dalley footnote 7.  Wilson, 619 F. Supp. 3d at

1102 (citing Dalley, 896 F.3d at 1210 n.7).  Judge Strickland explains that, unlike the situations

described in Dalley footnote 7 -- because Martinez fell while walking to an ATM, not "in the course of 'the betting of chips, the folding of a hand, or suchlike.'" Wilson, 619 F. Supp. 3d at 1103 (quoting Dalley, 896 F.3d at 1207). Judge Strickland asserts that Martinez' "injury occurred when he was 'in proximity to' . . . Class III gaming activities but was not 'actually involved in the *playing* of the game.'" Wilson, 619 F. Supp. 3d at 1103 (quoting Dalley, 896 F.3d at 1207)(emphasis in Dalley and in Wilson). Because Martinez was not actively gaming when he fell, Judge Strickland reasons that "IGRA does not permit the shifting of jurisdiction" over his claims from Tribal court to State court. Wilson, 619 F. Supp. 3d at 1103. Judge Strickland adds that further discovery would be "fruitless," because Martinez' actions immediately prior to his fall are "immaterial to the legal analysis." Wilson, 619 F. Supp. 3d at 1103.

Finally, Judge Strickland turns to the applicable remedy. See Wilson, 619 F. Supp. 3d at 1103. Judge Strickland determines that the requested declaratory relief is "consistent with Tenth Circuit precedent, tailored to the needs of the case, and warranted by the underlying facts." Wilson, 619 F. Supp. 3d at 1103. She notes that the requested declaratory relief is "virtually identical" to the relief the Tenth Circuit granted in Dalley, and, therefore, enters declaratory relief. Wilson, 619 F. Supp. 3d at 1103. Judge Strickland asserts that she "will consider issues related to injunctive relief only when and if they arise." Wilson, 619 F. Supp. 3d at 1103.

## LAW REGARDING THE ANTI-INJUNCTION ACT, 28 U.S.C. § 2283

"The Anti-Injunction Act provides that a federal court 'may not grant an injunction to stay proceedings in a State court.'" Weyerhaeuser Co. v. Wyatt, 505 F.3d 1104, 1107 (10th Cir. 2007) (quoting 28 U.S.C. § 2283).

> [T]he Supreme Court . . . explained the purpose of the [Anti-Injunction Act]. The law "is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts." By

prohibiting "frequent federal court intervention" in state court proceedings, the [Anti-Injunction Act] "forestalls . . . 'friction between the state and federal courts.'"

Weyerhaeuser Co. v. Wyatt, 505 F.3d at 1108.  The Anti-Injunction Act exists, in large part, to enforce the long-held notion that "[p]roceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts, with relief from error, if any, through the state appellate courts and ultimately to the [Supreme] Court [of the United States]."

Atl. Coast Line R.R. Co. v. Bd. of Locomotive Eng'rs, 398 U.S. 281, 287 (1970).  To that end, the Supreme Court has held that the term "proceedings" in State court

> is comprehensive.  It includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process.  It applies to appellate as well as to original proceedings; and is independent of the doctrine of res judicata.  It applies alike to actions by the court and by its ministerial officers; applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective.  The prohibition is applicable whether such supplementary or ancillary proceeding is taken in the court which rendered the judgment or in some other.  And it governs a privy to the state court proceeding . . . as well as the parties of record.  Thus, the prohibition applies whatever the nature of the proceeding, unless the case presents facts which bring it within one of the recognized exceptions [to the Anti-Injunction Act].

Hill v. Martin, 296 U.S. 393, 403 (1935)(footnotes omitted).  In the end, "any doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 630 (1977).

Although "the [Anti-Injunction] Act is an absolute prohibition against any injunction of any state-court proceedings," Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 630, it provides for three exceptions, see 28 U.S.C. § 2283.  Federal courts are permitted to enjoin State proceedings "in three circumstances: 'as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'" Weyerhaeuser Co. v. Wyatt, 505 F.3d

at 1107 (quoting 28 U.S.C. § 2283).  These three exceptions are "narrow and are not to be loosely construed."  Tooele Cnty. v. United States, 820 F.3d 1183, 1188 (10th Cir. 2016)(citing Smith v. Bayer Corp., 564 U.S. 29 (2011)).   The Court elaborates on those three exceptions in turn.

First, the Anti-Injunction Act permits a federal court to enjoin a State court proceeding where Congress has "expressly authorized" a federal court to grant such an injunction.  28 U.S.C. § 2283.  In simple terms, federal courts are empowered to enjoin State proceedings when Congress says federal courts can enjoin State proceedings.  The Supreme Court sheds light on what amounts to "express[] authorization" in Mitchum v. Foster, 407 U.S. 225 (1972).  In Mitchum v. Foster, the Supreme Court decides whether 42 U.S.C. § 1983 -- which permits "an action at law, suit in equity, or other proper proceeding for redress" -- expressly authorizes federal courts to enjoin State court proceedings.  407 U.S. at 226 n.2 (quoting 42 U.S.C. § 1983).  The Supreme Court concludes that § 1983 is an express authorization, see 407 U.S. at 242, and explains:

> In the first place, it is evident that, in order to qualify under the 'expressly authorized' exception of the anti-injunction statute, a federal law need not contain an express reference to that statute.  As the Court has said, 'no prescribed formula is required; an authorization need not expressly refer to § 2283.'  Amalgamated Clothing Workers of America v. Richman Bros. Co., 348 U.S. 511, 516 . . . [(1955)].  Indeed, none of the previously recognized statutory exceptions contains any such reference.  Secondly, a federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception.  Three of the six previously recognized statutory exceptions contain no such authorization.  Thirdly, it is clear that, in order to qualify as an 'expressly authorized' exception to the anti-injunction statute, an Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding.  This is not to say that in order to come within the exception an Act of Congress must, on its face and in every one of its provisions, be totally incompatible with the prohibition of the anti-injunction statute.  The test, rather, is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding.

407 U.S. at 237-38 (footnotes omitted).  The Supreme Court adds that, "[i]n so concluding, we do not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a State court proceeding."  407 U.S. at 243.

Second, the Anti-Injunction Act permits a federal court to enjoin a State proceeding where the injunction is "necessary in aid of its jurisdiction."  28 U.S.C. § 2283.  This exception memorializes a historical rule from in rem cases.  See Toucey v. N.Y. Life Ins. Co., 314 U.S. 118 (1941).  In Toucey v. New York Life Ins. Co., the Supreme Court explains:

> The rank and authority of the (federal and state) courts are equal, but both courts cannot possess or control the same thing at the same time, and any attempt to do so would result in unseemly conflict.  The rule, therefore, that the court first acquiring jurisdiction shall proceed without interference from a court of the other jurisdiction . . . .

314 U.S. at 135.  In other words, the Supreme Court permits the first court to obtain jurisdiction over res to enjoin a subsequent action in another court concerning the same res.  See 314 U.S. at 135.  The Anti-Injunction Act's second exception "may be fairly read as incorporating this historical in rem exception."  Wright & Miller § 4225.  See Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 641-42.  The Supreme Court has clarified that the exception is a narrow one that only applies in the in rem context, and that it is not applicable in the in personam context.  See Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 642.  The Supreme Court elaborates that "the traditional notion is that in personam actions in federal and state court may proceed concurrently, without interference from either court, and there is no evidence that . . . § 2283 was intended to alter this balance."  Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 642.  The Supreme Court adds: "We have never viewed parallel in personam actions as interfering with the jurisdiction of either court . . . ."  Vendo Co. v. Lektro-Vend Corp., 433 U.S. at 642.

Although the second Anti-Injunction Act exception stems from in rem tradition, courts have recently begun to apply it more broadly.  For example, In Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, the Supreme Court establishes that an injunction issued under the second exception is appropriate if it "may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case."  398 U.S. at 295.  Similarly, courts have applied the second exception in cases where a State proceeding infringes on an area of exclusive federal jurisdiction."  See, e.g., Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 541-42 (9th Cir. 1994)(upholding an injunction against State prosecutions of crimes that occur at casinos in Indian Country, because "18 U.S.C. § 1166(d) mandates exclusive federal jurisdiction over the criminal enforcement of Class III state gaming laws in Indian country").

Despite the trend in favor of a broader reading of the Anti-Injunction Act, the Tenth Circuit recently has emphasized that "the second statutory exception is limited." Tooele Cnty v. United States, 820 F.3d at 1188.  The Tenth Circuit underscores that the Supreme Court has applied the second exception "only when both the federal and state suits constitute in rem or quasi in rem proceedings and the federal court was the first to take possession of the res . . . ." Tooele Cnty v. United States, 820 F.3d at 1188 (citing Mandeville v. Canterbury, 318 U.S. 47, 48-49 (1943)).  In keeping with the Supreme Court, the Tenth Circuit dictates that, "[t]o apply the second exception, the court must decide whether the two suits are either in rem or quasi in rem." Tooele Cnty v. United States, 820 F.3d at 1188.  If either suit is not in rem or quasi in rem, the case will "not ordinarily trigger the Anti-Injunction Act's exception for injunctions involving two in rem or quasi in rem proceedings." Tooele Cnty v. United States, 820 F.3d at 1188.  In so holding, the Tenth Circuit acknowledges that "some other circuits have applied the second exception more

expansively," <u>Tooele Cnty v. United States</u>, 820 F.3d at 1189, but declines to adopt that broader approach, <u>Tooele Cnty v. United States</u>, 820 F.3d at 1191.  <u>See Gallegos v. CitiMortgage</u>, No. CIV 21-0486 JB/GJF, 2022 WL 656705, at *39 n.20 (D.N.M. March 4, 2022)(Browning, J.)(recognizing that "other United States Courts of Appeals apply [the second exception] to in personam actions under extremely limited circumstances," but citing <u>Tooele County v. United States</u> for the proposition that "[t]he Tenth Circuit has declined to expand the second exception beyond in rem and quasi in rem actions").

Finally, the Anti-Injunction Act allows a federal court to enjoin a State court proceeding where the injunction serves to "protect or effectuate" federal judgments.  28 U.S.C. § 2283.  This exception applies where parties attempt to relitigate in State court that a federal court has already decided.  <u>See Jackson v. Carter Oil Co.</u>, 179 F2d 524, 526-27 (10th Cir. 1950).  In those instances, the exception permits the federal court that has already decided the case to enjoin a subsequent State proceeding to relitigate that case, and thereby protect the preclusive effect of its judgments. <u>See Jackson v. Carter Oil Co.</u>, 179 F2d at 526-27.  For this exception to apply, two requirements must be met: (i) "the issue the federal court decided must be the same as the one presented in the state tribunal"; and (ii) the parties in the State suit must have been parties in the federal suit, "or else must fall within one of a few discrete exceptions to the general rule against binding nonparties."  <u>Smith v. Bayer Corp.</u>, 564 U.S. at 307-08.

## <u>LAW REGARDING YOUNGER ABSTENTION</u>

"Generally, federal courts must exercise their jurisdiction when available. However, principles of 'equity, comity, and federalism' motivate a 'longstanding public policy against federal court interference with state court proceedings.'"  <u>Rocky Mountain Gun Owners v. Williams</u>, 671 F. App'x 1021, 1024 (10th Cir. 2016)(unpublished)(quoting <u>Steffel v. Thompson</u>,

415 U.S. 452, 460-61, (1974), and citing <u>Younger</u>, 401 U.S. at 43-45; <u>Sprint</u>, 581 U.S. at 73).  The

Constitution's framers designed a system in which

> there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

<u>Younger</u>, 401 U.S. at 44.

Under the <u>Younger</u> abstention doctrine, "federal courts should not 'interfere with state

court proceedings' by granting equitable relief -- such as injunctions of important state proceedings

or declaratory judgments regarding constitutional issues in those proceedings" -- when the State

forum provides an adequate avenue for relief.  <u>Weitzel v. Div. of Occupational & Prof'l Licensing</u>,

240 F.3d 871, 875 (10th Cir. 2001)(quoting <u>Rienhardt v. Kelly</u>, 164 F.3d 1296, 1302 (10th Cir.

1999)).  A court in the Tenth Circuit should abstain from entertaining cases which implicate the

<u>Younger</u> doctrine, so long as an adequate opportunity is afforded in the State court proceedings to

raise the federal claims.  <u>See</u> <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d at 1291.  This refusal to exercise

federal jurisdiction arises from a desire to "avoid undue interference with states' conduct of their

own affairs."  <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d at 1291 (quoting <u>Seneca-Cayuga Tribe v.</u>

<u>Oklahoma</u>, 874 F.2d 709, 711 (10th Cir. 1989)).  The Tenth Circuit has "not treated abstention as

a 'technical rule of equity procedure,' rather, [it has] recognized that the authority of a federal

court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion

to grant or deny relief."  <u>Morrow v. Winslow</u>, 94 F.3d at 1392 (quoting <u>Quackenbush v. Allstate</u>

<u>Ins. Co.</u>, 517 U.S. 706, 716-17 (1996)).

For <u>Younger</u> abstention to be appropriate, the Tenth Circuit has ruled that three conditions

must be present: (i) interference with an ongoing State judicial proceeding; (ii) involvement of

important State interests; and (iii) an adequate opportunity afforded in the State court proceedings to raise the federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432; Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78.  See Bellotti v. Baird, 428 U.S. at 143 n.10 (noting that when all of the conditions mandating abstention clearly exist in the record, courts should address application of the Younger abstention doctrine sua sponte); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3.  Before examining the three-factor test, the Court first must address whether the case is one that allows for Younger abstention at all.  The Supreme Court has defined the appropriate set of cases narrowly: "Circumstances fitting within the Younger doctrine, we have stressed, are 'exceptional'; they include . . . [i] 'state criminal prosecutions,' [ii] 'civil enforcement proceedings,' and [iii] 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions."  Sprint, 581 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989)).

The Tenth Circuit subsequently has "applie[d] [Younger] to three categories of state cases." Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 670 (10th Cir. 2020).  See Catanach v. Thomson, 718 F. App'x 595, 598 n.2 (10th Cir. 2017)(unpublished)(noting that Sprint "significantly limited the reach of Younger to only" three situations, and that Sprint "also discounted reliance on the three factors outlined" in Middlesex, 457 U.S. at 433-44; MacIntyre v. JP Morgan Chase Bank, No. 12-CV-2586-WJM-MEH, 2015 WL 1311241, at *2 (D. Colo. March 19, 2015)(Blackburn, J.)("Thus, the Court agrees with Plaintiff that Sprint significantly cabined the breadth of Younger abstention as it has been applied in this circuit."); Brumfiel v. U.S. Bank, N.A., No. 14-CV-2453-WJM, 2014 WL 7005253, at *3 (D. Colo. December 11, 2014)(Martinez, J.)("[I]n Sprint, the Supreme Court reversed a decision by the Eighth Circuit Court of Appeals that

applied Younger abstention using substantially the same analysis as in [Amanatullah v. Colorado Board of Medical Examiners, 187 F.3d 1160 (10th Cir. 1999)][.]"); Conry v. Barker, No. 14-CV-02672-CMA-KLM, 2015 WL 5636405, at *6 (D. Colo. August 11, 2015)(Mix, M.J.).

In Sprint, the Supreme Court clarifies that "[t]he three Middlesex conditions . . . were not dispositive; they were, instead, *additional* factors appropriately considered by the federal court before invoking Younger." Sprint, 571 U.S. at 81 (emphasis in original).  In Hunter v. Hirsig, 660 F. App'x 711 (10th Cir. 2016)(unpublished)("Hunter"), the Tenth Circuit continued to use similar factors to determine whether Younger abstention is non-discretionary and "must be invoked absent extraordinary circumstances." Hunter, 660 F. App'x at 714-15.  "Younger and its progeny require federal courts to abstain from exercising jurisdiction if (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state proceeding provides an adequate forum to hear the plaintiff's federal claims, and (3) the state proceeding involves important state interests." Hunter, 660 F. App'x at 714 (citing Amanatullah v. Colo. Bd. of Med. Exam'rs, 187 F.3d at 1163).

The Tenth Circuit applies the three Sprint categories within its analysis of the first prong -- whether there are "ongoing state administrative proceedings." Hunter, 660 F. App'x at 715.  It explained that "[t]he first condition -- ongoing state administrative proceedings -- involves two subparts: the proceedings must be *ongoing* and they must be the *type* of proceedings afforded Younger deference," where the three Sprint categories define "type." Hunter, 660 F. App'x at 715 (emphasis in the original).  See Hunter, 660 F. App'x at 716 ("As for the *type* of proceeding, the Supreme Court has held that Younger applies to 'particular state civil proceedings that are akin to criminal prosecutions.'")(emphasis in the original)(quoting Sprint, 573 U.S. at 72).

Once a court determines that the case is appropriate for Younger abstention, a court must then analyze the second and third elements: (ii) involvement of important State interests; and

(iii) an adequate opportunity afforded in the State court proceedings to raise the federal claims. See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291 (citing Middlesex, 457 U.S. at 432)); Sw. Air Ambulance, Inc. v. City of Las Cruces, 268 F.3d at 1177-78).  When all three elements mandating abstention clearly exist in the record, courts may and should address Younger abstention doctrine's analysis sua sponte.  See Bellotti v. Baird, 428 U.S. at 143 n.10 ("Abstention may be raised by the court sua sponte."); Morrow v. Winslow, 94 F.3d at 1390-91 & n.3 (raising and applying Younger abstention doctrine sua sponte, and holding that parties need not raise the Younger abstention doctrine to preserve its applicability).

Younger abstention is not discretionary once its criteria are met.  See Taylor v. Jaquez, 126 F.3d 1294, 1296 (10th Cir. 1997)(holding that, because "'application of the Younger doctrine is absolute . . . when a case meets the Younger criteria,' there is no discretion for the district court to exercise." (quoting Tr. & Inv. Advisers Inc. v. Hogsett, 43 F.3d 290, 294 (7th Cir. 1994)).  When the Younger abstention elements are met, a district court should dismiss the claims before it, unless a petitioner has brought claims which "cannot be redressed in the state proceeding," in which case the district court should stay the federal proceedings pending the conclusion of the state litigation. Deakins v. Monaghan, 484 U.S. 198, 202 (1988).  For example, where a party brings a claim for damages under 42 U.S.C. § 1983, as well as a request for equitable relief from a State court proceeding, a federal district court should dismiss the claims for equitable relief under Younger, but stay the complaint with respect to the damages claim, because § 1983 is a federal cause of action.  See Myers v. Garff, 876 F.2d 79, 81 (10th Cir. 1989)(holding that a district court was right to dismiss claims for declaratory and injunctive relief, but that the district court should have stayed claims for damages under § 1983 against defendants until the state court proceedings ended).  See

also Younger, 401 U.S. at 43 (holding that the federal courts must dismiss suits requesting declaratory or injunctive relief when there are pending state criminal proceedings).

On the other hand, where a State court can address a plaintiff's cause of action, a federal court should abstain and dismiss the case even if the plaintiff requests monetary damages in addition to injunctive relief against the State court proceeding.  In Wideman v. Colorado, 242 F. App'x 611 (10th Cir. 2007)(unpublished), the Tenth Circuit considered a parent's complaints alleging ongoing violations arising from the Colorado state courts' adjudication of his child custody rights.  See 242 F. App'x at 613.  The parent had requested a federal district court to issue an order regarding his parental rights and right to child support payments, and to award the parent monetary damages compensating him for his past child support payments.  See 242 F. App'x at 611.  Additionally, the parent alleged that the Colorado State trial and appellate courts had treated him with "disrespect" on account of his gender and race, and he brought a § 1983 case in federal court seeking money damages from the State court officials adjudicating his State custody case. 242 F. App'x at 613.  The Tenth Circuit ruled that the district court was right to abstain from hearing the parent's case under Younger.  See 242 F. App'x at 614.  The Tenth Circuit explained that the parent's "complaints assert claims that involve matters still pending in Colorado state courts," as the custody proceedings were ongoing.  242 F. App'x at 614.  Further, the dispute implicated "important state interests," because the parent's complaints covered domestic relations issues.  242 F. App'x at 614.  Last, the Tenth Circuit found that the parent had "an adequate opportunity to litigate any federal constitutional issues that may arise . . . in the Colorado state proceedings."  242 F. App'x at 614.  Thus, where the Younger abstention criteria are otherwise met, even if a party requests monetary damages, a federal court in the Tenth Circuit must abstain from adjudicating the entire case while State proceedings are ongoing.  See 242 F. App'x at 614.

According to the Tenth Circuit, ordinarily, a State proceeding is no longer "ongoing" when "the time for appeal has run." Hunter, 660 F. App'x at 715 (citing Bear v. Patton, 451 F.3d 639, 642 (10th Cir. 2006)("[I]f a lower state court issues a judgment and the losing party allows the time for appeal to expire, then the state proceedings have ended.")). "[R]egardless of when [a State court's] judgment became final, . . . a necessary concomitant of Younger is that a party in [the federal plaintiff's] posture must exhaust his state appellate remedies before seeking relief in the [federal] District Court . . . ." Hunter, 660 F. App'x at 715 (quoting Huffman v. Pursue, Ltd., 420 U.S. 592, 608 (1975)).

## LAW REGARDING EXERCISE OF DISCRETIONARY JURISDICTION OVER DECLARATORY JUDGMENT ACTIONS UNDER BRILLHART

In Brillhart, the Supreme Court establishes that district courts are "under no compulsion to exercise . . . jurisdiction" under the Declaratory Judgment Act, 28 U.S.C. § 2201. Brillhart, 316 U.S. at 494. The Supreme Court elaborates:

> Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

Brillhart, 316 U.S. at 495. A court should determine whether the lawsuit "can be better settled in the proceeding pending in the state court." Brillhart, 316 U.S. at 495.

The Tenth Circuit has adopted a five-factor test for evaluating whether a district court should exercise its discretionary jurisdiction over a declaratory judgment action. See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169. These factors include:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata "; [4] whether use of a declaratory

action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169 (alterations in original)(quoting State Farm Fire and Cas. Co. v. Mhoon, 31 F.3d at 983). The Tenth Circuit has held that a district court's dismissal of a declaratory judgment action is an abuse of discretion when there is no pending State proceeding. See United States v. City of Las Cruces, 289 F.3d 1170, 1183 (10th Cir. 2002)(citing ARW Exploration Corp. v. Aguirre, 947 F.2d 450, 454 (10th Cir. 1991)).

In St. Paul Fire and Marine Insurance Co. v. Runyon, the plaintiff, a professional liability insurance company, filed suit in federal court seeking a declaratory judgment that it was not obligated to defend the defendant against claims his coworkers brought against him. See 53 F.3d at 1168. The defendant sought indemnification and argued that the insurance company had a duty to defend him in the underlying suit against him. See St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1168. The district court in St. Paul Fire and Marine Ins. Co. v. Runyon abstained from exercising jurisdiction, "because the same issues were involved in the pending state proceeding, and therefore, there existed a more effective alternative remedy." 53 F.3d at 1169.

On appeal, the Tenth Circuit explains:

The parties have a pending state contract action, which incorporates the identical issue involved in the declaratory judgment action. [The defendant's] state breach of contract complaint against [the insurance company] alleges the coworkers' lawsuit is a "covered claim" pursuant to the insurance policy. In resolving the insurance contract, the state court will necessarily determine rights and obligations under the contract. [The insurance company] is seeking a declaration by the federal court that the coworkers' lawsuit is not a covered claim. The issue in the federal declaratory judgment action is identical to what would be a defense to the state court contract action -- whether [the defendant]'s insurance contract with [the insurance company] protects him from the coworkers' lawsuit. Because the state court will determine, under state contract law, whether the tort action is covered by the insurance contract, it is not necessary for the federal court to issue a declaration on the insurance contract.

St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1169.  The Tenth Circuit adds that a federal court is not required to refuse jurisdiction, but it "should not entertain a declaratory judgment action over which it has jurisdiction if the same fact-dependent issues are likely to be decided in another pending proceeding."  St. Paul Fire and Marine Ins. Co. v. Runyon, 53 F.3d at 1170.

The Court applies the St. Paul Fire and Marine Ins. Co. v. Runyon factors in Schering Corp. v. Griffo, 872 F. Supp. 2d 1220,1247-50 (D.N.M. 2012)(Browning, J.).  In Schering Corp. v. Griffo, Alicia Gonzales drove under the influence of alcohol and collided with Gina Delfino's car, killing Manuel Delfino and a young boy.  See 872 F. Supp. 2d at 1222.  G. Delfino filed suit in State court against Donald Griffo and Thomas Gonzales, along with their employer, Schering Corp., alleging that they negligently overserved A. Gonzales before the crash.  See 872 F. Supp. 2d at 1222.  Schering Corp. then filed a suit in federal court, seeking a declaratory judgment that it was not vicariously liable for Griffo and T. Gonzales' negligence, because Griffo and T. Gonzales were not acting within the scope of their employment when then overserved A. Gonzales. See 872 F. Supp. 2d at 1224.  After considering the St. Paul Fire and Marine Ins. Co. v. Runyon factors, the Court declined to exercise jurisdiction.  See 872 F. Supp. 2d at1247-50.   The Court acknowledges that "a declaratory action would settle the controversy and whether a declaratory action would serve a useful purpose in clarifying the legal relations between the parties."  872 F. Supp. 2d at 1247.  Next, the Court notes that it "has concerns" that the suit involves procedural fencing.  872 F. Supp. 2d at 1248.  The Court stresses that the exercising federal jurisdiction will "increase friction between the state and federal courts."  872 F. Supp. 2d at 1248.  See id. at 1245-47 (elaborating on the friction analysis).  Finally, the Court determines that the "state court can provide a more comprehensive remedy."  872 F. Supp. 2d at 1249.  For these reasons, the Court declines to exercise jurisdiction over the federal suit.  872 F. Supp. 2d at 1250.

**LAW REGARDING COLORADO RIVER ABSTENTION**

In Colorado River, 424 U.S. at 800, the Supreme Court announces an abstention doctrine under which a federal court may, in exceptional circumstances, dismiss a federal suit "due to the presence of a concurrent state proceeding for reasons of wise judicial administration." Colorado River, 424 U.S. at 817-18.  In Colorado River, the United States filed suit in Colorado State court to clarify its rights to water flowing in certain Colorado rivers.  See 424 U.S. at 806.  The United States also filed suit in federal court on behalf of itself and two Indian tribes, seeking a declaration of its rights to that water.  See 424 U.S. at 805.  The federal district court dismissed the federal suit on the grounds that "the doctrine of abstention required deference to the [State] proceedings."  424 U.S. at 806.  The Tenth Circuit reversed.  See 424 U.S. at 806.

On review, the Supreme Court reverses the Tenth Circuit, determining that the district court was correct in abstaining from exercising jurisdiction over the federal suit.  See 424 U.S. at 821. In so ruling, the Supreme Court articulates several factors that district courts should consider in assessing whether to exercise jurisdiction in instances where similar issues are being concurrently litigated in state and federal courts.  See 424 U.S. at 814-19.  Those factors include:  (i) whether the questions before the federal court present difficult questions of State law, are governed by State as opposed to federal law,[14] or bear on policy problems of substantial import to the State; (ii) whether principles of wise judicial administration and economy suggest deferring to the State courts; (iii) which court first assumed jurisdiction over any property at issue; (iv) whether the federal forum is less convenient than the State forum; (v) whether allowing the matter to go

---

[14]This factor's development can be traced from Colorado River, 424 U.S. at 825-26, to Will v. Calvert Fire Ins. Co., 437 U.S. 655, 667, 668-77 (1978), and on to Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 (1983).

forward in State court would avoid  piecemeal litigation; and (vi) the order in which the concurrent

forums obtained jurisdiction.  See Colorado River, 424 U.S. at 814-19; Burford v. Sun Oil Co.,

319 U.S. 315 (1943).

In applying the Colorado River factors, the Supreme Court in Moses H. Cone Memorial

Hospital v. Mercury Construction Corp., 460 U.S. 1 (1983), states: "No one factor is necessarily

determinative; a carefully considered judgment taking into account both the obligation to exercise

jurisdiction and the combination of factors counseling against that exercise is required."  460 U.S.

at 15-16.  Addressing the factor concerning in which order jurisdiction was obtained, the Supreme

Court asserts:

> This factor, as with the other Colorado River factors, is to be applied in a pragmatic,
> flexible manner with a view to the realities of the case at hand.  Thus, priority should
> not be measured exclusively by which complaint was filed first, but rather in terms
> of how much progress has been made in the two actions.  Colorado River illustrates
> this point well.  There, the federal suit was actually filed first.  Nevertheless, we
> pointed out as a factor favoring dismissal the apparent absence of any proceedings
> in the District Court, other than the filing of the complaint, prior to the motion to
> dismiss.

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 21-22.

It is worth noting that a finding of parallel proceedings is a threshold condition for engaging

in the Colorado River analysis.  See Fox v. Maulding, 16 F.3d 1079, 1081 (10th Cir. 1994).  Even

in the Colorado River abstention context, however, exact identity of parties and issues is not

required.  Rather, State and federal proceedings are sufficiently parallel if "substantially the same

parties litigate substantially the same issues."  Fox v. Maulding, 16 F.3d at 1081 (quotation

omitted).

Additionally, district courts may only stay or dismiss such actions when "extraordinary

circumstances" exist, as a weighing of the factors laid out in Colorado River establish.  Moses H.

Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. at 14-15.  "Colorado River abstention is based on the policy of conserving judicial resources in situations involving the contemporaneous exercise of concurrent jurisdictions."  Grimes v. Crown Life Ins. Co., 857 F.2d 699, 707 (10th Cir. 1988).  Highlighting the distinction between the Colorado River abstention doctrine and Brillhart abstention, the United States Court of Appeals for the Fifth Circuit explains:

> Brillhart abstention is applicable "when a district court is considering abstaining from exercising jurisdiction over a declaratory judgment action.  In contrast, when actions involve coercive relief the trial court must apply the standards enunciated by the Court in Colorado River. . . ."  When a party seeks both injunctive and declaratory relief, the appropriateness of abstention must be assessed according to the doctrine of Colorado River; the only potential exception to this general rule arises when a party's request for injunctive relief is either frivolous or is made solely to avoid application of the Brillhart standard.

Black Sea Inv., Ltd., v. United Heritage Corp., 204 F.3d 647, 652 (5th Cir. 2000).  See United States v. Las Cruces, 289 F.3d 1170, 1181-82 (10th Cir. 2002)(stating that, "in a suit seeking coercive relief as well as declaratory relief, [the] broad Brillhart standard [is] inappropriate.").

In Moses H. Cone Memorial Hospital v. Mercury Construction Corp., the defendant moved for an order compelling arbitration under 9 U.S.C. § 4.  See 460 U.S. at 4.  The district court applied the Colorado River abstention doctrine and stayed the diversity action pending resolution of a pending concurrent state-court action.  The United States Court of Appeals for the Fourth Circuit reversed the stay order, and the Supreme Court affirmed the Fourth Circuit's reversal.

Applying the Colorado River factors, Justice Brennan, writing for the majority, explains:

> [I]t is clear that there was no showing of the requisite exceptional circumstances to justify the District Court's stay.  The Hospital concedes that the first two factors mentioned in Colorado River are not present here.  There was no assumption by either court of jurisdiction over any res or property, nor is there any contention that the federal forum was any less convenient to the parties than the state forum.  The remaining factors -- avoidance of piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums -- far from supporting the stay, actually counsel against it.

Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. at 18.  The Supreme

Court determines that there is no piecemeal litigation, because, "[a]lthough the Hospital will have

to litigate the arbitrability issue in federal rather than state court, that dispute is easily severable

from the merits of the underlying disputes."  460 U.S. at 20.  The hospital argued that the federal

court stay was proper, because the State court suit was filed nineteen days before the federal suit.

The Supreme Court reasons that this timing does not necessarily favor abstention in the unique

circumstance.  See 460 U.S. at 21.  The Supreme Court explains that the plaintiff filed its cause of

action for an arbitration order, because the hospital refused to arbitrate, but the hospital did not

refuse until less than a day before the hospital filed its State suit, and thus the plaintiff had no

reasonable opportunity to file its petition first.  See 460 U.S. at 21.  The Supreme Court also

expresses concern over the "probable inadequacy of the state-court proceeding to protect

Mercury's rights."  460 U.S. at 26.  Justice Brennan explains:

> In many cases, no doubt, a § 3 stay is quite adequate to protect the right to
> arbitration.  But in a case such as this, where the party opposing arbitration is the
> one from whom payment or performance is sought, a stay of litigation alone is not
> enough.  It leaves the recalcitrant party free to sit and do nothing -- neither to litigate
> nor to arbitrate.  If the state court stayed litigation pending arbitration but declined
> to compel the Hospital to arbitrate, Mercury would have no sure way to proceed
> with its claims except to return to federal court to obtain a § 4 order -- a pointless
> and wasteful burden on the supposedly summary and speedy procedures prescribed
> by the Arbitration Act.

460 U.S. at 27.

In Nationstar Mortgage, LLC v. Knox, 351 F. App'x 844 (5th Cir. 2009), the Fifth Circuit

reviewed the district court's decision to decline jurisdiction and deny a motion to compel

arbitration, because there was a pending State court proceeding.  See 351 F. App'x at 847.  The

Fifth Circuit, on appeal, states: "[F]or purposes of judicial efficiency, although the district court

did not expressly rely on the <u>Colorado River</u> abstention doctrine, we may consider *sua sponte* whether the requirements of <u>Colorado River</u> are met." <u>Nationstar Mortgage, LLC v. Knox</u>, 351 F. App'x at 851.  The Fifth Circuit concludes that the first two <u>Colorado River</u> factors are not present and determines that the third factor -- the possibility of piecemeal litigation -- counsels against abstention because "[a]llowing a federal court to order arbitration, even where a state court may construe an arbitration clause differently, is fully consistent with . . . established congressional intent." <u>Nationstar Mortgage, LLC v. Knox</u>, 351 F. App'x at 851-52 (quoting <u>Brown v. Pac. Life Ins. Co.</u>, 462 F.3d 384, 396 (5th Cir. 2006)).  The Fifth Circuit also concludes that the fifth factor -- the extent to which federal law provides the rules of decision on the merits -- favors federal jurisdiction, because, although the Knoxes' claims in State court were based on State law, the Federal Arbitration Act governs the merits of the federal action.  <u>See</u> 351 F. App'x at 852.  The Fifth Circuit concludes, however, that the fourth factor -- the order in which the forums obtain jurisdiction -- favors abstention: the State action was filed first, and, although arbitrability was not asserted in state court, Nationstar Mortgage could have asserted arbitrability and still could assert arbitrability, whereas the merits of the federal action had not been reached.  <u>See</u> 351 F. App'x at 852.  The Fifth Circuit also concludes that the sixth factor -- the adequacy of the State proceedings in protecting the rights of the party invoking diversity jurisdiction -- weighs in favor of abstention. <u>See</u> 351 F. App'x at 852 ("Needless to say, we have no reason to doubt the adequacy of the state court's ability to resolve arbitrability issues.").  After considering the factors and determining that two factors are neutral, two favor abstention, and two counsel against abstention, the Fifth Circuit concludes that the district court did not abuse its discretion in abstaining:

> We are fully cognizant of the "national policy in favor of arbitration." <u>Brown</u>, 462 F.3d at 396.  For reasons of "[w]ise judicial administration," <u>Colo. River</u>, 424 U.S. at 817, however, abstention was not improper.  As discussed, this diversity action

is governed by state law (except, of course, the arbitrability issue); the state court
is subject to, and can likewise apply, the FAA; and the merits of the parties' dispute
have not been reached in either the state or the federal action.

Nationstar Mortgage, LLC v. Knox, 351 F. App'x at 852.

## LAW REGARDING THE ROOKER-FELDMAN DOCTRINE

The Supreme Court announced the Rooker-Feldman doctrine in a pair of decisions, Rooker

v. Fidelity Trust Co., 263 U.S. 413 (1923)("Rooker"), and District of Columbia Court of Appeals

v. Feldman, 460 U.S. 462, 476 (1983)("Feldman").  It embodies the principle that federal district

courts may not serve as courts of appeal for State courts.  See Valdez v. Metro. Prop. & Cas. Ins.

Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *19 (D.N.M. March 29, 2012)(Browning,

J.).  The Rooker-Feldman doctrine prevents district courts from hearing "cases brought by state-

court losers complaining of injuries caused by state-court judgments rendered before the federal

district court proceedings commenced and inviting district court review and rejection of those

judgments." Exxon, 544 U.S. at 284.  It applies in cases where a plaintiff explicitly asks a federal

district court "to modify or set aside a state-court judgment," Mayotte v. U.S. Bank Nat'l Ass'n

for Structured Asset Inv. Loan Trust Mortg. Pass-Through Certificates, Series 2006-4, 880 F.3d

1169, 1174 (10th Cir. 2018("Mayotte"), and in cases where the claims presented to the district

court are "inextricably intertwined" with a State court decision such that "the District Court is in

essence being called upon to review the state court decision." Feldman, 460 U.S. at 482 n.16.  "A

federal claim is inextricably intertwined with a state-court judgment if that judgment 'caused,

actually and proximately, the injury for which the federal-court plaintiff seeks redress.'" Bear v.

Patton, 451 F.3d 639, 642 (10th Cir. 2006)(quoting Kenmen Eng'g v. City of Union, 314 F.3d 468,

476 (10th Cir. 2002), abrogated on other grounds by Exxon, 544 U.S. at 280).

At first blush, the Rooker-Feldman doctrine, with its four elements, appears straightforward.  It applies to cases brought by (i) state-court losers, (ii) complaining of injuries caused by an underlying State court judgment, (iii) rendered before the federal district court proceedings commenced, and (iv) inviting the federal district court to review and to reject that State judgment.  See Bolden v. City of Topeka, 441 F.3d 1129, 1142-43 (10th Cir. 2006)(citing Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 282 (2005)("Exxon")).  In practice, however, the Rooker-Feldman doctrine's application is more vexing.  For example, a challenge to a State court judgment is "barred even if the claim forming the basis of the challenge was not raised in the state proceedings," yet "Rooker-Feldman does not bar a federal-court suit raising a claim previously decided by a state court unless the federal suit actually seeks to overturn, as opposed to simply contradict, the state-court judgment."  Bolden v. City of Topeka, 441 F.3d at 1141-44.  The Tenth Circuit has reconciled these principles by concluding that the scope of Rooker-Feldman is "confined to the cases of the kind . . . brought by state-court losers complaining of injuries caused by state court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Bolden v. City of Topeka, 441 F.3d at 1142-43 (citing Exxon, 544 U.S. at 282).  Thus, an essential characteristic of a suit barred under Rooker-Feldman is that the "loser in state court invites [a] federal district court to overturn [a] state court judgment."  Exxon, 544 U.S. at 287 n.2.  Conversely, Rooker-Feldman does not bar a plaintiff whose "claims . . . do not rest on any allegation concerning the state court proceedings or judgment."  Bolden v. City of Topeka, 441 F.3d at 1145.[15]  Thus, where

---

[15]The Court previously has discussed the relation of Rooker-Feldman and Younger.  See F.D.I.C. v. Harger, 778 F. Supp. 2d 1123, 1135 n.6 (D.N.M. 2011)(Browning, J.).  In brief, whereas Rooker-Feldman bars a federal district court from reviewing State court judgments which are final, Younger "prevents the federal district court from interfering in an ongoing state proceeding."

a plaintiff does not put the State court judgment itself at issue, the plaintiff may bring a federal suit "regarding the same subject matter, or even the same claims, as those presented in the state-court action." Bolden v. City of Topeka, 441 F.3d at 1139.

The Tenth Circuit's discussion of the Rooker-Feldman doctrine in Bolden v. City of Topeka elucidates the opaque distinction between claims that Rooker-Feldman bars, and those claims that allege the same cause of action asserted in the State court, but are not barred. See 441 F.3d at 1129. The controversy in Bolden v. City of Topeka arose after the City of Topeka notified the plaintiff that several properties he owned failed to meet housing code regulations and that the city would demolish the noncompliant buildings. See 441 F.3d at 1131-32. The plaintiff sought to enjoin the destruction of his buildings in State court, but the State court denied his request. See 441 F.3d at 1131-32. The plaintiff then filed suit in federal district court, once again seeking to enjoin the destruction of his buildings. See 441 F.3d at 1131-32. His federal suit did not address the validity of the State court judgment or argue that the federal court should override, on any grounds, the State court judgment. See 441 F.3d at 1132. The district court dismissed the federal suit pursuant to Rooker-Feldman. See 441 F.3d at 1132.

On appeal, the Tenth Circuit reverses the district court. See 441 F.3d at 1138. In so doing, the Tenth Circuit draws on a hypothetical child-custody case. See 441 F.3d at 1129. The Tenth Circuit explains that, a father who lost custody of his child in a State court judgment could not bring suit in federal court alleging that the State court judgment is invalid. See 441 F.3d at 1129.

---

F.D.I.C. v. Harger, 778 F. Supp. 2d at 1135, n.6. Taking the two doctrines together, a plaintiff may neither request a federal district court to interfere before a State court judgment is final nor pray for relief from a State court judgment once it becomes final. See Martinez v. Martinez, No. CIV 09-0281 JB/LFG, 2013 WL 3270488, at *17 n.8 (D.N.M. June 3, 2013)(Browning, J.).

The father would be barred even if his claims in federal court were different from those in State court; were the father, perhaps, to argue that the State court judgment deprived him of due process or was contrary to federal law on other grounds, Rooker-Feldman would bar such an action. Bolden v. City of Topeka, 441 F.3d at 1129. Rooker-Feldman would not bar the father, however, from seeking custody of his child in federal court, so long as the father's complaint did not raise any allegations regarding the State court judgment specifically. Bolden v. City of Topeka, 441 F.3d at 1145.

After providing those examples, the Tenth Circuit determines that the district court below erred in concluding that Rooker-Feldman bars the plaintiff's suit, because the plaintiff "did not seek to overturn the state-court judgment." 441 F.3d at 1138. The Tenth Circuit emphasizes that the plaintiff's claims in federal court are "identical to what they would have been had there been no state-court proceeding." 441 F.3d at 1138. Because the plaintiff did not argue that the "judgment itself inflicted an injury," the Tenth Circuit reasons that Rooker-Feldman does not bar the plaintiff's claims. 441 F.3d at 1138, 1145. Rooker-Feldman did not apply, because the plaintiff's claims "would be identical even had there been no state court judgment." 441 F.3d at 1145.

Similarly, the Tenth Circuit has endorsed, in an unpublished opinion, the United States Court of Appeals for the Seventh Circuit's decision in Nesses v. Shepard, 68 F.3d 1003 (7th Cir. 1995)( Posner, J.), wherein the Seventh Circuit determines that Rooker-Feldman does not apply to a party's claims that do not request relief from a State court judgment. See Read v. Klein, 1 F. App'x 866, 870 (10th Cir. 2001)(unpublished)(quoting Nesses v. Shepard, 68 F.3d at 1005). In Nesses v. Shepard, the plaintiff suffered several losses in State court before suing the lawyers and judges involved in those State court proceedings in federal court. See 68 F.3d at 1004. He

"allege[d] a massive, tentacular conspiracy among the lawyers and the judges to engineer [his] defeat" in the State court suits.  Nesses v. Shepard, 68 F.3d at 1004.  The federal district court dismissed the federal case for want of jurisdiction under the Rooker-Feldman doctrine.  See Nesses v. Shepard, 68 F.3d at 1004.

On appeal, the Seventh Circuit concludes that Rooker-Feldman does not bar the plaintiff's suit.  See Nesses v. Shepard, 68 F.3d at 1005.  The Honorable Richard Posner, United States Circuit Judge for the Seventh Circuit, explains:

> [The Rooker-Feldman doctrine] is not that broad.  Were [a plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the doctrine would indeed bar his claim.  But if he claims, as he does, that people involved in the decision violated some independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker Feldman* doctrine, sue to vindicate that right and show as part of his claim for damages that the violation caused the decision to be adverse to him and thus did him harm.  Otherwise there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment.

Nesses v. Shepard, 68 F.3d at 1005.  Judge Posner distinguishes the case from one Rooker-Feldman bars by pointing out that, although the plaintiff "was in a sense attacking the ruling by the state court," by asserting that he lost in State court, because the "lawyers and the judges [engineered the plaintiff's] defeat," the plaintiff was not "seeking to undo a remedial order of some sort."  68 F.3d at 1005.

By contrast, the Tenth Circuit has barred a plaintiff's due process claims against a city, under Rooker-Feldman, where a State court order caused the plaintiff's injuries.  See Campbell v. City of Spencer, 682 F.3d, 1278, 1284 (10th Cir. 2012).  In Campbell v. City of Spencer, a plaintiff filed suit in federal court, alleging, among other claims, that the City of Spencer, Oklahoma violated her due-process and Eighth Amendment rights by seizing her horses and imposing an

"excessive fine" pursuant to a State court order.  682 F.3d at 1280.  The federal district court

dismissed her due-process allegations, finding that <u>Rooker-Feldman</u> barred the claims.  682 F.3d

at 1280.  The Tenth Circuit agreed, because the plaintiff's "deprivation of property . . . allegedly

without just compensation or due process was the deprivation ordered by the state court . . . [her]

claim [had] merit only if the state court forfeiture order was unlawful on the record before the

court."  682 F.3d at 1284.  The plaintiff's suit was a "direct attack on the state court's judgment

because an element of [her] claim [was] that the judgment was wrongful."  682 F.3d at 1284.  "The

alleged constitutional wrong was the content of the judgment . . . not . . . some act by a defendant

that led to the judgment."  682 F.3d at 1285.  Thus, <u>Rooker-Feldman</u> barred the plaintiff's claims,

because the harm the plaintiff alleged would not have occurred but-for the state court judgment.

682 F.3d at 1285-86.

      Most recently, the Court applied the <u>Rooker-Feldman</u> doctrine in <u>Pickup v. District Court</u>

<u>of Nowata County, Oklahoma</u>.  <u>See</u> No. CIV 20-0346, 2023 WL 1394896 (N.D. Okla. January 31,

2023)(Browning, J.)("<u>Pickup</u>").[16]  The plaintiffs in <u>Pickup</u> are members of the Cherokee Nation

who had been convicted of various misdemeanor and traffic offenses in Oklahoma State court.

<u>See</u> 2023 WL 1394896, at *3-4.   After the Supreme Court announced its decision in <u>McGirt v.</u>

<u>Oklahoma</u>, 140 S. Ct. 2452 (2020),[17] the plaintiffs filed suit in federal court seeking declaratory

relief that "the Cherokee Reservation has not been disestablished and therefore any action by the

---

[16]The Court decided <u>Pickup</u> while sitting by designation in the United States District Court
for the Northern District of Oklahoma.

[17]In <u>McGirt v. Oklahoma</u>, the Supreme Court concludes that Congress never disestablished
the Creek Reservation for the Major Crimes Act's purposes and that "[o]nly the federal
government, not the State, may prosecute Indians for major crimes committed in Indian country."
<u>McGirt v. Oklahoma</u>, 140 S. Ct. at 2478.

State of Oklahoma or its political subdivisions is void because the court would have lacked subject matter jurisdiction," among other relief.  2023 WL 1394896, at *5.  The Court dismisses the plaintiffs' suit under Rooker-Feldman, "because the claims impermissibly require the Court to review the Plaintiffs' State convictions."  2023 WL 1394896, at *57.

The Court's analysis in Pickup walks through the plaintiffs' three claims and explains why Rooker-Feldman bars each claim.  See 2023 WL 1394896, at *57-59.  The Court dismisses the plaintiffs' declaratory relief claim and money-had-and-received claim, "because both claims expressly ask the Court to void the Plaintiffs' State court convictions," which "run[s] afoul of Rooker-Feldman."  2023 WL 1394896, at *58 (citing Mayotte, 880 F.3d at 1174).  Additionally, the Court dismisses the plaintiffs' 42 U.S.C. § 1983 claim.  See 2023 WL 1394896, at *58.  The Court acknowledges that the § 1983 claim does not require expressly the Court to void the plaintiffs' State court convictions, but nevertheless determines that Rooker-Feldman bars the § 1983 claim, because it is "inextricably intertwined" with the State proceedings.  See 2023 WL 1394896, at *58 (quoting Bear v. Patton, 451 F.3d at 642).  The Court explains that, "[n]o matter how the Court construes the § 1983 claim, the Court, on some level, will have to review the State court's subject-matter jurisdiction determination and find that it caused the Plaintiffs' injuries, which Rooker-Feldman prohibits."  2023 WL 1394896, at *58.

Importantly, in Pickup, the Court clarifies that Rooker-Feldman is a jurisdictional doctrine, but not an Article III jurisdictional doctrine.  See 2023 WL 1394896, at *60.  The Court explains that Courts and scholars conceive of the Rooker-Feldman doctrine two ways: (i) as a preclusion doctrine that prevents parties from relitigating prior claims; and (ii) as a jurisdictional doctrine that prevents courts from exercising jurisdiction.  See 2023 WL 1394896, at *61.  The Court explains that courts -- including the Supreme Court and Tenth Circuit -- more frequently rely on the

jurisdiction theory, and, accordingly, accepts the jurisdiction theory.   See 2023 WL 1394896, at *62.   "Nevertheless, the Court applies the jurisdictional theory with some hesitation," because of the "'ever-present risk . . . that the jurisdiction label will stop up thought.'"   2023 WL 1394896, at *62 (quoting Wright & Miller § 4469.1).   Additionally, the Court determines that Rooker-Feldman is not an Article III jurisdictional doctrine, because it originates from statute and caselaw, and not Article III.   See 2023 WL 1394896, at *62.   For these reasons, the Court determines that, where Rooker-Feldman applies to a case, it prevents the Court from exercising jurisdiction over the case and reaching the case's merits.   See 2023 WL 1394896, at *62-65.

The parties in Pickup did not appeal the Court's decision.   The parties in a substantially similar case, Hooper v. City of Tulsa, however, appealed a district judge's decision to dismiss that case.   See 71 F.4th 1270.   In Hooper v. City of Tulsa, the Honorable William P. Johnson, Chief Judge of the United States District Court for the District of New Mexico, dismissed the plaintiffs' suit, holding that the Curtis Act of 1898, 30 Stat. 499 (1898) foreclosed their claims.   See 71 F.4th at 1275.   The Tenth Circuit reverses Judge Johnson's decision on the Curtis Act issue.   See 71 F.4th at 1288-89.   More importantly, however, the Tenth Circuit remands the case to Judge Johnson, with instructions "to dismiss Mr. Hooper's appeal for lack of jurisdiction" under Rooker-Feldman.   71 F.4th at 1288.

## ANALYSIS

The Court: (i) denies the SJ Motion; and (ii) denies the Reconsider Motion.   The Court's analysis begins at this case's heart.   The Court first concludes that IGRA does not permit Tribes and States to shift jurisdiction from Tribal to State court in cases like Pena's.   For that reason, the Court concludes that Judge Biedscheid does not have jurisdiction over Pena's State slip-and-fall suit.   Although the Court concludes that Judge Biedscheid does not have jurisdiction over Pena's

State suit, the Court next concludes that it lacks the power to prevent Judge Biedscheid from hearing the case. More specifically, the Court concludes that it must abstain from issuing the Plaintiffs' requested relief under <u>Younger</u>. Similarly, the Court concludes that the Anti-Injunction Act prevents the Court from issuing the Plaintiffs' requested injunctive relief. Conversely, the Court determines that the <u>Brillhart</u>, <u>Colorado River</u>, and <u>Rooker-Feldman</u> doctrines do not prevent the Court from granting the requested relief in this case.

I.   **IGRA DOES NOT AUTHORIZE TRIBES AND STATES TO SHIFT JURISDICTION FROM TRIBAL TO STATE COURT IN VISITOR PERSONAL INJURY CASES LIKE PENA'S.**

The Court concludes that IGRA does not permit Tribes and States to enter into agreements that shift jurisdiction from Tribal to State court in visitor personal injury suits like Pena's suit. The Court first recognizes that the plain language of Pojoaque Gaming Compact § 8.A., at 4, purports to permit jurisdiction shifting in a wide variety of cases. Nevertheless, the Court determines that the question before it is not whether the Pojoaque Gaming Compact authorizes jurisdiction shifting, but whether Congress empowered Tribes and States to enter into jurisdiction shifting agreements as broad as Pojoaque Gaming Compact § 8.A., at 4, when it passed IGRA. The Court looks to IGRA's plain text and to IGRA's legislative history and determines that IGRA does not permit Tribes and States to enter into jurisdiction shifting agreements as broad as Pojoaque Gaming Compact § 8.A., at 4.

A.   **THE POJOAQUE GAMING COMPACT'S PLAIN LANGUAGE PURPORTS TO PERMIT JURISDICTION SHIFTING IN PENA'S CASE.**

As an initial matter, the Court notes that the Pojoaque Gaming Compact purports to allow jurisdiction shifting in a wide variety of cases, including Pena's case. Specifically, Pojoaque Gaming Compact § 8.A., at 4, establishes:

the Tribe agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in Tribal, State, or other court of competent jurisdiction) at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise.  For purposes of this Section, any such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that the IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.

Pojoaque Gaming Compact § 8.A., at 4.  In short, the Pojoaque Gaming Compact abrogates Tribal immunity in personal injury suits and leaves the choice of jurisdiction up to the visitor plaintiff's discretion.  See Pojoaque Gaming Compact § 8.A., at 4.  According to the Pojoaque Gaming Compact, the only real limit on the jurisdiction shifting power is that the injury at issue must be "proximately caused by the conduct of the Gaming Enterprise."  Pojoaque Gaming Compact § 8.A., at 4.  Additionally, the Pojoaque Gaming Compact leaves open the possibility that it could be "finally determined by a state or federal court that the IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court."  Pojoaque Gaming Compact § 8.A., at 4.

It follows that the Pojoaque Gaming Compact permits Pena to bring his suit in State court. Pena is a casino visitor bringing a "claim[] for bodily injury" against Pojoaque Pueblo and Buffalo Thunder stemming from a slip-and-fall accident that occurred on the casino floor.  Pojoaque Gaming Compact § 8.A., at 4.  See State Complaint ¶ 24, at 6.  Therefore, under the Pojoaque Gaming Compact, Pena's claims "may be brought in state district court."  Pojoaque Gaming Compact § 8.A., at 4.  Evidently, Judge Biedscheid believes this Pojoaque Gaming Compact provision empowers him to exercise jurisdiction over the case.  See Second State MTD Order at 2 (declining to dismiss the State suit on the ground that "the Gaming Compact . . . waives sovereign immunity as to claims for personal injury occurring on its premises in circumstances where it is

alleged that the activities of a casino employee caused or contributed to an alleged accident or injury").

### B.    IGRA DOES NOT PERMIT TRIBES AND STATES TO SHIFT JURISDICTION FROM TRIBAL TO STATE COURT FOR PERSONAL INJURY SUITS LIKE PENA'S.

Although the Court determines that Pojoaque Gaming Compact § 8.A., at 4, purports to allow jurisdiction shifting in Pena's case, the Court's analysis does not end there. The paramount question before the Court is not whether the Pojoaque Gaming Compact permits jurisdiction shifting in this case. Instead, the operative question is whether Congress authorized Tribes and States to shift jurisdiction from Tribal to State court in cases like Pena's case when it passed IGRA. See Nash, 972 F. Supp. 2d at 1263 (asserting that "first inquiry before the Court is whether Congress, by way of the IGRA, has authorized tribes and states to agree to shifting jurisdiction from tribal court to state court, thereby allowing the state to exercise jurisdiction over tribal defendants in visitors' personal injury lawsuits arising on Indian land"). The Court concludes that IGRA does not permit such jurisdiction shifting. Accord Dalley, 896 F.3d at 1200; Nash, 972 F. Supp. 2d at 1263; Wilson, 619 F. Supp. 3d at 1103.

The Court begins with the general principle that "tribal courts retain exclusive jurisdiction over claims arising on tribal lands against tribes." Nash, 972 F. Supp. 2d at 1263 (citing Williams v. Lee, 358 U.S. at 220). Additionally, "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." Nash, 972 F. Supp. 2d at 1263 (quoting Kiowa Tribe of Okla. v. Mnf'g Techs. Inc., 523 U.S. at 754). Accordingly, the Court turns to IGRA's plain language and assesses whether it authorizes Pojoaque Pueblo to abrogate Tribal immunity and shift jurisdiction as it does in Pojoaque Gaming

Compact § 8.A., at 4.  In particular, the Court focusses on 25 U.S.C. § 2710(d)(3)(C), the IGRA

provision that governs topics that Tribal-State gaming compacts may cover.  It provides:

> (C)    Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to --
>
> > (i)    the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
> >
> > (ii)    the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
> >
> > (iii)    the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
> >
> > (iv)    taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
> >
> > (v)    remedies for breach of contract;
> >
> > (vi)    standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
> >
> > (vii)    any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C).  In so doing, the Court recognizes that the Tenth Circuit engages in a

similar textual analysis in Dalley, and concludes that § 2710(d)(3)(C) does not authorize Tribes

and States to shift jurisdiction in personal injury suits.  See 896 F.3d at 1207-23.  The Court agrees

with the analysis that the Tenth Circuit provides in Dalley, and similarly concludes that

§ 2710(d)(3)(C) does not permit Tribes and States to shift jurisdiction in personal injury suits.  To

avoid redundancy, the Court will not restate the points that the Tenth Circuit raises in <u>Dalley</u>,[18] but instead elaborates on the groundwork that the Tenth Circuit provides in <u>Dalley</u>.

As an initial matter, the Court determines that sub-sections (iii), (iv), (v), and (vi) do not permit Tribes and States to shift jurisdiction. <u>See</u> 25 U.S.C. § 2710(d)(3)(C)(iii), (iv), (v), (vi). Sub-section (iii) concerns the assessment of costs stemming from gaming regulation, (iv) relates to taxation, (v) involves breach of contract remedies, and (vi) concerns operations standards. <u>See</u> 25 U.S.C. § 2710(d)(3)(C)(iii), (iv), (v), (vi). No matter how broadly the Court construes these four sub-sections, they cannot soundly embrace jurisdiction shifting over personal injury suits. Instead, the Court focuses on sub-sections (i), (ii), and (vii), which more plausibly could encompass jurisdiction shifting. <u>See</u> 25 U.S.C. § 2710(d)(3)(C)(i), (ii), (vii).

The Court agrees with the Tenth Circuit's assessment in <u>Dalley</u> that sub-section (i) does "not authorize tribes to allocate to states jurisdiction over tort claims like" Pena's. <u>Dalley</u>, 896 F.3d at 1218. <u>See id.</u> at 1206-10. The Tenth Circuit's sub-section (i) analysis focuses primarily on the phrase "directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C. § 2710(d)(3)(C)(i). <u>See Dalley</u>, 896 F.3d at 1206-10. The Tenth Circuit reasons that, after <u>Bay Mills</u>, the gaming "activity" referenced in (i) is "what goes on in a casino -- [that is,] *each roll of the dice and spin of the wheel*," and that a gaming provision governing jurisdiction over slip-and-fall suits does not pertain to the rolling of dice or spinning of a wheel. <u>Dalley</u>, 896 F.3d at 1210 (quoting <u>Bay Mills</u>, 134 S. Ct. at 2032)(alteration and emphasis in <u>Dalley</u>, but not in <u>Bay Mills</u>). The Court agrees with the Tenth Circuit's analysis regarding the phrase "directly related to, and necessary for, the licensing and regulation of such activity," and adds that the phrase

---

[18]The Court provides a fulsome summary of the <u>Dalley</u> decision in its legal section on IGRA above.

"criminal and civil laws and regulations" is also instructive.  25 U.S.C. § 2710(d)(3)(C)(i).  The Court reads "criminal and civil laws and regulations" to refer to substantive criminal and civil statutes and regulations that Class III gaming implicates, and not procedural or jurisdictional rules.  25 U.S.C. § 2710(d)(3)(C)(i).  The "criminal and civil laws and regulations" that sub-section (i) references must be "directly related to, and necessary for, the licensing and regulation of" Class III gaming, implying that the "laws and regulations" must be substantive laws that pertain to gambling.  25 U.S.C. § 2710(d)(3)(C)(i).  Jurisdictional doctrines and statutes are not substantive laws; they are procedural rules that limit courts' exercise of authority.  It follows that a gaming compact provision relating to jurisdiction -- like Pojoaque Gaming Compact § 8.A., at 4 -- is not a provision governing the applicability of substantive gambling "laws and regulations" within 25 U.S.C. § 2710(d)(3)(C)(i)'s meaning.

IGRA's legislative history bolsters the Court's reading of "criminal and civil laws and regulations."  25 U.S.C. § 2710(d)(3)(C)(i).  The Court summarizes IGRA's legislative history in greater detail in its legal section on IGRA above.  That history illustrates that Congress became interested in regulating Indian gaming federally after "there was a mini-explosion" in Indian gaming in the mid- to late 1980s.  IGRA Background at 111.  Congress "perceived [a] vacuum in legal authority at either the state or federal level" concerning Class III gaming.  IGRA Background at 112.  In particular, Congress wanted to promote the "sound enforcement of gaming laws and regulations," IGRA Background at 166 (quoting Senator Inouye's comments on the Senate floor on September 15, 1988), and particularly to "shield [Indian gaming] from organized crime and other corrupting influences," 25 U.S.C. § 2702(2).  When the Court takes a step back and looks at IGRA's legislative history as a whole, it is evident that, in passing IGRA, Congress primarily was concerned with imposing order in Indian gaming.  See IGRA Background at 111.  Congress wanted

to preserve Tribal sovereignty and authority over gaming, but it also wanted to ensure that States are not powerless to enforce their State gambling laws.  See IGRA Background at 166 (quoting Senator Inouye's comments on the Senate floor on September 15, 1988, which focus on balancing State and Tribal interests).  The Court determines that Congress had substantive, State gambling laws in mind when it drafted IGRA, and not procedural or jurisdictional rules.  For these reasons, the Court concludes that 25 U.S.C. § 2710(d)(3)(C)(i) does not permit Tribes and States to enter into jurisdiction shifting agreements in cases like Pena's.

Similarly, the Court agrees with the Tenth Circuit's assessment in Dalley that sub-section (ii) does "not authorize tribes to allocate to states jurisdiction over tort claims like" Pena's.  Dalley, 896 F.3d at 1218.  See id. at 1210.  The Tenth Circuit reasons that sub-section (ii) permits jurisdiction shifting only with respect to "such laws and regulations," 25 U.S.C. § 2710(d)(3)(C)(ii), that sub-section (i) references -- gaming laws -- "and not for the enforcement of laws and regulations pertaining to such tangential matters as the safety of walking surfaces in Class III casino restrooms," Dalley, 896 F.3d at 1210.  The Court agrees with the Tenth Circuit's reading of "such laws and regulations," 25 U.S.C. § 2710(d)(3)(C)(ii), but notes that the Tenth Circuit's analysis is entirely textual.  Dalley, 896 F.3d at 1210.  The Court adds that the legislative history that the Court lays out above bolsters the Tenth Circuit's reading of "such laws and regulations."  25 U.S.C. § 2710(d)(3)(C)(ii).  Congress had substantive State gambling laws in mind when it passed IGRA, and that informs the meaning of the phrase "such laws and regulations" as Congress uses it in  25 U.S.C. § 2710(d)(3)(C)(ii).  For these reasons, the Court concludes that 25 U.S.C. § 2710(d)(3)(C)(ii) does not permit Tribes and States to enter into jurisdiction shifting agreements in cases like Pena's.

Finally, the Court agrees with the Tenth Circuit's assessment in <u>Dalley</u> that sub-section (vii) also does "not authorize tribes to allocate to states jurisdiction over tort claims like" Pena's. <u>Dalley</u>, 896 F.3d at 1218.  <u>See id</u>. at 1212-16.  The Tenth Circuit acknowledges that "clause (vii) functions as a catch-all provision, and, consequently, Congress expressed its scope in broad terms." <u>Dalley</u>, 896 F.3d at 1212.  Nevertheless, the Tenth Circuit zeroes in on Congress' use of "other subjects" in sub-section (vii), and reasons that "Congress did not intend for [sub-section (vii)] to address the 'subjects' covered in the preceding clauses of subsection (C) -- including the jurisdictional-allocation subject of clause (ii)."  <u>Dalley</u>, 896 F.3d at 1213 (quoting 25 U.S.C. § 2710(d)(3)(C)(vii)).  The Court agrees with the Tenth Circuit's reading of "other subjects" and adds that "operation of gaming activities" is also instructive.  25 U.S.C. § 2710(d)(3)(C)(vii).

Although 25 U.S.C. § 2710(d)(3)(C)(vii) permits Tribes and States to enter into agreements regarding "other subjects," those subjects must be "directly related to the <u>operation</u> of gaming activities."   25   U.S.C.   § 2710(d)(3)(C)(vii)(emphasis added).   "Operation" means the "performance of a practical work or of something involving the practical application of principles or processes."  Operation, Merriam-Webster Dictionary (Online Edition),  https://www.merriam-webster.com/dictionary/operation (last visited August 3, 2023)("Operation Definition").   It follows that the "other subjects" referenced in sub-section (vii) must "directly relate" to the performance or practice of gaming.  25 U.S.C. § 2710(d)(3)(C)(vii).  <u>See</u> Operation Definition.  A gaming compact concerning jurisdiction over personal injury suits does not "directly relate" to the performance or practice of Indian gaming.  25 U.S.C. § 2710(d)(3)(C)(vii).  In light of <u>Bay Mills</u>, the "other subjects" must directly relate to the performance or practice of gaming, like the rolling of dice or spinning of a wheel.  <u>See Bay Mills</u>, 134 S. Ct. at 2032; Operation Definition.  Provisions governing jurisdiction over casino personal injury suits are tangentially connected to gaming

operations, but the Court determines that they are not "directly related" to gaming operations, within 25 U.S.C. § 2710(d)(3)(C)(vii)'s meaning.  For these reasons, the Court concludes that 25 U.S.C. § 2710(d)(3)(C)(vii) does not permit Tribes and States to enter into jurisdiction-shifting agreements in cases like Pena's.

In sum, the Court joins the other federal courts that have determined that "IGRA, under its plain terms, does not authorize tribes to allocate to states jurisdiction over tort claims like" Pena's claims.  Dalley, 896 F.3d at 1218.  See Nash, 972 F. Supp. 2d at 1263; Wilson, 619 F. Supp. 3d at 1103.  "[T]ribal courts retain exclusive jurisdiction over claims arising on tribal lands against tribes."  Nash, 972 F. Supp. 2d at 1263 (citing Williams v. Lee, 358 U.S. at 220).  Additionally, "congressional approval is necessary . . . before states and tribes can arrive at an agreement altering the scope of a state court's jurisdiction over matters that occur on Indian land." Dalley, 896 F.3d at 1205.  No such congressional approval exists here, because IGRA does not permit Pojoaque Pueblo to allocate subject-matter jurisdiction over cases like Pena's to New Mexico State courts. See Nash, 972 F. Supp. 2d at 1263; Wilson, 619 F. Supp. 3d at 1103.

Pena protests, however, that "[t]here is no need for this Court to find that IGRA authorizes Section 8 of the [Pojoaque Gaming] Compact, because Indian tribes have independent authority to waive sovereign immunity by contract so long as it is 'clearly' done."  Pena SJ Motion Response at 15 (quoting C&L Enterprises, 532 U.S. at 419).  In other words, Pena reads the Supreme Court's decision in C&L Enterprises to create an exception to the general rule that Congress must authorize Tribes to enter into agreements that "alter[] the scope of a state court's jurisdiction over matters that occur on Indian land," Dalley, 896 F.3d at 1205, where Tribes "clearly" waive their immunity, Pena SJ Motion Response at 15 (citing C&L Enterprises, 532 U.S. at 419).  The Court disagrees with Pena's argument, because it conflates a Tribe's ability to waive its immunity with a Tribe's

ability to enter into a contract that alters the boundary between Tribal and State jurisdiction.  A Tribe's immunity from suit and a Tribe's subject-matter jurisdiction are related and often-overlapping concepts.  Nevertheless, "sovereign immunity and a court's lack of subject-matter jurisdiction are different animals."  Lawrence, 875 F.3d at 545.  C&L Enterprises stands for the proposition that a Tribe can "relinquish its immunity" by clear waiver.  532 U.S. at 418 (emphasis added).  It does not follow from C&L Enterprises, however, that Tribes can alter the boundaries between Tribal and State jurisdiction over matters that occur in Indian Territory absent congressional authority, because immunity and jurisdiction are not one and the same.  See Lawrence, 875 F.3d at 545.  In other words, C&L Enterprises -- a case concerning Tribal immunity -- has no bearing on the longstanding rule that Congress must authorize Tribes to enter into agreements that "alter[] the scope of a state court's jurisdiction over matters that occur on Indian land."  Dalley, 896 F.3d at 1205.  For all these reasons, the Court concludes that IGRA "does not authorize tribes to agree in gaming compacts to shift . . . jurisdiction to state courts over tort claims like those here."  Dalley, 896 F.3d at 1210.

## II.   ALTHOUGH JUDGE BIEDSCHEID LACKS SUBJECT-MATTER JURISIDCTION OVER PENA'S SUIT, THE COURT DOES NOT HAVE THE POWER TO PREVENT HIM FROM PRESIDING OVER THE SUIT.

Although the Court concludes that IGRA does not authorize Pojoaque Pueblo and New Mexico to shift jurisdiction from Tribal to State court in cases like Pena's case, the Court determines that it lacks the authority to prevent Judge Biedscheid from presiding over Pena's State suit.  Pena is one of many plaintiffs who has been injured in an Indian casino in New Mexico and subsequently filed suit in New Mexico State court on the belief that a gaming compact permits jurisdiction shifting in their case. See, e.g., Dalley, 896 F.3d at 1200 (describing that a slip-and-fall plaintiff initially filed suit in State court); Wilson, 619 F. Supp. 3d at 1089 (same).  The practice

has created a rift between the New Mexico State and federal courts: the State courts conclude that IGRA permits them to hear these cases, while the federal courts determine that IGRA does not permit State courts to hear these cases.  Compare Mendoza II, 2011-NMSC-030 ¶ 15, 150 N.M. at 263, 258 P.3d at 1055; Santa Clara Pueblo, 2005-NMCA-110 ¶ 17, 138 N.M. at 203-04, 118 P.3d at 208-09 with Dalley, 896 F.3d at 1218; Nash, 972 F. Supp. 2d at 1263; Wilson, 619 F. Supp. 3d at 1103.  For the reasons discussed above, the Court sides with its colleagues on the federal bench and concludes that IGRA "does not authorize tribes to agree in gaming compacts to shift . . . jurisdiction to state courts over tort claims like those here."  Dalley, 896 F.3d at 1210.  Although the Court determines that IGRA does not allow New Mexico State courts to exercise jurisdiction over suits like Pena's, the Court also recognizes the limits of its authority to stop State courts from hearing cases like Pena's.  Here, the Court does not have power to prevent Judge Biedscheid from exercising jurisdiction over Pena's case in the ways that the Plaintiffs request.  First, Younger compels the Court to abstain from issuing the requested relief, because the ongoing State civil proceedings involve an order that furthers the State court's ability to adjudicate, the requested relief would interfere with the State proceeding, and the State court is an adequate forum for the federal issues.  Second, the Anti-Injunction Act prevents the Court the from issuing the requested injunctive relief, because this case does not fall into one of the three narrow exceptions to the general rule that federal courts cannot enjoin State proceedings.  Finally, by contrast, the Court determines that other doctrines like Brillhart, Colorado River, and Rooker-Feldman do not prevent it from issuing the requested relief.

A.    THE COURT WILL ABSTAIN FROM ISSUING THE REQUESTED
RELIEF UNDER <u>YOUNGER</u>.

First, the Court will abstain from granting the requested relief under <u>Younger</u>.  As the Court describes in greater detail in its legal section above, <u>Younger</u> stands for the proposition that "federal courts should not 'interfere with state court proceedings' by granting equitable relief -- such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings" -- when the State forum provides an adequate avenue for relief.  <u>Weitzel v. Div. of Occupational & Prof'l Licensing</u>, 240 F.3d at 875.  <u>Younger</u> is a jurisdictional doctrine.  <u>See</u> <u>D.L. v. Unified Sch. Dis. No. 497</u>, 392 F.3d 1223, 1228 (10th Cir. 2004).  For the Court to abstain under <u>Younger</u>, the requested relief: (i) must interfere with an ongoing State judicial proceeding; (ii) must involve important State interests; and (iii) the State proceeding must provide an adequate opportunity to raise the federal claims.  <u>See</u> <u>J.B. ex rel. Hart v. Valdez</u>, 186 F.3d at 1291.  Before a court can engage in that three-part analysis, the Court first must address whether the case involves an exceptional circumstance to which <u>Younger</u> abstention is applicable.  <u>See</u> <u>Sprint</u>, 571 U.S. at 73.  Exceptional circumstances include "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" <u>Sprint</u>, 571 U.S. at 73 (quoting <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. at 368).  If Younger applies in a case that does not involve a claim for money damages, the proper remedy is dismissal.  <u>See</u> <u>Buck v. Myers</u>, 244 F. App'x 193, 198 (10th Cir. 2007)(unpublished)(citing <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. at 730).  Here, the Court concludes that <u>Younger</u> abstention is warranted here, because this case presents an exceptional circumstance, and all three <u>Younger</u> considerations are met.

1.      **Younger** <u>Applies to This Exceptional Case</u>.

First, this case is an exceptional case where <u>Younger</u> abstention is warranted, because it concerns "'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  <u>Sprint</u>, 571 U.S. at 73 (quoting <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. at 368).  The Tenth Circuit has explained that two Supreme Court cases -- <u>Juidice v. Vail</u>, 430 U.S. 327 (1977), and <u>Pennzoil Co. v. Texaco. Inc.</u>, 481 U.S. 1 (1987) -- are the "prototypical examples of situations falling within this third category" of exceptional cases that warrant <u>Younger</u> abstention, <u>i.e.</u>, cases concerning orders uniquely in furtherance of State courts' ability to perform their judicial functions.  <u>Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC</u>, 943 F.3d 660, 670 (10th Cir. 2020).  In <u>Juidice v. Vail</u>, a State court initiated contempt proceedings against Vail, so Vail filed suit in federal court seeking an injunction against the State proceedings.  <u>See</u> 430 U.S. 329-30.  The Supreme Court reasons that <u>Younger</u> abstention is appropriate in <u>Juidice v. Vail</u>, because "[t]he contempt power lies at the core of the administration of a State's judicial system," and a federal order interfering with that power would disrupt "the legitimate activities of the State."  430 U.S. at 335-36.  Similarly, in <u>Pennzoil Co. v. Texaco. Inc.</u>, the Supreme Court explains that <u>Younger</u> abstention is appropriate where a party asks a federal court to enjoin a State court from executing its judgment, because doing so would "challenge the very process by which those judgments were obtained."  481 U.S. at 14.  The Tenth Circuit explains that <u>Younger</u> abstention is warranted in <u>Juidice v. Vail</u> and <u>Pennzoil Co. v. Texaco. Inc.</u>, because both cases "involve[] requests to directly or indirectly thwart state court compliance processes."  <u>Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC</u>, 943 F.3d at 671.  In other words, the Tenth Circuit asserts that <u>Younger</u> is warranted in both cases, because, at bottom, they "'involve[] plaintiffs filing separate federal suits in an attempt to enjoin

ongoing state proceedings.'"  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 943 F.3d at 671

(quoting Zeeco, Inc. v. JPMorgan Chase Bank, Nat'l Ass'n, No. 17-CV-384-JED-FHM, 2017 WL

6539504, at *2 (N.D. Okla. December 21, 2017)(Dowdell, J.)).

Applied here, those principles dictate that this case concerns "'civil proceedings involving

certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial

functions.'"  Sprint, 571 U.S. at 73 (quoting New Orleans Pub. Serv., Inc. v. Council of City of

New Orleans, 491 U.S. at 368).  This case does not concern a State compliance process like a

contempt proceeding.  See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 943 F.3d at 671.

Nevertheless, it "'involves plaintiffs filing [a] separate federal suit[] in an attempt to enjoin

ongoing state proceedings.'"  Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 943 F.3d at 671

(quoting Zeeco, Inc. v. JPMorgan Chase Bank, Nat'l Ass'n, 2017 WL 6539504, at *2).  The

Plaintiffs' requested declaratory relief "directly" challenges Judge Biedscheid's ability to hear

Pena's cases, and, if granted, it would "thwart" Pena's State lawsuit entirely.  Elna Sefcovic, LLC

v. TEP Rocky Mountain, LLC, 943 F.3d at 671.  For this reason, the Court concludes that this case

presents "exceptional" circumstances that merit Younger abstention.  Sprint, 581 U.S. at 73.

### 2.    **The Requested Relief Would Interfere With an Ongoing State Proceeding.**

Second, Pojoaque Pueblo and Buffalo Thunder's requested relief "interfere[s] with

ongoing state proceedings."  Columbia Fin. Corp. v. Stork, 811 F.3d 390, 393 (10th Cir. 2016).

Courts have explained that relief "interferes" with State proceedings where, if granted, it would

"have the practical effect of enjoining the state proceedings."  ReadyLink Healthcare, Inc. v. State

Comp. Ins. Fund, 754 F.3d 754, 759 (9th Cir. 2014).  See Joseph A. ex rel. Corrine Wolfe v.

Ingram, 275 F.3d 1253, 1272 (10th Cir. 2002)("Younger governs whether the requested relief

would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly.").

As a threshold matter, Pena's State lawsuit is ongoing.  See Hunter, 660 F. App'x at 715. After Judge Biedscheid issued the Second State MTD Order, the parties moved for an interlocutory appeal, but the New Mexico Court of Appeals denied the motion.  See February 4 Tr. at 25:2-6 (Sydow).  To date, Judge Biedscheid has not issued a final judgment in the State case and, as a result, the time to appeal a final judgment has not expired.  See Bear v. Patton, 451 F.3d at 642.

Further, the Plaintiffs' requested relief would interfere with that ongoing State proceeding. See Columbia Fin. Corp. v. Stork, 811 F.3d at 393.  The Plaintiffs seek two forms of relief from the ongoing State matter: (i) an injunction against the State proceeding; and (ii) a declaratory judgement that the State court lacks jurisdiction.  See Complaint ¶¶ 22-22.C, at 5-6.  Specifically, they ask the Court to issue an order "enjoining Rudy Pena from pursuing such claims in state court," Complaint ¶¶ 17-20, 22.C, at 5, 6, and for a declaratory judgment

> that the IGRA does not permit the shifting of jurisdiction from tribal courts to state court over personal injury lawsuits brought against tribes or tribal gaming enterprises for alleged wrongs arising or occurring within Indian country, even when the lawsuit alleges that the acts of tribal employees were a cause of the alleged harm

and that "the New Mexico state courts do not have jurisdiction over lawsuits such as the Pena lawsuit even when such lawsuits allege that the acts of tribal employees were a cause of the alleged harm," Complaint ¶¶ 22-22.B, at 5-6.  The requested injunctive relief would "enjoin[] the state proceedings." ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund, 759 F.3d at 393.  Similarly, the requested declaratory relief would "have the practical effect of enjoining the state proceedings," because it would divest State courts of their jurisdiction over cases like Pena's. ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund, 754 F.3d at 759.  For these reasons, both

forms of relief that the Plaintiffs seek "interfere with ongoing state proceedings." Columbia Fin. Corp. v. Stork, 811 F.3d at 393.

### 3.      The Requested Relief Involves Important State Interests.

Third, the Plaintiffs' requested relief implicates "important state interests." J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291. Younger applies only where a "vital state interest" is at play. Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.3d 709, 716 (10th Cir. 1989). In other words, a State interest sufficient to merit Younger abstention must be more significant than simply a "legitimate state concern[]." Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.3d at 712.

Here, the Court identifies two State interests at issue in Pena's State lawsuit.   First, the New Mexico State courts have an interest in exercising their jurisdiction.   The New Mexico courts are at an impasse on the jurisdictional issue raised in the SJ Motion.  The Supreme Court of New Mexico has determined that New Mexico State courts have jurisdiction over claims filed in State court under Pojoaque Gaming Compact § 8.A., at 21.  See Mendoza II, 2011-NMSC-030 ¶ 3, 150 N.M. at 258, 258 P.3d at 1052.  Meanwhile, the New Mexico federal courts have determined that IGRA does not permit Tribes to shift jurisdiction from Tribal to State court through provisions as broad as Pojoaque Gaming Compact § 8.A., at 4.  See Dalley, 896 F.3d at 1218; Nash, 972 F. Supp. 2d at 1263; Wilson, 619 F. Supp. 3d at 1103.   Ultimately, the federal position on the jurisdictional issue, however, does not change or override the Supreme Court of New Mexico's decision on the jurisdictional issue.  Injured plaintiffs will continue to file suit in New Mexico State courts, and New Mexico federal courts will continue to declare that the New Mexico State courts lack jurisdiction.  If Indians want to end that cycle, they must seek relief from the Supreme Court of the United States.  Until then, the New Mexico State courts have a "vital" interest in

exercising the jurisdiction that the Supreme Court of New Mexico establishes that they have. Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.3d at 716. See Mendoza II, 2011-NMSC-030 ¶ 3, 150 N.M. at 258, 258 P.3d at 1052.

Second, and relatedly, the greater New Mexico legal community -- the courts, the bar, and the State -- have an interest in finally determining whether suits like Pena's belong in State court. New Mexico is a State in which trial lawyers play an important role.   In the Court's experience, damages awards tend to be much higher in New Mexico State courts than in New Mexico Tribal courts.  Accordingly, the New Mexico plaintiffs' bar has an interest in keeping suits like Pena's in State court rather than being forced to try those suits in Tribal court.  The jurisdictional boundary between State and Tribal courts in cases like Pena's is complex and highly fact-driven. See Dalley, 896 F.3d at 1210 n.7 (indicating that jurisdiction depends, in large part, on the circumstances surrounding a plaintiff's injury).  New Mexican courts and lawyers alike have a "vital" interest in clarifying the jurisdictional landscape in these cases, Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.3d at 716, and cases like Pena's case are integral in sorting out these important jurisdictional questions.   Relatedly, New Mexico has a "vital" interest in learning once and for all whether it can agree to gaming compacts that permit jurisdiction shifting in cases like Pena's. Seneca-Cayuga Tribe of Okla. v. Oklahoma ex rel. Thompson, 874 F.3d at 716.  For these reasons, the Court concludes that Pena's State lawsuit implicates "important state interests." J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.

4.   **The State Proceeding Provides an Adequate Opportunity to Raise the Federal Claims**.

Finally, the State proceeding provides an adequate opportunity for the Plaintiffs to raise their federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.  A State proceeding does not provide an adequate opportunity to raise federal issues "'only if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it.'"  Moore v. Sims, 442 U.S. 415, 433 (1979)(quoting Trainor v. Hernandez, 431 U.S. 434, 442 n.7 (1977)(quoting Kugler v. Helfant, 421 U.S. 117, 124 (1975))).  The burden "rests on the federal plaintiff to show 'that state procedural law bar[s] presentation of its claims.'"  Pennzoil Co. v. Texaco, Inc., 481 U.S. at 14 (quoting Moore v. Sims, 442 U.S. at 432).

Here, the Plaintiffs have not met their burden of showing that a procedural bar prevents Judge Biedscheid from hearing and deciding their federal claims.  See Pennzoil Co. v. Texaco, Inc., 481 U.S. at 14.  To the contrary, the record indicates that the Plaintiffs raised their federal issues in the State proceeding below.  For example, in the State MTD, Buffalo Thunder asserts that the State court lacks subject-matter jurisdiction, because "Congress possesses plenary power over Indian affairs" and, absent "congressional consent," federal courts have jurisdiction over Indian law issues.  State MTD at 1-2 (citing Cohen's Handbook § 7.03[1][a][ii]).  Similarly, Buffalo Thunder invokes Nash and Dalley for the proposition that "Indian self-governance and sovereignty are so ingrained in federal law and so inviolate, that they may not be waived even by agreement, unless federal law expressly authorizes such a waiver." State MTD at 2-5.  In the State MTD Response, Pena asserts that IGRA permits the State court to exercise jurisdiction, because IGRA permits jurisdiction shifting in cases "directly related to, and necessary for, the licensing and regulation" of Class III gaming, like Pena's State suit.  MTD Response at 10 (quoting 25

U.S.C. § 2710(d)(3)(C)).  Because the Plaintiffs raised their federal issues in the State proceeding, the Court cannot conclude that a State procedural bar prevents the Plaintiffs from raising their federal issues in State court.  See Pennzoil Co. v. Texaco, Inc., 481 U.S. at 14.  For these reasons, the Court determines that the State proceeding provides an adequate opportunity for the Plaintiffs to raise their federal claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291.

Because this case presents extraordinary circumstances and satisfies Younger's three requirements, the Court determines that Younger abstention is appropriate here and that it will dismiss the Plaintiffs' claims.  See J.B. ex rel. Hart v. Valdez, 186 F.3d at 1291; Buck v. Myers, 244 F. App'x at 198.  The Plaintiffs protest, however, that the Court should not abstain from exercising jurisdiction in this case, because federal courts "'have a strict duty to exercise the jurisdiction that is conferred upon them by Congress' and 'to say what the law is.'"  Reconsider Motion Opening Brief at 6 (quoting Courthouse News, 2021 WL 4710644, at *36).  The Court acknowledges that federal courts "have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," and that, in the absence of a congressional directive, federal courts should not decline lightly to carry out their obligation.  Quackenbush v. Allstate Ins. Co., 517 U.S. at 716. That duty, however, is not absolute.  See Graff, Aberdeen Enterprizes, II, Inc., 65 F.4th 500, 522 (10th Cir. 2023).  In certain circumstances, "abstention doctrines may . . . permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation."  Exxon, 544 U.S. at 292.  For the reasons the Court lays out above, such circumstances are present here, and, accordingly, Younger abstention is appropriate.  See Exxon, 544 U.S. at 292.  For all these reasons, the Court concludes that it will abstain from exercising jurisdiction over this case under Younger.[19]

_____

[19]The Court acknowledges that the federal courts in Dalley, Nash, and Wilson do not apply Younger abstention.  See Dalley, 896 F.3d at 1218 (reversing the district court and remanding with

**B.     THE ANTI-INJUNCTION ACT PREVENTS THE COURT FROM GRANTING THE REQUESTED INJUNCTIVE RELIEF.**

Additionally, the Court concludes that the Anti-Injunction Act prevents the Court from granting the requested injunctive relief.  The Plaintiffs ask the Court to issue an order "enjoining Rudy Pena from pursuing such claims in state court."  Complaint ¶¶ 17-20, 22.C, at 5, 6.  As the Court explains in greater detail above, the Anti-Injunction Act prevents the Court from "grant[ing] an injunction to stay proceedings in a State court."  28 U.S.C. § 2283.  The Anti-Injunction Act permits injunctions "in three circumstances: 'as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.'"  Weyerhaeuser Co. v. Wyatt, 505 F.3d at 1107 (quoting 28 U.S.C. § 2283).  These three exceptions are "narrow and are not to be loosely construed."  Tooele Cnty. v. United States, 820 F.3d at 1188.  Here, none of the exceptions to the Anti-Injunction Act apply to the injunctive relief that the Plaintiffs seek.

**1.     Congress Did Not Expressly Authorize the Court to Grant the Requested Injunctive Relief When it Passed IGRA.**

IGRA does not "expressly authorize" the Court to grant the requested injunctive relief.  28 U.S.C. § 2283.  To determine whether an act "expressly authorizes" an injunction, 28 U.S.C. § 2283, "[t]he test . . .  is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a

---

instructions to grant the requested declaratory relief); Nash, 972 F. Supp. 2d at 1267 (issuing the requested declaratory relief); Wilson, 619 F. Supp. 3d at 1104 (same)  The Court has, however, reviewed the dockets in Dalley -- both at the district and circuit level -- Nash, and Wilson, and does not see any indication that the parties in Dalley, Nash, or Wilson raised Younger abstention arguments.  Accordingly, the Court determines that it is the first court to encounter parties in a casino patron personal injury suit that raise and brief a Younger argument.  While the Court is concerned that the Tenth Circuit in Dalley ordered the district court to issue the requested declaratory relief, see Dalley, 896 F.3d at 1218, the Court here cannot avoid the Younger abstention issue or its responsibility to decide the issues before it the best it can.

state court proceeding." Mitchum v. Foster, 407 U.S. at 237-38. In making that determination, the Court can rely on the statute's language and legislative history. See Mitchum v. Foster, 407 U.S. at 238-43 (summarizing § 1983's legislative history in determining the meaning of "suit in equity" as it is used in § 1983).

Here, the Court determines that IGRA does not expressly authorize the Court to grant the Plaintiffs' requested injunctive relief. In their SJ Motion briefing, the Plaintiffs do not allege that IGRA expressly authorizes the Court to grant the injunctive relief they seek. Similarly, in their Reconsider Motion papers, the Plaintiffs do not contest the Court's conclusion in the SJ Motion Order that this case does not fall within one of the Anti-Injunction Act's exceptions. See SJ Motion Order at 3-4. For that reason, the Plaintiffs do not point the Court to a particular IGRA provision that they believe could "expressly authorize" the Court to grant the injunction they request. 28 U.S.C § 2283.

On its own review of IGRA, the Court has not identified an IGRA provision that plausibly could be interpreted to authorize the Court to enjoin the underlying State proceedings here. Typically, Courts conclude that a statute amounts to an express authorization where the statute plainly limits State court jurisdiction or permits a federal Court to issue an injunction. See, e.g., McFarland v. Scott, 512 U.S. 849, 850 (1994)(concluding that Congress expressly authorized federal courts to enjoin State proceedings when it passed the habeas corpus statute, 28 U.S.C. § 2251, because § 2251 provides that a federal court may "stay any proceeding against the person detained in any State court"); Ackerman v. ExxonMobil Corp., 734 F.3d 237, 249 (4th Cir. 2013)(concluding that Congress expressly authorized federal courts to enjoin State proceedings when it passed the federal removal statute, 28 U.S.C. § 1446(d), because § 1446(d) "explicitly states that 'the State court shall proceed no further'" (quoting 28 U.S.C. § 1446(d)). The Court

has not identified any analogous language in IGRA.  The Court cannot say soundly that a particular

provision "clearly create[es] a federal right or remedy enforceable in a federal court" that "could

be given its intended scope only by the stay of a state court proceeding."  Mitchum v. Foster, 407

U.S. at 237-38.  Accordingly, the Court determines that IGRA does not "expressly authorize" the

Court to grant the injunctive relief that the Plaintiffs seek.  28 U.S.C. § 2283.

### 2.     The Requested Injunction Is Not Necessary to Aid the Court's Jurisdiction.

Second, the requested injunctive relief is not "necessary in aid of [the federal district

court's] jurisdiction." 28 U.S.C. § 2283.  "[T]he second statutory exception [to the Anti-Injunction

Act] is limited." Tooele Cnty v. United States, 820 F.3d at 1188.  "To apply the second exception,

the court must decide whether the two suits are either in rem or quasi in rem." Tooele Cnty v.

United States, 820 F.3d at 1188.   "'An action in rem is one founded upon the right in or to

property.'" Tooele Cnty v. United States, 820 F.3d at 1188 (quoting Housely v. Anaconda Co.,

19 Utah 2d 124, 427 P.2d 390 (1967)).  An action is in rem if it "affect[s] the interest of all persons

in the property," while an action is quasi in rem if it "affects the interests of only some persons."

Tooele Cnty v. United States, 820 F.3d at 1188.  If either the State suit or the federal suit is not in

rem or quasi in rem, the case will "not ordinarily trigger the Anti-Injunction Act's exception for

injunctions involving two in rem or quasi in rem proceedings." Tooele Cnty v. United States, 820

F.3d at 1188.

Here, neither the State suit nor the federal suit are in rem or quasi in rem, because neither

affect the interest of persons "on the right in or to property." Tooele Cnty v. United States, 820

F.3d at 1188.  Pena's underlying State suit asserts claims for negligence, and for negligent hiring,

training, supervision, staffing and retention.  See State Complaint ¶¶ 28-36, 43-44 at 6-8, 9-10.

The federal suit seeks injunctive and declaratory relief from the State suit. See Complaint ¶¶ 17-22.D, at 5-6. Neither suit involves a claim to real or personal property and, therefore, neither suit is in rem or quasi in rem. See Tooele Cnty v. United States, 820 F.3d at 1188. Because neither suit at issue here is in rem or quasi in rem, this case does not "trigger the Anti-Injunction Act's [second] exception." Tooele Cnty v. United States, 820 F.3d at 1188.

The Court acknowledges that some courts do a broader reading of the Anti-Injunction Act's second exception. See, e.g., Atl. Coast Line R. Co. v. Brotherhood of Locomotive Eng'rs, 398 U.S. at 295 (explaining an injunction "may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case"). Perhaps there is a colorable argument that, under the broader approach, an injunction under the second exception is appropriate here. Nevertheless, the Court reads the Tenth Circuit's decision in Tooele County v. United States, 820 F.3d at 1188, as repudiating the broader approach. See Tooele Cnty v. United States, 820 F.3d at 1188-91.

In Tooele County v. United States, the Tenth Circuit acknowledges that "some other circuits have applied the second exception more expansively in certain cases," particularly in cases involving multi-district litigation or attacks on federal discovery orders in State proceedings. 820 F.3d at 1189-91 (citing Winkler v. Eli Lilly & Co., 101 F.3d 1196, 1202 (7th Cir. 1996)(suggesting that an injunction could be appropriate in cases involving multi-district litigation or attacks on a federal discovery order)). Without expressly rejecting those cases, the Tenth Circuit determines that those "circumstances are not present here." 820 F.3d at 1191. The Tenth Circuit then explains that the second exception does not apply in Tooele County v. United States, because the State and federal proceedings are not both in rem or quasi in rem. See 101 F.3d at 1191.

The Tenth Circuit's decision in <u>Tooele County v. United States</u> does not give definitive guidance.  On one hand, it does not foreclose the possibility that the second exception could apply in a case involving multi-district litigation or attacks on federal discovery orders in State proceedings.  <u>See</u> 820 F.3d at 1191.  On the other hand, it applies the narrow, in rem approach. <u>See</u> 820 F.3d at 1191.  Despite those ambiguities, the Court and others read <u>Tooele County v. United States</u> as rejecting a broader reading of the second exception.   <u>See</u> <u>Gallegos v. CitiMortgage</u>, 2022 WL 656705, at *39 n.20 (recognizing that "other United States Courts of Appeals apply [the second exception] to in personam actions under extremely limited circumstances," but citing <u>Tooele County v. United States</u> for the proposition that "[t]he Tenth Circuit has declined to expand the second exception beyond in rem and quasi in rem actions"); <u>In re Jimmy John's Overtime Litigation</u>, 877 F.3d 756, 766 (7th Cir. 2017)(characterizing <u>Tooele County v. United States</u> as the Tenth Circuit "refusing" to accept "the expansion of th[e second] exception")  The Court stands by its assessment that, in <u>Tooele County v. United States</u>, "[t]he Tenth Circuit . . . decline[s] to expand the second exception beyond in rem and quasi in rem actions." <u>Gallegos v. CitiMortgage</u>, 2022 WL 656705, at *39 n.20.  Even if the Court reads <u>Tooele County v. United States</u> liberally, at most, the Court can read it to leave the door open for the second exception's application in  a multi-district litigation or where there is an attack on a federal discovery order.   <u>See</u> 820 F.3d at 1191.  Neither of those circumstances are present here. Accordingly, the Court determines that the second exception to the Anti-Injunction Act does not apply here.  <u>See</u> 820 F.3d at 1188-91.

Additionally, the Court determines that the Ninth Circuit's decision in <u>Sycuan Band of Mission Indians v. Roache</u>, another IGRA case, is inapposite.  <u>See</u> 54 F.3d at 541-42.  There, the Ninth Circuit affirms a district court's decision to enjoin several State prosecutions of crimes

involving Class III gaming.  See 54 F.3d at 541-42.  The Ninth Circuit concludes that the injunction is permissible under the Anti-Injunction Act's second exception, because "18 U.S.C. § 1166(d) mandates exclusive federal jurisdiction over the criminal enforcement of Class III state gaming laws in Indian country," and the injunction is necessary to protect federal exclusivity.  Sycuan Band of Mission Indians v. Roache, 54 F.3d at 541-42.  Sycuan Band of Mission Indians v. Roache does not change the Court's analysis for two reasons.  First, the Ninth Circuit's analysis relies on a broader interpretation of the second exception, and, for the reasons explained above, the Court does not subscribe to the broader interpretation.   Second, Sycuan Band of Mission Indians v. Roache concerns State criminal prosecutions under IGRA, and not State civil litigation under IGRA.  See 54 F.3d at 541-42.  18 U.S.C. § 1166(d) provides that federal courts have exclusive jurisdiction over "criminal prosecutions of violations of State gambling laws," but IGRA does not have a similar provision governing civil litigation under IGRA like this suit.  18 U.S.C. § 1166(d).

### 3.      The Requested Injunction Will Not Protect or Effectuate a Federal Judgment.

Third, the requested injunctive relief is not necessary to "protect or effectuate" a previous judgment in federal district court.  The third exception to the Anti-Injunction Act applies where parties attempt to relitigate in State court that a federal court has already decided.  See Jackson v. Carter Oil Co., 179 F2d 524, 526-27 (10th Cir. 1950).  As the Court describes in greater detail above, the third exception to the Anti-Injunction Act applies where: (i) "the issue the federal court decided must be the same as the one presented in the state tribunal;" and (ii) the parties in the State suit must have been parties in the federal suit, "or else must fall within one of a few discrete exceptions to the general rule against binding nonparties."  Smith v. Bayer Corp., 564 U.S. at 307-08.  Those conditions are not met here.  Here, the State action predates any federal litigation.

- 145 -

Compare State Complaint at 1 with Complaint at 1.  "[T]he issue the federal court decided" is not "the same as the one presented in the state tribunal," because there was no federal decision before Pena initiated his State suit.  Smith v. Bayer Corp., 564 U.S. at 307-08.  In other words, there is no federal judgment at issue in the State proceedings, and therefore, no federal judgment that an injunction could serve to "protect or effectuate."  28 U.S.C. § 2283.  For these reasons, the Court determines that the third exception to the Anti-Injunction Act does not apply here.

In the Reconsider Motion Opening Brief, the Plaintiffs protest that they carefully crafted their requested for injunctive relief to fit within the Anti-Injunction Act's third exception.  See Reconsider Motion Opening Brief at 5.  According to the Plaintiffs, the Plaintiffs recognized that "injunctive relief would be available only if the state court were to violate this Court's declaration of federal law."  Reconsider Motion Opening Brief at 5.  The Plaintiffs assert that they sidestepped that limitation when they drafted their Complaint and were "careful merely to request that the Court authorize them to seek injunctive relief in the event the state court were to proceed with the Pena lawsuit following the declaration of federal law."  Reconsider Motion Opening Brief at 5 (emphasis in original).  The Plaintiffs' argument is not sound.

First, the Plaintiffs' Complaint contradicts the Plaintiffs' suggestion that they seek authorization to obtain an injunction and not an injunction.  See Complaint ¶ 22, at 5-6.  The Complaint asks the Court to "issue an order . . . . Enjoining Judge Biedscheid from exercising jurisdiction over the Pena lawsuit, and enjoining Pena from pursuing such claims in state court."  Complaint ¶¶ 22, 22.C., at 5-6.  Importantly, the Complaint does not request permission to request an injunction or authorization to obtain an injunction, as the Plaintiffs suggest it says.  See Reconsider Motion Opening Brief at 5.

Second, even if the Complaint requests authorization to obtain an injunction if Judge Biedscheid violated the Court's declaratory judgment, the Plaintiffs would be on no better footing. The Plaintiffs do not need the Court to authorize them to move for an injunction if Judge Biedscheid disregards a federal declaratory judgment. The Plaintiffs are already empowered to seek such relief, and such relief would likely be appropriate under the Anti-Injunction Act's third exception. See 28 U.S.C. § 2283. As it stands, however, the Plaintiffs are putting the cart before the horse. The Court has not issued a declaratory judgment in this case, and Judge Biedscheid has not violated any federal judgments. The Court need not issue an injunction at this stage, and the Plaintiffs do not need special permission to seek an injunction should one be appropriate down the line. For all these reasons, the Court concludes that the Anti-Injunction Act bars the Court from granting the Plaintiff's requested injunctive relief.

### C.   OTHER JURISDICTION AND ABSTENTION DOCTRINES DO NOT PREVENT THE COURT FROM ISSUING THE REQUESTED RELIEF.

Although the Court concludes that Younger and the Anti-Injunction Act prevent the Court from issuing the Plaintiffs' requested declaratory and injunctive relief, the Court determines that other jurisdictional and abstention doctrines -- namely Brillhart abstention, Colorado River abstention, and the Rooker-Feldman doctrine -- do not bar the Court in this case. The Court addresses all three doctrines in turn, starting with Brillhart abstention. As the Court explains in greater detail in its legal section above, Brillhart establishes that a federal court should abstain from exercising jurisdiction over an action for declaratory relief if the relief: (i) does not settle the controversy; (ii) does not serve a useful purpose in clarifying the legal relations at issue; (iii) will be used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; (iv) will increase friction between our federal and State courts and improperly encroach

upon State jurisdiction; and (v) there is an alternative remedy that is better or more effective.  State Farm Fire and Cas. Co. v. Mhoon, 31 F.3d at 983.  See St. Paul Fire and Marin Ins. Co. v. Runyon, 53 F.3d at 1169.  The Court notes, however, that Brillhart abstention does not apply when a party seeks both injunctive relief and declaratory relief, except when "a party's request for injunctive relief is either frivolous or is made solely to avoid application of the Brillhart standard."  Black Sea Inv., Ltd. v. United Heritage Corp., 204 F.3d 647, 652 (5th Cir. 2000).  See TNI of N.M. at Las Cruces, LLC. v. Fox, 727 F. Supp. 2d 1195, 1203 (D.N.M. 2010)(Browning, J.)).

Here, Brillhart abstention does not apply, because the Plaintiffs seek both a declaratory judgment and injunctive relief.  See TNI of N.M. at Las Cruces, LLC. v. Fox, 727 F. Supp. 2d at 1203; Complaint ¶ 21, at 5-6.  Additionally, neither exception to that general rule applies.  See TNI of N.M. at Las Cruces, LLC. v. Fox, 727 F. Supp. 2d at 1203.  First, the requested injunctive relief is not frivolous, because the two forms of relief are not duplicative.  See TNI of N.M. at Las Cruces, LLC. v. Fox, 727 F. Supp. 2d at 1203.  A declaratory judgment would establish that the New Mexico State courts do not have jurisdiction over Pena's State lawsuit, but it would not, on its own, halt the State proceedings.  See Complaint ¶ 21, at 5-6.  Meanwhile, the requested injunctive relief would enjoin the State proceedings.  See Complaint ¶ 21, at 5-6.  In other words, the two forms of requested relief offer the plaintiffs distinct remedies to the injuries that they allege Pena's State lawsuit cause.    Second, the Court has no reason to believe, on the basis of the record before it, that the Plaintiffs request declaratory and injunctive relief for the purpose of avoiding Brillhart abstention.  See TNI of N.M. at Las Cruces, LLC. v. Fox, 727 F. Supp. 2d at 1203.  For

these reasons, the Court concludes that <u>Brillhart</u> abstention does not apply in this matter.[20]   <u>See</u>

<u>TNI of N.M. at Las Cruces, LLC. v. Fox</u>, 727 F. Supp. 2d at 1203.

Second, <u>Colorado River</u> abstention does not apply.  <u>Colorado River</u> abstention permits "a

federal court to abstain from exercising jurisdiction when a parallel case exists in state court."

<u>Wakaya Perfection, LLC. v. Youngevity Int'l, Inc.</u>, 910 F.3d 1118, 1121 (10th Cir. 2018).  As the

Court describes in greater detail above, the Tenth Circuit recognizes eight factors that a district

court should consider when deciding whether to abstain under <u>Colorado River</u>: (i) the possibility

that one of the two courts has exercised jurisdiction over property; (ii) the inconvenience

associated with litigating in the federal forum; (iii) avoiding piecemeal litigation; (iv) the sequence

in which the courts obtained jurisdiction; (v) the "vexatious or reactive nature" of either case;

(vi) federal law's applicability; (vii) the State court's ability to provide an effective remedy for the

federal plaintiff; and (viii) whether the party opposing abstention has engaged in forum shopping.

<u>Fox v. Maulding</u>, 16 F.3d 1079, 1082 (10th Cir. 1994).  <u>See</u> <u>Colorado River</u>, 424 U.S. at 814-19.

"No one factor is necessarily determinative; a carefully considered judgment taking into account

both the obligation to exercise jurisdiction and the combination of factors counseling against that

---

[20]The Court notes that the plaintiffs in <u>Wilson</u> did not seek declaratory and injunctive relief, they sought only declaratory relief.  <u>See</u> <u>Wilson</u>, 619 F. Supp. 3d at 1098 n.3.  <u>But see</u> <u>id.</u> at 1104 (indicating that, in their briefing, but not their complaint, the plaintiffs had requested that the court "authorize" them to seek an injunction if necessary).  Accordingly, in <u>Wilson</u>, Judge Strickland does not apply the general rule that <u>Brillhart</u> abstention does not apply where a plaintiff seeks declaratory and injunctive relief.  <u>See</u> <u>Wilson</u>, 619 F. Supp. 3d at 1100-02; <u>TNI of N.M. at Las Cruces, LLC. v. Fox</u>, 727 F. Supp. 2d at 1203.  Instead, Judge Strickland applies the <u>State Farm Fire and Casualty Co. v. Mhoon</u> factors and determines that <u>Brillhart</u> abstention is not appropriate.  <u>See</u> <u>Wilson</u>, 619 F. Supp. 3d at 1100-02 (applying <u>State Farm Fire and Cas. Co. v. Mhoon</u>, 31 F.3d at 983).  If the parties here had sought only one form of relief -- declaratory or injunctive -- the Court would have applied the <u>State Farm Fire and Casualty Co. v. Mhoon</u> factors and its analysis would have been the same as Judge Strickland's analysis of those same factors in <u>Wilson</u>.  <u>See</u> <u>Wilson</u>, 619 F. Supp. 3d at 1100-02 (applying <u>State Farm Fire and Cas. Co. v. Mhoon</u>, 31 F.3d at 983).

exercise is required."   Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. at 15-16.

Having considered the factors that the Tenth Circuit provides in Fox v. Maulding, 16 F.3d at 1082, the Court determines that the factors suggesting that the Court should not abstain under Colorado River qualitatively outweigh the factors suggesting that the Court should abstain under Colorado River.   The Court begins with the factors weighing in favor of abstention.   The fourth factor -- the sequence in which the courts obtained jurisdiction -- counsels in favor of abstention, because this litigation originated in State court.   See Fox v. Maulding, 16 F.3d at 1082; State Complaint at 1.   Relatedly, the third factor -- avoiding piecemeal litigation -- also weighs in favor of abstention.   See Fox v. Maulding, 16 F.3d at 1082.   As the Court describes in greater detail in its procedural background section above, this case originated in State court, and the parties and the State court already have spent considerable time and energy litigating and deciding issues in State court.   In an effort to avoid piecemeal litigation in State and federal court, the Court should consider abstaining.   Next, the fifth factor -- vexatious or reactive nature -- counsels in favor of abstention.   See Fox v. Maulding, 16 F.3d at 1082.   The Plaintiffs' federal claims are not made in bad faith or with an ulterior motive in mind.   The Plaintiffs' federal claims, however, are a reaction to the State litigation: they expressly call on the federal court to halt the State proceedings.   See Complaint ¶ 22, at 5-6.   The suit, therefore, is a reactive one, and the Court should consider abstaining.   Additionally, the seventh factor -- the State court's ability to provide an effective remedy for the federal plaintiff -- counsels in favor of abstention, because, for the reasons described in greater detail in the Younger abstention analysis above, the State court is an adequate forum that can adjudicate the State and federal issues at play and provide the Plaintiffs an appropriate remedy.   Finally, the eighth factor -- whether the party opposing abstention has

engaged in forum shopping -- weighs in favor of abstention, because the federal Plaintiffs -- the State defendants -- are not engaged in forum shopping, either in the federal or State courts. See Fox v. Maulding, 16 F.3d at 1082.

On the other hand, some of the factors that the Tenth Circuit provides in Fox v. Maulding, 16 F.3d at 1082, counsel against abstention.[21] The second factor -- the inconvenience associated with litigating in federal court -- weighs against abstention, because litigating in the federal court is no more inconvenient than litigating in the State court. See Fox v. Maulding, 16 F.3d at 1082. Second, and most importantly the fourth factor -- federal law's applicability -- weighs heavily against abstention. See Fox v. Maulding, 16 F.3d at 1082. At bottom, this case presents an issue of federal law: whether IGRA permits jurisdiction shifting in Pena's case. The primary question presented is one of federal law, and the Court should not shy away from interpreting and applying that federal law. Abstaining would, in effect, allow the State courts to take a more active role in interpreting and applying IGRA than the federal courts in cases like Pena's.

On balance, the Court determines that the considerations weighing against abstention qualitatively outweigh the considerations weighing in favor of abstention. See Fox v. Maulding, 16 F.3d at 1082. The Court acknowledges that, quantitatively, there a more factors weighing in favor of abstention. Nevertheless, the factors weighing against abstention are more significant qualitatively. The Court gives particular weight to the fourth factor -- federal law's applicability. See Fox v. Maulding, 16 F.3d at 1082. Fundamentally, this case concerns federal law, specifically IGRA. The Court should take an active role in interpreting IGRA and applying it to Pena's case.

---

[21]The Court notes that the first factor -- the possibility that one of the two courts has exercised jurisdiction over property -- does not weigh in favor of or against abstention, because neither court at issue here has exercised jurisdiction over property. See Fox v. Maulding, 16 F.3d at 1082.

Abstaining would prevent the Court from weighing in on important federal issues, and leave those issues for the State courts.  The considerations that counsel in favor of abstention are not significant enough to outweigh the Court's interest in exercising jurisdiction over this case, especially when that interest is considered in conjunction with the other factor weighing against abstention.  In the end, the federal character of the issues at play -- combined with the other considerations weighing against abstention -- compel the Court to conclude that <u>Colorado River</u> abstention is not appropriate in this case.  <u>See</u> <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. at 14-15.

Finally, the <u>Rooker-Feldman</u> doctrine does not apply.  As the Court describes in greater detail above, the <u>Rooker-Feldman</u> doctrine stands for the proposition that a district court does not have jurisdiction over a matter in which (i) a State court loser; (ii) asks a federal district court; (iii) to review the correctness of a judgment rendered by a State court; and (iv) the State judgment at issue was rendered before the commencement of the federal proceeding.   <u>See</u> <u>Guttman v. Khalsa</u>, 446 F.3d 1027, 1032 (10th Cir. 2006)).  Importantly, <u>Rooker-Feldman</u> applies only after State proceedings have ended.  <u>See</u> <u>Guttman v. Khalsa</u>, 446 F.3d at 1032 (citing <u>Exxon</u>, 544 U.S. at 292).  For the reasons the Court explains above in its <u>Younger</u> analysis, the State proceedings at issue here are ongoing.  Accordingly, <u>Rooker-Feldman</u> does not apply to a federal case involving those ongoing State proceedings.  <u>See</u> <u>Guttman v. Khalsa</u>, 446 F.3d at 1032.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Summary Judgment, filed June 25, 2021 (Doc. 36), is denied; (ii) the Plaintiffs' Motion to Reconsider Order Denying Summary Judgment, filed April 4, 2022 (Doc. 64), is denied; (iii) the Court abstains from exercising jurisdiction pursuant to the Supreme Court of the United States' decision in <u>Younger v. Harris</u>,

401 U.S. 37 (1971); (iv) the Complaint for Declaratory Judgment, filed February 26, 2020 (Doc.

1), is dismissed; and (v) Final Judgment will be entered separately.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Ripley B. Harwood
Ripley B. Harwood, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Hector Balderas
  New Mexico Attorney General
Gregory Ara Chakalian
  Assistant Attorney General
Office of the Attorney General for the State of New Mexico
Santa Fe, New Mexico

-- and --

Nicholas M. Sydow
  Assistant Attorney General
Office of the Attorney General for the State of New Mexico
Albuquerque, New Mexico

    *Attorneys for Defendant Judge Byran Biedscheid*

Linda J. Rios
Michael G. Solon
Rios Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Pena*